# In the United States Court of Federal Claims

No. 18-1425C
Filed: November 30, 2018
Redacted Version Issued for Publication: January 2, 2019[1]

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

SIGMATECH, INC.,

          Protestor,

v.

UNITED STATES,

          Defendant,

v.

DIGIFLIGHT, INC.,

          Defendant-Intervenor.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**Post-Award Bid Protest; Cross-Motions for Judgment on the Administrative Record; Disparate Treatment; Best-Value Trade-Off; Organizational Conflict of Interest.**

    **Jon D. Levin**, Maynard, Cooper & Gale, P.C., Huntsville, AL, for protestor. Of counsel were **J. Andrew Watson**, **W. Brad English**, and **Katherine E. McGuire**, Maynard, Cooper & Gale, P.C., Huntsville, AL.

    **Joseph E. Ashman**, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him were **Patricia M. McCarthy**, Assistant Director, Commercial Litigation Branch, **Robert E. Kirschman, Jr.**, Director, Commercial Litigation Branch, and **Joseph H. Hunt**, Assistant

---

[1] This Opinion was issued under seal on November 30, 2018. The parties were asked to propose redactions prior to public release of the Opinion. Defendant proposed redactions related "to the content and evaluation of the proposal submitted by Systems & Simulations, Inc.," which was not a party in the above-captioned bid protest. Protestor stated that protestor "concurs with the Government's proposed redactions" and "proposes no additional redactions." Defendant-intervenor requested that the court redact "specific tools and features" offered in defendant-intervenor's quotation.

This Opinion is issued with some of the redactions that the parties proposed in response to the court's request. Words which are redacted are reflected with the notation: "[redacted]."

Attorney General. Of counsel was **Lieutenant Colonel Robert B. Nelson**, Judge Advocate, United States Army Legal Services Agency, Fort Belvoir, VA.

    **Christopher L. Lockwood**, Wilmer & Lee, P.A., Huntsville, AL, for defendant-intervenor. Of counsel were **Jerome S. Gabig** and **Richard J.R. Raleigh, Jr.**, Wilmer & Lee, P.A., Huntsville, AL.

# O P I N I O N

**HORN, J.**

    On September 21, 2017, the Department of the Army, Army Contracting Command – Redstone (the Army), issued Task Order Request for Quotation No. 2015P-06 (the TORFQ), which is the solicitation at issue in the above-captioned bid protest. On May 22, 2018, the Army awarded a task order, which became Contract No. W31P4Q-18-A-0035 (the DigiFlight Task Order), under the TORFQ to DigiFlight, Inc. (DigiFlight), the defendant-intervenor in the above-captioned bid protest. On September 18, 2018, protestor, Sigmatech, Inc. (Sigmatech), filed a bid protest complaint in this court challenging the Army's award under the TORFQ to DigiFlight as being irrational, arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law.

## FINDINGS OF FACT

    The parties have stipulated that the Sigmatech is the "incumbent contractor on the task order the TORFQ seeks to replace." According to Sigmatech's motion for judgment on the administrative record, on July 10, 2017, the Army initially issued the TORFQ "as a small business 'reserve.'" DigiFlight submitted a quotation in response to the July 10, 2017 TORFQ that Sigmatech asserts was issued as a "small business 'reserve.'" Sigmatech states that "Sigmatech protested the Agency's decision to 'reserve' the TORFQ" at the United States Government Accountability Office (GAO), and that the Army subsequently took corrective action in response to Sigmatech's bid protest at the GAO.

    On September 21, 2017, the Army reissued the TORFQ, which was "competitively solicited for award in accordance with the EXPRESS Blanket Purchase Agreements (BPAs)." The parties have stipulated that the "AMCOM [Aviation and Missile Command] EXPRESS program utilizes General Services Administration Federal Supply Schedule contractors to acquire advisory and assistance services." (capitalization in original). The parties have stipulated that the resultant task order awarded under the TORFQ is to consist of a one-year base period of performance and four one-year option periods of performance. The Army's Independent Government Cost Estimate anticipated the total value of the resultant task order awarded under the TORFQ to be $88,358,911.64.[2]

    The TORFQ's performance work statement stated:

---

[2] As discussed below, the Army's Best Value and Fair and Reasonable Determination indicated that the Army's Independent Government Cost Estimate estimated the total value of the resultant task order awarded under the TORFQ to be $92,730,115.53.

1.1 The Security Assistance Management Directorate (SAMD) has a requirement for programmatic support to meet contractual obligations for the procurement, delivery and sustainment of weapon systems entered into via the Foreign Military Sales (FMS) process between the United States Government (USG) and numerous foreign governments. The objective of this Performance Work Statement (PWS) is to provide support for implementation and sustainment of current program actions and future programs.

1.2 The contractor shall provide programmatic services for independent evaluation, assessments and analysis. The contractor shall provide programmatic support necessary to monitor, coordinate and integrate FMS [Foreign Military Sales] programs for our foreign allies. The contractor shall supply the necessary personnel and travel, facilities and materials to fulfill this objective except as identified in Paragraph 5.0., Government Furnished Property (GFP).

Section 2.1.1 of the performance work statement stated that:

2.1.1.1 The contractor shall perform financial analyses, verification of FMS monies and provide input and recommendations utilizing automated databases and systems. (PS1)

2.1.1.2 The contractor shall track case funding consisting of country level, case level, line level and requisition level data using databases. (PS1)

2.1.1.3 The contractor shall develop and utilize an automated system for FMS financial data collection. This system should access multiple FMS databases and work towards an output that standardizes FMS financial status data reporting. (PS1)

In section 2.1.2 of the performance work statement, the performance work statement required that the "contractor shall collect data such as repair status, repair cost, and repair capability from Corpus Christi Army Depot (CCAD) and Letterkenny Army Depot (LEAD), Security Assistance Management Information System and other databases in order to update requisition and document status reports and to provide recommendations on repair requirements."

Under section 2.1.3, the TORFQ stated:

2.1.3.1 The contractor shall provide recommendations regarding financial database programs for particular systems and in the establishment of future databases for the budgetary support of the FMS cases. (PS1)

3

2.1.3.2 The contractor shall provide maintenance of these financial databases for all FMS requirements in order to provide status/information as input to required reports. (PS1)

Section 2.2.2 of the performance work statement addressed "INPUTS BY OTHER CONTRACTORS AND USG [United States government] AGENCIES." (capitalization in original). Under section 2.2.2, the "contractor shall perform cost estimating and analysis of data prepared and furnished by other contractors and USG agencies" and "provide analysis of the life cycle cost requirements for FMS programs."

The TORFQ stated that award would be made on a best value basis based upon evaluation of three criteria, which the TORFQ identified as being the Technical Expertise factor, Risk Mitigation and Management factor, and Price factor. The TORFQ stated that the Army would engage in a "tradeoff process." The TORFQ defined best value as meaning "the expected outcome of the acquisition that, in the Government's estimation, provides the greatest overall benefit in response to the requirement (FAR [Federal Acquisition Regulation] 2.101)." The TORFQ stated that "'[t]radeoff' means that the Government may accept other than the lowest priced quotation, where the decision is consistent with the evaluation criteria and the Government reasonably determines that the perceived benefits of a higher priced quotation warrant the additional price." The TORFQ also stated that the Technical Expertise factor and the Risk Mitigation and Management factor were of equal importance, and that the Technical Expertise factor and the Risk Mitigation and Management each were more important than the Price factor. The Price factor was "not expected to be the controlling criterion in the selection, but its importance will increase as the differences between the evaluation results for the other criteria decrease." According to the TORFQ, "'Offeror' means the entity or entities submitting the quotation and is comprised of the Blanket Purchase Agreement (BPA) Team Leader (Prime) or Direct Awardee, as well as BPA Team Members and Subcontractors."

The Army indicated in the TORFQ that the Army would evaluate the Technical Expertise factor "based on how well the quotation demonstrates a clear understanding of the requirements and deliverables, and on the Offeror's expressed ability to successfully perform." The TORFQ stated that the Army would "assess the Offeror's understanding of the requirements and the technical methodology" and whether a quotation "thoroughly demonstrates the Offeror's understanding of the services to be delivered in order to meet the requirements of the PWS and the Offeror's ability to perform those services." According to the TORFQ, "a quotation may also establish its expertise in other ways such as, but not limited to, combinations of stated capabilities and explanations of how seemingly unrelated experiences have provided sufficient preparation to perform the PWS requirements." The TORFQ stated that the Army would assign the following ratings to an offeror's Technical Expertise factor:

| Technical Expertise Ratings | |
| --- | --- |
| Rating | Description |

| Outstanding | Quotation meets requirements and indicates an exceptional level of expertise and an understanding of the requirements. Strengths far outweigh any weaknesses. Risk of unsuccessful performance is very low. |
|---|---|
| Good | Quotation meets requirements and indicates a thorough level of expertise and an understanding of the requirements. Strengths outweigh any weaknesses. Risk of unsuccessful performance is low. |
| Acceptable | Quotation meets requirements and indicates an adequate level of expertise and an understanding of the requirements. Strengths and Weaknesses are offsetting or will have little or no impact on contract performance. Risk of unsuccessful performance is moderate. |
| Unacceptable | Quotation does not meet requirements and contains one or more deficiencies. If this criterion is rated as **Unacceptable**, additional factors will not be evaluated and the quotation is not eligible for award. |

(emphasis and capitalization in original).

The TORFQ stated that the Army would evaluate the Risk Mitigation and Management factor based on how well an offeror would mitigate and manage the following three risks: "1. The ability to obtain and retain qualified personnel. 2. The ability to bring together the right team to perform the PWS requirements. 3. The ability to effectively manage the project." The TORFQ stated:

> The quotation's description of Risk Mitigation and Management shall also include any significant anticipated technical or management risks that the Offeror believes may be encountered in performing the required work and shall provide an effective plan for overcoming them.
>
> The quotation shall identify any possible adverse impacts to existing programs/projects and include an approach that ensures the successful performance of the PWS while avoiding or mitigating such impacts on the other programs/projects.

The TORFQ indicated that the Army would evaluate the Risk Mitigation and Management factor "to assess completeness, feasibility, and how well it addresses the details of the PWS" and would assign one of the following rating:

| Risk Mitigation and Management Ratings | |
|---|---|
| Rating | Description |
| Outstanding | Quotation meets requirements and indicates an exceptional Risk Mitigation and Management approach. Strengths far outweigh any weaknesses. Risk of unsuccessful performance is very low. |

| Good | Quotation meets requirements and indicates a thorough Risk Mitigation and Management approach. Strengths outweigh any weaknesses. Risk of unsuccessful performance is low. |
|------|------------------------------------------------------------------------|
| Acceptable | Quotation meets requirements and indicates an adequate Risk Mitigation and Management approach. Strengths and weaknesses are offsetting or will have little or no impact on contract performance. Risk of unsuccessful performance is moderate. |
| Unacceptable | Quotation does not meet requirements and contains one or more deficiencies. If this criterion is rated as **Unacceptable**, additional factors will not be evaluated and the quotation is not eligible for award. |

(emphasis and capitalization in original).

Regarding the third factor, the Price factor, the TORFQ stated that the Army would use price analysis to determine the overall price reasonableness of a quotation. The TORFQ defined reasonableness as "a fair and reasonable price; i.e., a price that a prudent businessperson would pay for an item or service under competitive market conditions, given a reasonable knowledge of the marketplace."

The TORFQ also defined the terms strength, weakness, and deficiency. The TORFQ stated that a strength was defined "as an aspect of an offeror's quote that has merit or exceeds specified performance capability requirements in a way that will be advantageous to the Government during contract performance." The TORFQ defined a weakness "as any flaw in the quote that increases the risk of unsuccessful contract performance," and a deficiency as "any material failure of a quote to meet a Government requirement or a combination of significant weaknesses in a quote that increases the risk of unsuccessful contract performance to an unacceptable level."

On October 2, 2017, the Army issued an amendment to the TORFQ, which corrected typos in the TORFQ. On October 23, 2017, Sigmatech, DigiFlight, and Systems & Simulations, Inc. (S3) submitted quotations in response to the TORFQ. In Sigmatech's quotation, Sigmatech stated that:

Our team is to provide expert labor; be knowledgeable of Security Assistance (SA) and Foreign Military Sales (FMS) execution IAW [in accordance with] US laws and USG regulations, policies and guides; recognize the overarching mission, role, structure, and priorities of the SAMD; and deliver capability to enable accomplishment of SAMD mission effectively and efficiently.

Sigmatech's quotation indicated that "Team Sigmatech" consisted of Sigmatech, Applied Technologies Group, and PROJECTXYZ.

Sigmatech stated that "Repair & Return (R&R) programs are a key component of security assistance programs and continue long after delivery of the major systems to support sustainment." Sigmatech asserted that "Team Sigmatech brings proven methodologies to data collection, repair status, repair cost, and repair capability, coordinating with depots and ensuring accurate database information." According to Sigmatech, "[o]ur ability to perform is further demonstrated through Sigmatech's coordination with USASAC [United States Army Security Assistance Command]-NC, the SAMD R&R [Repair and Return] Office, and CCAD to manage the Royal Saudi Land Forces Aviation Command (RSLFAC) Apache R&R program."

In section 2.1.3 of Sigmatech's quotation, which is titled "Update & Maintenance of Databases," Sigmatech asserted:

> We recommend and support the development of SAMD-unique financial databases, which monitor and report on implemented FMS case line budgets and expenditure. Sigmatech assists in the development and maintenance of FAST [Financial Analysis Support Tool] financials, which is a compilation of financial reports drawn from GFEBS [General Fund Enterprise Business System], PBAS [Program Budget Accounting System], SOMARDS [Standard Operation & Maintenance Army Research & Development System], and DIFS [Defense Integrated Financial System] financial databases. During case execution, periodic financial analysis provides performance and cost control monitoring and measurement, to include variance and trend analyses. We currently support SAMD in improving efficiencies throughout the FMS financial and accounting processes by developing and implementing an enterprise portal (the COP [Common Operating Picture]) to file and store FMS accounting data, reports and case close-out files. We support the migration of legacy SA systems to [redacted], a DoD [Department of Defense] system which will be common across MILDEPs [military departments] (**2.1.3.1**). [redacted] will replace the Army legacy systems for logistics and financial processes, such as CISIL [Centralized Integrated System for International Logistics] and PBAS. Sigmatech has provided SME [subject matter expert] support to the development of this system, to include analysis of interfaces with the Army-wide GFEBS accounting system.

(emphasis in original). Sigmatech stated that, "[u]nder the USASAC programmatic TO [task order], we helped develop the [redacted]. [redacted] will provide the FMS customer with a common and standard system for management of their FMS cases."

In Sigmatech's quotation, Sigmatech also stated "[w]e generate funding profiles for customer baseline hardware and services requirements, O&S [operations and support], maintenance concepts, associated support items, and CSPs [concurrent spare parts]. We compare LOA [Letter of Agreement] data, current contracts, and Army stock prices for consistency, reasonableness and fairness." Sigmatech asserted:

In compliance with the primary financial management references, our team performs FMS program analyses and cost estimating from pre-LOR [Letter of Request], LOR, case development and execution through case closure to identify program, financial, acquisition, and logistical requirements. This ensures accurate information for financial reports and reviews. *Sigmatech demonstrated this expertise in the analysis of financial data in preparation of an Indonesian Apache amendment that identified $7M of unused transportation funding. These savings were reprogrammed to support other case requirements.* Sigmatech further demonstrates an ability to execute this requirement through amendment of the largest RSLFAC [Royal Saudi Land Forces Aviation Command] Apache FMS case (SR-B-WAL). Sigmatech coordinated with the technical POCs [point of contacts], budget personnel, and case managers to define and request funding for specific FMS requirements to be included in the amendment.

(emphasis in original). Sigmatech's proposed price, if all option periods of performance were exercised, was $61,454,297.78.

In DigiFlight's quotation, DigiFlight stated that "Team DigiFlight comprises over 35 years of International Program / FMS case experience and current support to 84 FMS Partners and five international organizations." DigiFlight indicated that "Team DigiFlight" is comprised of "[redacted] SB [small business] Team Member: [redacted] SB Subcontractors: [redacted] and [redacted] CAS, Inc. (hereafter, referred to as KBRwyle), [redacted]." According to DigiFlight's quotation, with the "fivefold increase in AMCOM FMS cases over the past decade, an automated FMS financial data collection and standardized reporting system, such as [redacted], is essential to the collection of data to support budgetary processes for management of the $53.2B in undelivered value for over 1,000 SAMD-managed FMS cases." DigiFlight stated:

Team DigiFlight uses [redacted] to collect financial transactions (commitments, obligations, and disbursements), automate financial analysis, generate standardized SAMD financial reports, and provide inputs and recommendations based on the analysis and reports. ***Our Team developed*** [redacted]***, maintains the underlying code, and recommends*** [redacted] ***for future SAMD Division and Branch support.*** As shown in ***Figure 2.1***, we maintain and update [redacted] standardized FMS financial reports by accessing access and extract financial data from [redacted]. [redacted]-generated standardized reports provide automated comparisons of source data to quickly identify anomalies, verify [redacted] funding sources, and generate case funding and budget execution reports. Our Team's [redacted] analysts facilitate case funding tracking and report at the country, case, line, and requisition levels. We collect, process, and report [redacted] data to enhance financial case status.

(emphasis in original). DigiFlight alleged that "***Team-developed*** [redacted] automatically retrieves and merges critical FMS financial records from legacy databases, improves

accuracy and efficiency, and [redacted]." (emphasis in original). DigiFlight also stated that "[o]ur approach is to continue to use our Team expertise, coupled with [redacted] data collection methodology, to refine R&R processes and automatically collect WebRoR data to track repair status, costs, and capabilities from CCAD, LEAD, and OEMs [original equipment manufacturers]/industry." According to DigiFlight's quotation, DigiFlight's approach "is to manage thousands of assets through database systems that maintain accountability by tracking and monitoring R&R assets from FMS Partner requests for repair through return-of-country assets."

Regarding its cost estimating and analysis process, DigiFlight stated that "[o]ur Team develops FMS case-specific databases that identify the purpose of funding; key milestones; PWD, MIPR [military intradepartmental purchase request], and JONO [job order number] issuance; monthly fund allocations; and expenditures supporting FMS budget and pricing." DigiFlight stated that "Team DigiFlight uses our Team's [redacted] cost estimating analysts to conduct line-by-line reviews of LOR data provided by PMs [program managers], OEMs, and USG agencies. We provide thorough analyses of life cycle costs and recommendations during reviews with SAMD, FMS Partners, and prime contractors." DigiFlight proposed a total price of $63,001,142.24 if all option periods of performance were exercised.

In S3's quotation, S3 asserted that S3 was [redacted]. (emphasis and capitalization in original). S3 proposed a price of [redacted] if all option periods of performance were exercised.

The parties have stipulated that the Army completed its evaluation of the quotations submitted by Sigmatech, DigiFlight, and S3 on January 24, 2018.[3] The Army completed a document titled "Evaluation Worksheet" for each of the quotations of Sigmatech, DigiFlight, and S3, which evaluated the Technical Expertise and Risk Mitigation and Management factors for each vendor's quotation.[4] In the Evaluation Worksheet analyzing DigiFlight's quotation, the Army determined that DigiFlight's Technical Expertise was outstanding. The Army found that DigiFlight's technical approach warranted five strengths, which were assigned under sections 2.1.1 and 2.1.3,[5] 2.1.2, 2.2.2, 2.3, and 2.4 of DigiFlight's quotation, zero weaknesses, and zero deficiencies. Under the strength assigned to sections 2.1.1 and 2.1.3, the Army stated:

---

[3] As discussed below, on June 4, 2018, Sigmatech filed a post-award bid protest at the GAO challenging the Army's award to DigiFlight under the TORFQ, and the Army issued a Stop Work Order to DigiFlight on June 5, 2018.

[4] The Army's Evaluation Worksheets were not signed, but the Army's Best Value and Fair and Reasonable Determination indicates that the Evaluation Worksheets were completed by Jennifer Kaufman, Michele Crook, and John Philips. The Army's Best Value and Fair and Reasonable Determination does not provide the job titles of Jennifer Kaufman, Michele Crook, and John Philips.

[5] The Army assigned DigiFlight a single strength for DigiFlight's technical approach under sections 2.1.1 and 2.1.3 of DigiFlight's quotation.

The Offeror's proposal details its response to the Task Order Request for Quotation (TORFQ) and the USG Performance Work Statement's requirements for financial databases, analysis, tracking and use, as well as the updates and maintenance of those databases. The Offeror has developed [redacted]. The Offeror demonstrates superior understanding of multiple SAMD databases necessary to support its proprietary [redacted] system that provides an exceptional level of financial support by maintaining and updating [redacted] standardized reports to aid in quickly identifying anomalies and for case managers to use in managing and executing Foreign Military Sales (FMS) case lines. The [redacted] system also [redacted]. The Offeror utilizes legacy systems for reporting, maintaining the underlying code for [redacted], and providing recommendations and plans for future growth of the [redacted] system to support SAMD's evolving needs.

The Offeror's specialized knowledge and experience in both legacy and current data systems will be advantageous to SAMD in managing case line and contract financials. The use of the legacy systems and the innovative development of the [redacted] system will enable the Offeror to provide critical recommendations to SAMD for future growth and exceptional support for program resource control. The Offeror's development and maintenance of its innovative [redacted] system will also benefit SAMD by exporting data from multiple SAMD financial databases and will provide a consistent standardized report. The Offeror's unique skillset with [redacted] and legacy systems will increase mission efficiency of financial management by reducing the time to pull reports from multiple systems, simplifying data utilization, and providing automated financial solutions to the FMS case managers.

Under the strength assigned to section 2.1.2 of DigiFlight's quotation, the Army stated:

The Offeror has provided extensive support to R&R programs for over three decades. The Offeror has developed and will provide the [redacted]. The Offeror also plans to combine the existing expertise with the [redacted] data collection methodology to refine the R&R process to automatically collect Web Repair of Repairable (WebRoR) data for better tracking from Corpus Christi Army Depot (CCAD), Letterkenny Army Depot (LEAD), and industry.

The Offeror's R&R experience will benefit SAMD by utilizing its innovative [redacted] in conjunction with the WebRoR system to track and assist in the management of repair requirements, requisition documentation, contract information, and other major commands data to generate R&R reports. The system along with the Offeror's cited very extensive experience with the

SAMD R&R process will benefit SAMD by increasing the amount of data and status information collected from CCAD, LEAD, and industry.

Regarding DigiFlight's strength under section 2.2.2 of DigiFlight's quotation, the Army stated that DigiFlight demonstrated a "unique ability to perform cost analysis by utilizing their [redacted] cost estimation analysts, which are personnel trained and certified using cost analysis methods." The Army stated that Team DigiFlight employees already were trained in using [redacted] and asserted that such training "will improve the quality of detailed cost assessments to SAMD." As to DigiFlight's strength under section 2.3, the Army stated that DigiFlight utilizes [redacted] and that DigiFlight's "scheduling tools will benefit SAMD by having readily available access to [redacted] for the development, maintenance, evaluation, and presentation of an IMS [Integrated Master Schedules] for each FMS case." Under the strength assigned to section 2.4 of DigiFlight's quotation, the Army noted that DigiFlight developed the [redacted], which is a [redacted]. The Army asserted that the [redacted] "provides an exceptional management system for post-meeting tracking."

Under a section of the Evaluation Worksheet titled "RATIONALE FOR OVERALL RATING (TECHINICAL EXPERTISE)," the Army stated that DigiFlight's "superlative understanding" of and ability to perform the tasks in the performance work statement warranted a rating of outstanding under the Technical Expertise factor. (capitalization in original). According to the Army, DigiFlight successfully addressed all of the Army's requirements in the performance work statement and demonstrated a capability to exceed the requirements in the performance work statement "by providing existing proprietary systems that support financial, R&R, scheduling, and programmatic tracking in support of SAMD operations."

Under the Risk Mitigation and Management factor, the Army assigned DigiFlight three strengths, zero weaknesses, and zero deficiencies. The Army assigned DigiFlight a strength under section 3.1 of DigiFlight's quotation because of DigiFlight's "exceptional ability to have no loss of mission effectiveness, no loss of a documented knowledge base, and no need of government funds to train new employees." The Army assigned DigiFlight a strength under section 3.2 because of DigiFlight's ability to "bring together the right team to perform the PWS requirements." Under section 3.4, the Army assigned DigiFlight a strength because DigiFlight "demonstrates a firm ability to staff OCONUS Field Office Positions."

The Army also provided comments on sections 2.3 and 3.4 of DigiFlight's quotation. Under section 2.3, the Army stated that DigiFlight had developed and is currently maintaining an [redacted], and that DigiFlight's experience with the [redacted] reduces risk for the Security Assistance Management Directorate. Under section 3.4, the Army asserted that DigiFlight "has experience anticipating and addressing challenges and uses its extensive expertise to quickly and proactively handle various inherent organization dynamics." The Army assigned DigiFlight's quotation a rating of outstanding under the Risk Mitigation and Management factor. The Army stated that DigiFlight "demonstrated an exceptional Risk Mitigation and Management approach and proven

ability to effectively manage the project and anticipated technical risk" and that the "[r]isk of unsuccessful performance is very low."

In the Army's Evaluation Worksheet analyzing Sigmatech's quotation, the Army assigned Sigmatech one strength under the Technical Expertise factor, which was under section 2.4 of the performance work statement. The Army assigned Sigmatech a strength under section 2.4 because Sigmatech demonstrated that it could successfully host meetings "at its local facility," which the Army asserted "reduces the logistics required for visitor access, ensuring adequate meeting space and media support equipment." The Army also provided four "[c]omments" on Sigmatech's technical approach. The Army's comments included that, under section 2.1.1 of Sigmatech's quotation, Sigmatech's "experience with various Foreign Military Sales (FMS) financial systems is useful to SAMD in performing financial analysis and providing input and recommendations." Under section 2.1.1.3, the Army commented that Sigmatech's quotation "cites experience with the SAMD Saudi PATRIOT Program," which the Army stated "is valuable to understanding the importance of organization and financial tracking," but "does not support the PWS requirement of developing an automated database that provides standardized reports from multiple systems." Under section 2.1.2, the Army stated that DigiFlight's "experience with Repair and Return (R&R) will assist SAMD in the analysis of the R&R process and will provide recommendations to expedite and streamline the return of items to the FMS customer." Under section 2.1.3 of the TORFQ, the Army commented that Sigmatech "demonstrates experience in aiding in the development of a case management system however; details on how it will perform these tasks in support of SAMD are not provided." The Army assigned Sigmatech's quotation a rating of good under the Technical Expertise factor because Sigmatech "addressed all of the PWS paragraph requirements, stating it will meet all requirements and discussed how it plans to meet requirements by providing examples of relevant experience associated with each PWS paragraph."

Under the Risk Mitigation and Management factor, the Army assigned Sigmatech's quotation three strengths, which were assigned to sections 3.2, 3.2,[6] and 3.4. Under section 3.2, Sigmatech received a strength for Sigmatech's "ability to bring together the right team to perform the PWS requirements." The Army also assigned Sigmatech a strength for its "ability to obtain and retain qualified personnel" and noted that Sigmatech "maintains an exceptional 92% average retention rate." Under section 3.4, the Army assigned Sigmatech a strength for its ability to effectively manage "the project" because Sigmatech "utilizes multiple processes and tools to minimize performance risk by accurately tracking contract data and requirements." The Army did not assign Sigmatech any weaknesses or deficiencies or list any comments for Sigmatech's Risk Mitigation and Management factor. The Army rated Sigmatech's Risk Mitigation and Management factor as outstanding. According to the Army, Sigmatech "demonstrated a [sic] exceptional Risk Mitigation and Management approach and proven ability to effectively manage the project and anticipated technical risk."

---

[6] The Army's Evaluation Worksheet assigned two separate strengths to section 3.2 for Sigmatech's quotation.

The Army assigned [redacted] and a rating of [redacted] to S3's Technical Expertise factor and [redacted] and a rating of [redacted] to S3's Risk Mitigation and Management factor. The Army did not assign [redacted] to S3's quotation.

On May 22, 2018, Army contracting officers Ashantas Cornelius and Sonya Anderson issued the Army's Best Value and Fair and Reasonable Determination. The Best Value and Fair and Reasonable Determination provided "a summary of the evaluations for the non-price factors," which noted the strengths, weaknesses, deficiencies, and ratings assigned to each vendor's quotation under the Technical Expertise and Risk Mitigation and Management factors. The Army's Best Value and Fair and Reasonable Determination also provided the following "summary comparison of the Independent Government Cost Estimate (IGE) and the Offeror's proposed prices:"

| Offeror | DigiFlight | Sigmatech | S3 | IGE |
|---|---|---|---|---|
| Base Effort | $59,928.57 | $26,034.41 | [redacted] | $26,376.18 |
| Option 1 | $12,273,922.83 | $12,184,307.52 | [redacted] | $16,725,207.35 |
| Option 2 | $12,429,121.33 | $12,248,669.31 | [redacted] | $17,614,215.65 |
| Option 3 | $12,586,626.43 | $12,294,440.10 | [redacted] | $18,527,784.27 |
| Option 4 | $12,746,460.43 | $12,328,644.55 | [redacted] | $19,466,895.64 |
| Option 5 | $12,905,082.65 | $12,372,201.89 | [redacted] | $20,369,636.44 |
| Total | $63,001,142.24 | $61,454,297.78 | [redacted] | $92,730,115.53 |

According to the Best Value and Fair and Reasonable Determination, "[a]ll three offerors quoted prices that were less than the IGE. DigiFlight's total price is $63,001,142.24 which is 32% lower than the IGE value of $92,730,115.53. Sigmatech's total price is $61,454,297.78 which is 34% lower than the IGE. S3's price is [redacted] which is [redacted] lower than the IGE." The Best Value and Fair and Reasonable Determination states that the "Contracting Officer has reviewed the pricing received in response to this solicitation to determine price reasonableness. In accordance with FAR Subpart 15.404-1(b)(2)(i) price analysis is considered substantiated based on this acquisition having adequate price competition."

In a section of the Best Value and Fair and Reasonable Determination titled "Best Value Discussion," the Army provided the following summary of the Army's evaluation of the vendors' quotations:

| Offeror | DigiFlight | Sigmatech | S3 |
|---|---|---|---|
| Technical Expertise | Outstanding | Good | [redacted] |
| Risk Mitigation & Management | Outstanding | Outstanding | [redacted] |
| Total Price | $63,001,142.24 | $61,454,297.78 | [redacted] |

(emphasis in original). The Army noted that DigiFlight received five strengths, no weaknesses, and no deficiencies under its Technical Expertise factor and three strengths, no weaknesses, and no deficiencies under its Risk Mitigation and Management factor, which produces a total of eight strengths. The Army stated that Sigmatech received one strength, no weaknesses, and no deficiencies under its Technical Expertise factor and three strengths, no weaknesses, and no deficiencies under its Risk Mitigation and Management factor, which produces a total of four strengths. Regarding S3's quotation, the Army stated that S3 received [redacted] under its Technical Expertise factor and [redacted] under its Risk Mitigation and Management factor, which produces a total of [redacted] strengths.

The Army's Best Value and Fair and Reasonable Determination stated that all vendors demonstrated a capability to perform the Army's requirement, but asserted:

> DigiFlight, however, provided quotations with superior responses describing their capability to accomplish the PWS requirements and how they plan to meet requirements through examples of relevant experience associated with each PWS paragraph. They thoroughly described how they will manage the project and addressed anticipated risks. DigiFlight can provide the required support, with very low risk of unsuccessful performance.

> In further analyzing the best value amongst all three Offerors based on Technical Expertise, the strengths and weaknesses of each Offeror were considered. DigiFlight exhibited numerous strengths; providing relevant experiences and demonstrating exceptional understanding of the technical requirements. DigiFlight had no weaknesses identified in the Technical Expertise factor. DigiFlight demonstrated exceptional capability, experience and understanding to successfully perform the requirements of the PWS with virtually no risk to the Government. DigiFlight demonstrated exceptional understanding in the use of current and legacy data systems. DigiFlight developed and implemented numerous systems and databases such as [redacted]. The implementation of these programs will significantly aid in collecting, processing and refining, analyzing and tracking data. The use of such innovative databases/systems will effectively redefine data collection and processing.

The Army further stated that:

> In regards to the Risk Mitigation and Management, DigiFlight and Sigmatech both received the rating "Outstanding" indicating an exceptional approach. Both demonstrated a thorough approach to Risk Mitigation and Management. Both demonstrated proven techniques in their abilities to obtain and retain qualified personnel, ability to bring together the right team to perform PWS requirements and the ability to effectively manage the project; thus providing continuous support and risk mitigation through the performance of the PWS requirements.

(capitalization in original). Regarding the vendors' proposed prices, the Army asserted:

> Based upon a price comparison of the Offerors, all three Offerors total quoted prices are lower than the Independent Government Estimate (IGE). DigiFlight's total quoted price of $63,001,142.24 is 2% higher than Sigmatech's total quoted price of $61,454,297.78 and [redacted] lower than S3's quoted price of [redacted]. Sigmatech's total quoted price of $61,454,297.78 is [redacted] lower than S3's quoted price of [redacted]. Due to its ratings of "Outstanding" for Technical Expertise and Risk Mitigation and Management and the 2% price premium between it and Sigmatech, DigiFlight's proposal offers the best value to the Government.

> The rationale for award is based on a rating of Outstanding in the area of Technical Expertise, Outstanding in the area of Risk Mitigation and Management, and fair and reasonable pricing all combined. DigiFlight clearly stated the requirements and how they would perform the requirements for both Technical Expertise and Risk Mitigation and Management. This was demonstrated by specific examples for both Technical Expertise and Risk Mitigation and Management.

(capitalization in original).

In a subsequent section in the Best Value and Fair and Reasonable Determination titled "Trade-Off Discussion," the Army noted that, under the evaluation criteria set forth in the TORFQ, the Technical Expertise factor and the Risk Mitigation and Management factor were of equal importance, and each factor was of greater importance than the Price factor. (capitalization in original). The Army stated:

> DigiFlight demonstrated a far superior approach in both Technical Expertise and Risk Mitigation and Management. DigiFlight received the highest ratings in the two most important criteria (Technical and Risk Mitigation and Management), and only presented a slight disadvantage over Sigmatech in the least important criteria of Price. DigiFlight's significant strengths exceeds specified performance capability requirements in a way that will be advantageous to the Government during contract performance. Consequently, DigiFlight's strengths in Technical Expertise and Risk Mitigation and Management support the Government's payment of a higher price premium and will provide the Government the best value.

The Army concluded that, "[b]ased on the review of the evaluations, the Contracting Officer determines that DigiFlight provides the best value with all ratings and price considered."

On May 22, 2018, the Army sent a memorandum with a subject of "Explanation of Basis of Award Decision, TORFQ: 2015P-6" to Sigmatech, which explained the Army's

evaluation of Sigmatech's quotation and stated that DigiFlight was the awardee under the TORFQ. (capitalization in original). The Army asserted in the May 22, 2018 memorandum that DigiFlight's quotation provided the best value to the government. Also on May 22, 2018, the Army awarded the DigiFlight Task Order under the TORFQ to DigiFlight.

On June 4, 2018, Sigmatech filed a post-award bid protest at the GAO challenging the Army's award to DigiFlight under the TORFQ. In its post-award protest at the GAO, Sigmatech argued that the Army "unreasonably downgraded Sigmatech's Technical Expertise rating by identifying strengths as 'comments,'" "unreasonably downgraded Sigmatech's quotation under the Technical Expertise factor," and unreasonably evaluated DigiFlight's quotation. Sigmatech also argued that the Army's source decision document was unreasonable. On June 5, 2018, the Army issued a Stop Work Order to DigiFlight.

On July 16, 2018, Sigmatech filed a supplemental bid protest at the GAO. In its supplemental bid protest, Sigmatech asserted that the Army assigned strengths to DigiFlight "but not to Sigmatech for the same or virtually identical features," the Army failed to consider an organizational conflict of interest (OCI), the Army improperly emphasized the experience of DigiFlight's subcontractors, the Army improperly relied on "unexplained technology in differentiating Sigmatech and DigiFlight," and that the "source selection authority failed to properly document the source selection decision." Regarding the alleged organizational conflict of interest, the parties have stipulated that Sigmatech alleged at the GAO that an employee, Eileen Whaley, "of DigiFlight's subcontractor on the task order, KBRWyle,[7] was a former agency employee who, in that capacity, was involved with the programmatic requirements of the TORFQ, thereby allegedly placing her in a position to provide DigiFlight competitively useful non-public information about the Army's needs under the TORFQ."

On July 27, 2018, contracting officer Ashantas Cornelius issued a Determination and Findings regarding the alleged OCI involving Eileen Whaley, in which Ms. Cornelius concluded that an OCI did not exist. Regarding Eileen Whaley's employment at the Security Assistance Management Directorate, Ashantas Cornelius stated:

Ms. Eileen Whaley served as Deputy Director of the Security Assistance Management Directorate (SAMD) from August 2013 to June 2017. In her capacity as the Supervisory International Program Management Specialist, Ms. Eileen Whaley oversaw Security Assistance Program matters under the cognizance of the command. She participated equally with the Director in directing, managing, and coordinating the total activities of the organization, consisting of professional, technical, and support personnel through subordinate supervisors. As such, her duties included reviewing directives,

---

[7] In DigiFlight's quotation, DigiFlight identifies "CAS, Inc. (hereafter, referred to as KBRwyle)" as a subcontractor on Team DigiFlight. Other documents in the administrative record refer to KBRWyle as "KBRWyle/CAS, Inc." The parties have referred to KBRWyle/CAS, Inc. as KBRWyle, and the court refers to KBRWyle/CAS, Inc. as KBRWyle.

planning documents, and program and policy statements received from high authority and interpreting and evaluating to determine merits of new concepts of long plans proposed in the various fields of security assistance management in their operation staff aspects.

(capitalization in original; internal references omitted). According to Ashantas Cornelius:

In response to questions asked of the Contracting Officer's Representative (COR) on the current task order, the COR explained that Ms. Eileen Whaley served as the Deputy Director of SAMD during the initiation and submission of the Contracts Requirement Packet (CRP) for the task order whose award is being protested. Due to her position and level of management, Ms. Whaley was not involved in the development or completion of the documents. Due to her position, it has been confirmed that Ms. Whaley only provided signatory authority in the approval of two Limited Sources Justifications (LSJs) to allow non-competitive extension of the previous task order while the protests of the new task order are resolved. Ms. Whaley confirms via her declaration, that she did not discuss nor have any knowledge of or involvement with the current acquisition process. The CRP documents were completed by Ms. Susan Tier [sic] (COR)[8] with the assistance of Jimmy D. Jones, Jr. (Chief of Business Management Office) and Mr. Alex T. Lamar (Technical Monitor). The documents required for the Contract Requirements Packet (CRP) are approved independently and require signatures based upon the type of document requiring approval. Ms. Whaley did not sign any of the documents for the current procurement. Upon completion of individual documents, submission was made to the respective Contract Specialist and/or Officer.

(capitalization in original; internal references and footnote omitted). In a footnote, Ashantas Cornelius stated that the Contract Requirement Packet consisted of multiple documents used in the TORFQ, including the performance work statement, task order data requirements, Independent Government Cost Estimate, and evaluation criteria.

In the July 27, 2018 Determination and Findings, Ashantas Cornelius also stated that Larry Jess, the Vice President for DigiFlight's Huntsville operations, stated in a declaration that "he was directly responsible for the quotation development effort and exclusively interfaced with all of DigiFlight teammates," including KBRWyle, when preparing DigiFlight's quotation. Ashantas Cornelius asserted that:

According to his declaration, Mr. Jess had no interaction with Ms. Whaley, nor did she serve as representative for CAS [KBRWyle] in supporting the quotation preparation. As shown by his declaration, Mr. Jess was not aware that Ms. Eileen Whaley was a CAS employee until the filing of the

---

[8] In the November 1, 2018 declaration signed by Susan Teir and a September 25, 2018 email message sent by Susan Teir, Ms. Teir spells her name as "Teir," rather than "Tier."

supplemental protest. Moreover, CAS has confirmed, that Ms. Eileen Whaley was hired on August 14, 2017. This is four days after the due date for initial responses to the TORFQ, which were due on August 10, 2017. Quotations were received as stated above; however, a protest was received. Upon receipt of the protest, the Government did not take any action regarding the quotations submitted in response to TORFQ 2015P-6 in August 2017. Due to the receipt of the protest and proposed corrective action, the TORFQ was subsequently re-issued on September 21, 2017 as full open and competition (which was a change from the previous TORFQ, which was issued as a Small Business Reserve). DigiFlight submitted quotes in response to both TORFQs. The Contracting Officer compared the two quotations, finding minimal differences in the two quotations.

(capitalization in original; internal references omitted). Ashantas Cornelius concluded that she had

found no evidence that Ms. Whaley had any involvement in the development of the TORFQ PWS, or that she had access to or received any competitively useful, proprietary, or source selection information relating to the Programmatic Services Support TORFQ, or that she had any involvement in the procurement process or any influence on the source selection decision. Thus, there is no evidence that DigiFlight gained unequal access to any non-public information which would give the company an unfair competitive advantage about the Programmatic Support Services procurement as a result of Ms. Whaley's tenure as the Deputy Director of SAMD or as a KBRWyle/CAS employee.

On September 11, 2018, the GAO denied in part and dismissed in part Sigmatech's bid protest at the GAO. See Sigmatech, Inc., B-415028.3 et al., 2018 WL 5110874, at *1 (Comp. Gen. Sept. 11, 2018). The GAO determined that there was "no merit to the protester's challenges to the agency's evaluation of Sigmatech's quotation" and dismissed Sigmatech's allegation of unequal treatment as untimely. Id. at *3. The GAO rejected Sigmatech's argument that the Army unreasonably evaluated DigiFlight's experience because the GAO found "no basis to conclude that the agency's assignment of strengths to the awardee's quotation based on the experience of its proposed subcontractors was inconsistent with the terms of the solicitation or otherwise unreasonable." Id. at *6. The GAO also found that Sigmatech's allegation of an OCI involving Eileen Whaley lacked merit because, "[w]here, as here, the contracting officer investigates a potential unfair competitive advantage and reasonably concludes that no such advantage exists, we will defer to the agency's judgment." Id. at *9 (citation omitted). The GAO denied the remainder of Sigmatech's claims. See id. at *11.

On September 18, 2018, Sigmatech filed its complaint in the above-captioned bid protest.[9] In its complaint, Sigmatech argued that the Army arbitrarily and capriciously evaluated Sigmatech's quotation, that the Army engaged in disparate treatment, and that the Army's source selection decision was unequal, arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law. Sigmatech argued that the Army "failed to adequately consider the former Acting Director's [Eileen Whaley's] access to information and setting of requirements, who is now a KBRWyle employee working on the LPTO Task Order, was a conflict of interest." During a discussion of the alleged conflict of interest involving Eileen Whaley at the November 13, 2018 oral argument, counsel of record for protestor stated "I will formally withdraw it." Counsel of record for protestor stated "I will fully admit, having reviewed the briefs, that I do not believe the Eileen Whaley argument is particularly strong" and counsel officially withdrew protestor's claim involving Eileen Whaley.

In Sigmatech's complaint, Sigmatech also asserted, for the first time, that the Army failed to consider "the DigiFlight team's organizational conflicts of interest" involving KBRWyle's position as the prime contractor on a task order "under the Defense System Technical Area Task ('DS TAT') contract for Patriot Technical Support at the 'Lower Tier Project Office System Engineering Directorate.'" (capitalization in original). According to Sigmatech:

> KBRWyle (and therefore, DigiFlight) has an organizational conflict of interest—that is, as the subcontractor to DigiFlight under the RFQ and as the contractor under the DS TAT task order, KBRWyle would have to monitor and evaluate its own work under the DS TAT task order an impermissible impaired objectivity OCI.

Sigmatech's complaint requests a declaration that the Army's evaluation of quotations and award under the TORFQ was irrational, arbitrary, and capricious, an abuse of discretion, and contrary to law, a permanent injunction, other relief deemed appropriate by the court, and that the court "[r]equire the Agency to perform a new evaluation and make a new award decision."

On September 19, 2018, DigiFlight filed an unopposed motion to intervene in the above-captioned bid protest, which the court granted. Also on September 19, 2018, the court held a hearing with the parties in the above-captioned bid protest. During the September 19, 2018 hearing, counsel of record for defendant indicated that the Army voluntarily agreed to stay performance of DigiFlight's award under the TORFQ until December 14, 2018. Defendant indicated that an Army contracting officer was investigating and evaluating Sigmatech's new OCI claim involving KBRWyle's performance under the Defense System Technical Area Task task order.

---

[9] In a footnote in the complaint, Sigmatech states that "Sigmatech is not pursuing all of the grounds it raised before the GAO."

On October 1, 2018, defendant filed the administrative record in the above-captioned bid protest. On October 3, 2018, defendant filed a notice of the Army's Determination and Findings, which was dated October 2, 2018, signed by contracting officer Ashantas Cornelius, and addressed Sigmatech's allegation that

> DigiFlight, Inc. entered into a teaming/subcontractor agreement with KBRWyle/CAS Inc. (KBRWyle), creating impaired objectivity in which KBRWyle, in performing the EXPESS Task Order, would provide oversight and/or approval over its own work performance and deliverables performed under other task orders awarded through the Defense Technical Information Center (DTIC) Defense Systems Technical Area Task (DS-TAT) program.

In the October 2, 2018 Determination and Findings, Ashantas Cornelius "concluded that no OCI exists." Ms. Cornelius states that the Lower Tier Project Office is the "Office of Record for the ACAT-1A PATRIOT Air & Missile Defense Weapon System," and that the "LTPO [Lower Tier Project Office] provides requirements based upon 'production contracts', providing foreign military customers with a weapon system/end product." (capitalization in original). Ms. Cornelius asserts:

> The Lower Tier Project Office is part of the Program Executive Office (PEO) Missiles and Space. This office is not a part of AMCOM. SAMD is an Aviation and Missile Command (AMCOM) organization. SAMD has divisions that are co-located with the respective Missile and Space Program Executive Office (PEO)/Aviation Program Executive Office (PEO) Weapon Systems Program Offices. However, each organization performs duties and responsibilities specific to that organization's mission. The two organizations function independently of each other and have no organizational relationship with each other. With different command teams/structures, SAMD does not provide management oversight to LTPO or vice versa.

> LTPO and AMCOM SAMD require technical support services in order to successfully perform their missions. In response to this need, both organizations acquired technical supports [sic] services through the use of the DTIC Defense Systems Technical Area Task (DS-TAT) Indefinite Delivery Indefinite Quantity (IDIQ) contracts managed by Defense Technical Information Center (DTIC) personnel located at Ft. Belvoir, VA. A task order for technical support at LTPO (FA807517F1374) was awarded on May 20, 2017 and a task order for technical support at SAMD (FA807517F1389) was awarded on September 28, 2017. Both task orders were awarded to Wyle Laboratories, Inc., a part of KBRWyle/CAS, Inc., located in Huntsville, Alabama.

(internal references omitted).

According to Ashantas Cornelius's statements in the October 2, 2018 Determination and Findings, "[t]hese contracts are similar in the type of 'technical support' they provide to LTPO and SAMD. However; the support is based upon individual mission requirements of each organization." Ashantas Cornelius further states:

> The primary purpose of Task Order FA 807517F1374 in support of the LTPO mission is to study, analyze, provide, advice [sic], research, and develop deliverables to advance defense-related scientific and technical information (STI) through the application of knowledge and resources in achieving the requiring activity's mission requirements. The objective is to provide the Government the necessary multi-discipline support to execute the extremely challenging effort of managing the PATROIT weapon system. The primary purpose of Task Order FA 807517F1389 in support of the AMCOM SAMD mission is to study, analyze, advise, research and develop deliverables to advance FMS-related scientific and technical Information (STI). Some of the key objectives are Program Management, STI Relevance Assessment and Gap Analysis, Systems Engineering Support; Forensic and Reliability Analysis, Strategic Planning, Integrated Logistics Support; and Foreign Military Sales Support. These task orders are separate entities and function independently of each other in support of two different commands with varying missions.

(capitalization in original; internal references omitted).

Regarding the task order awarded to DigiFlight under the TORFQ, Ashantas Cornelius asserts:

> [T]he task order provides programmatic services to AMCOM SAMD. Programmatic services entails [sic] support in monitoring, assessing, coordinating, analyzing and integrating component programs/activities, including briefings/ presentations and agendas for the total life cycle systems. This program is in response to the SAMD's mission and supports only the SAMD Foreign Military Sales (FMS) functions. The EXPRESS task order functions is [sic] the same manner as the DTIC task order. The Contracting Officer appoints a COR, who has been trained and performs duties in accordance with the FAR and other applicable regulations. Similarly, each EXPRESS task order is allocated a Program Manager and/or a task order lead whose primary duty and responsibility is to manage/ provide oversight in support of his/her specific task order.

(internal references omitted). In the October 2, 2018 Determination and Findings, Ashantas Cornelius concludes that:

> As the Contracting Officer responsible for the acquisition of the Programmatic Support Services Task Order Request for Quote and subsequent award, I have thoroughly reviewed the tasks to be performed

under the EXPRESS task order and the tasks KBRwyle performs under the DS-TAT task orders for both LTPO and SAMD, and have found no evidence of impaired objectivity with KBRWyle/CAS, Inc. in performance of their duties supporting the EXPRESS Task Order and the DTIC Task Orders. KBRwyle working on the EXPRESS task order will not be monitoring or evaluating the work of KBRwyle employees on the DTIC task orders. As stated above, oversight of contractor personnel and performance is done by the Government, through Contracting Officer Representative and Program Managers, and not by other contractors. Furthermore, the work performed under the EXPRESS task order is different from the work performed under the DTIC task orders, involving different categories of services, with the EXPRESS task order providing program support services and the DTIC task orders focused on scientific and technical tasks.

Furthermore, additional last-minute information was provided by Sigmatech regarding KBRWyle performing other DS TAT task Orders. These tasks orders provide support to various Program Management Offices (PMOs) to include Cargo Helicopter, Unmanned Aircraft Systems, Fixed Wing and Future Vertical Lift. Additionally, information has been provided indicating that DigiFlight is a subcontractor on several of KBRWyle's task orders. While Sigmatech has not provided sufficient information to fully investigate these last-minute additions to its impaired objectivity OCI allegations, because these DS TAT task orders are all managed in the manner as previously stated, sufficient government oversight is provided to successfully eliminating [sic] any possibility of impaired objectivity.

Protestor has not amended its complaint in the above-captioned bid protest to include an allegation that there is an organizational conflict of interest as a result of DigiFlight's role as a "subcontractor on several of KBRWyle's task orders."

On October 19, 2018, Sigmatech filed a motion for judgment on the administrative record. In the October 19, 2018 motion, Sigmatech argues that the Army's evaluation of Sigmatech's quotation and DigiFlight's quotation, as well as the Army's source selection decision, was irrational, arbitrary, capricious, an abuse of discretion, and not in accordance with law. Sigmatech asserts in its motion for judgment on the administrative record that the Army failed to consider Eileen Whaley's "access to information and her involvement in setting the requirements for the TORFQ." Sigmatech also contends that the Army's "evaluation of KBRWyle's impaired objectivity OCI resulting from its work on related task orders was arbitrary, capricious, and contrary to law." Sigmatech also provided a "concrete (hypothetical) example of KBRWyle's conflicting roles" in an attempt to support Sigmatech's allegation of an impaired objectivity OCI.

Sigmatech attached to its October 19, 2018 motion for judgment on the administrative record an October 15, 2018 declaration signed by Philip Roman, who

states that he is the "Vice President of Security, Cooperation/Security Assistance of Sigmatech, Inc.," and that the October 15, 2018 declaration is offered "in support of Sigmatech's Motion to Supplement the Agency Record." On October 22, 2018, the court issued an Order stating that defendant had not filed a motion to supplement the administrative record as described in the October 15, 2018 declaration signed by Philip Roman. On October 23, 2018, Sigmatech filed a motion to supplement the administrative record with the October 15, 2018 declaration signed by Philip Roman. In the October 23, 2018 motion, Sigmatech argues that supplementation of the administrative record is appropriate because, without the declaration signed by Philip Roman, the court "cannot determine whether the Agency ignored salient information without understanding where contractor-employees are placed and whether the Agency oversees those employees; the scope of the Agency's oversight; and how the Agency integrates FMS into its program management."

On November 2, 2018, defendant and defendant-intervenor both filed responses to Sigmatech's motion for judgment on the administrative record and cross-motions for judgment on the administrative record. In defendant's cross-motion for judgment on the administrative record, defendant argues that the administrative record establishes that the Army's evaluators treated all offerors equally and that the Army's best value determination was rational. Defendant also argues that the Army's award to DigiFlight "does not create any OCI." In defendant-intervenor's cross-motion for judgment on the administrative record, defendant-intervenor asserts that Sigmatech has failed to establish that the Army's evaluation was unequal and has failed to establish that the source selection decision was improper. Defendant-intervenor contends that Sigmatech failed to establish "an OCI arising from KBRwyle's hiring of Eileen Whaley" or that award to DigiFlight created an "impaired objectivity OCI."

Also on November 2, 2018, defendant submitted a motion to supplement the administrative record with a November 1, 2018 declaration signed by Susan Teir, who states that she served as the contracting officer's representative on the Sigmatech's incumbent task order. Defendant argues that the November 1, 2018 declaration signed by Susan Teir "is necessary to fill a gap in the administrative record regarding Sigmatech's allegation that the agency's award decision created an impaired objectivity organizational conflict of interest (OCI) because the awardee's subcontractor, KBRWyle, would, allegedly, be placed in a position to review its work on other contracts with the agency." Defendant asserts that Sigmatech's "hypothetical significantly mischaracterizes KBRWyle's performance of the task order with the Lower Tier Project Office Patriot Missile program management office," and that, "[i]n her declaration, Ms. Tier [sic] responds to Sigmatech's hypothetical scenario involving KBRWyle and explains why it is factually incorrect."

On November 6, 2018, defendant and defendant-intervenor filed responses to Sigmatech's October 23, 2018 motion to supplement the administrative record, both of which asserted that the court should not supplement the administrative record with the additional documents proffered by Sigmatech.

On November 9, 2018, Sigmatech filed a reply in support of its motion for judgment on the administrative record and response to defendant and defendant-intervenor's cross-motions.[10]  In Sigmatech's November 9, 2018 filing, Sigmatech argued that this court should deny defendant's November 2, 2018 motion to supplement the administrative record.  Also on November 9, 2018, Sigmatech filed a reply in support of Sigmatech's October 23, 2018 motion for supplementation to the administrative record.  On November 13, 2018, the court heard oral argument in the above-captioned bid protest.

## DISCUSSION

Rule 52.1(c)(1) (2018) of the Rules of the United States Court of Federal Claims (RCFC) governs motions for judgment on the administrative record.  The court's inquiry is directed to "'whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record.'"  Mgmt. & Training Corp. v. United States, 115 Fed. Cl. 26, 40 (2014) (quoting A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006) (citing Bannum, Inc. v. United States, 404 F.3d 1346, 1356-57 (Fed. Cir. 2005))); see also Centerra Grp., LLC v. United States, 138 Fed. Cl. 407, 412 (2018) (citing Bannum, Inc. v. United States, 404 F.3d at 1356-57); Informatics Applications Grp., Inc. v. United States, 132 Fed. Cl. 519, 524 (2017) (citation omitted); Strategic Bus. Sols., Inc. v. United States, 129 Fed. Cl. 621, 627 (2016), aff'd, 711 F. App'x 651 (Fed. Cir. 2018); Rotech Healthcare Inc. v. United States, 118 Fed. Cl. 408, 413 (2014); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. 6, 21 (2013); DMS All-Star Joint Venture v. United States, 90 Fed. Cl. 653, 661 (2010).  Pursuant to RCFC 52.1, in a bid protest, the court reviews the agency's procurement decision to determine whether it is supported by the administrative record.  See CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. 462, 481 (2013); see also CR/ZWS LLC v. United States, 138 Fed. Cl. 212, 223 (2018) (citing Bannum, Inc. v. United States, 404 F.3d at 1353-54).

The Administrative Dispute Resolution Act of 1996 (ADRA), Pub. L. No. 104-320, §§ 12(a), 12(b), 110 Stat. 3870, 3874 (1996) (codified at 28 U.S.C. § 1491(b)(1)–(4) (2012)), amended the Tucker Act to establish a statutory basis for bid protests in the United States Court of Federal Claims.  See Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1330-32 (Fed. Cir. 2001); see also Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1380 (Fed. Cir. 2012) (explaining that the Tucker Act expressly waives sovereign immunity for claims against the United States in bid protests).  The statute provides that protests of agency procurement decisions are to be reviewed under APA standards, making applicable the standards outlined in Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), and the line of cases following that decision.  See, e.g., Per Aarsleff A/S v. United States, 829 F.3d 1303, 1309 (Fed. Cir. 2016) ("Protests of agency procurement decisions are reviewed under the standards set forth in the Administrative Procedure Act ('APA'), see

---

[10] During the September 20, 2018 hearing, defendant indicated that defendant did not intend to file a reply in support of its cross-motion for judgment on the administrative record and subsequently did not file a reply.  Intervenor, likewise, declined to file a reply in support of its cross-motion for judgment on the administrative record.

28 U.S.C. § 1491(b)(4) (citing 5 U.S.C. § 706), 'by which an agency's decision is to be set aside only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]'" (quoting <u>NVT Techs., Inc. v. United States</u>, 370 F.3d 1153, 1159 (Fed. Cir. 2004)) (citing <u>PAI Corp. v. United States</u>, 614 F.3d 1347, 1351 (Fed. Cir. 2010))); <u>Impresa Construzioni Geom. Domenico Garufi v. United States</u>, 238 F.3d at 1332; <u>Res. Conservation Grp., LLC v. United States</u>, 597 F.3d 1238, 1242 (Fed. Cir. 2010) ("Following passage of the APA in 1946, the District of Columbia Circuit in <u>Scanwell Labs., Inc. v. Shaffer</u>, 424 F.2d 859 (D.C. Cir. 1970), held that challenges to awards of government contracts were reviewable in federal district courts pursuant to the judicial review provisions of the APA."); <u>Galen Med. Assocs., Inc. v. United States</u>, 369 F.3d 1324, 1329 (Fed. Cir. 2004) (citing <u>Scanwell Labs., Inc. v. Shaffer</u>, 424 F.2d at 864, 868, for its "reasoning that suits challenging the award process are in the public interest and disappointed bidders are the parties with an incentive to enforce the law"); <u>Banknote Corp. of Am., Inc. v. United States</u>, 365 F.3d 1345, 1351 (Fed. Cir. 2004) ("Under the APA standard as applied in the <u>Scanwell</u> line of cases, and now in ADRA cases, 'a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" (quoting <u>Impresa Construzioni Geom. Domenico Garufi v. United States</u>, 238 F.3d at 1332)); <u>Info. Tech. & Applications Corp. v. United States</u>, 316 F.3d at 1319.

When discussing the appropriate standard of review for bid protest cases, the United States Court of Appeals for the Federal Circuit addressed subsections (2)(A) and (2)(D) of 5 U.S.C. § 706, see <u>Impresa Construzioni Geom. Domenico Garufi v. United States</u>, 238 F.3d at 1332 n.5, but focused its attention primarily on subsection (2)(A). See <u>Croman Corp. v. United States</u>, 724 F.3d 1357, 1363 (Fed. Cir.) ("'[T]he proper standard to be applied [to the merits of] bid protest cases is provided by 5 U.S.C. § 706(2)(A) [(2006)]: a reviewing court shall set aside the agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."'" (alterations in original) (quoting <u>Banknote Corp. of Am. v. United States</u>, 365 F.3d at 1350-51 (citing <u>Advanced Data Concepts, Inc. v. United States</u>, 216 F.3d 1054, 1057-58 (Fed. Cir.), <u>reh'g denied</u> (Fed. Cir. 2000)))), <u>reh'g and reh'g en banc denied</u> (Fed. Cir. 2013). The statute says that agency procurement actions should be set aside when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D) (2012);[11] see also <u>Tinton Falls</u>

---

[11] The language of 5 U.S.C. § 706 provides in full:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
>
> > (1) compel agency action unlawfully withheld or unreasonably delayed; and

Lodging Realty, LLC v. United States, 800 F.3d 1353, 1358 (Fed. Cir. 2015); Orion Tech., Inc. v. United States, 704 F.3d 1344, 1347 (Fed. Cir. 2013); COMINT Sys. Corp. v. United States, 700 F.3d 1377, 1381 (Fed. Cir. 2012) ("We evaluate agency actions according to the standards set forth in the Administrative Procedure Act; namely, for whether they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting 5 U.S.C. § 706(2)(A); and Bannum, Inc. v. United States, 404 F.3d at 1351)); Savantage Fin. Servs. Inc., v. United States, 595 F.3d 1282, 1285-86 (Fed. Cir. 2010); Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1358 (Fed. Cir. 2009); Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (noting arbitrary and capricious standard set forth in 5 U.S.C. § 706(2)(A), and reaffirming the analysis of Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332); Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1312 (Fed. Cir. 2007) ("'[T]he inquiry is whether the [government]'s procurement decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."'" (quoting Bannum, Inc. v. United States, 404 F.3d at 1351 (quoting 5 U.S.C. § 706(2)(A) (2000)))); NVT Techs., Inc. v. United States, 370 F.3d at 1159 ("Bid protest actions are subject to the standard of review established under section 706 of title 5 of the Administrative Procedure Act ('APA'), 28 U.S.C. § 1491(b)(4) (2000), by which an agency's decision is to be set aside only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 5 U.S.C. § 706(2)(A) (2000)." (internal citations omitted)); Info. Tech. & Applications Corp.

---

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

v. United States, 316 F.3d at 1319 ("Consequently, our inquiry is whether the Air Force's procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A) (2000)."); Synergy Sols., Inc. v. United States, 133 Fed. Cl. 716, 734 (2017) (citing Banknote Corp. of Am. v. United States, 365 F.3d at 1350); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. at 22; Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. 334, 340 (2012). "In a bid protest case, the agency's award must be upheld unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Turner Constr. Co. v. United States, 645 F.3d 1377, 1383 (Fed. Cir.) (quoting PAI Corp. v. United States, 614 F.3d at 1351), reh'g en banc denied (Fed. Cir. 2011); see also Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d at 1358 ("In applying this [arbitrary and capricious] standard to bid protests, our task is to determine whether the procurement official's decision lacked a rational basis or the procurement procedure involved a violation of a regulation or procedure." (citing Savantage Fin. Servs., Inc. v. United States, 595 F.3d at 1285-86)); Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d 901, 907 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2013); Nat'l Gov't Servs., Inc. v. United States, 137 Fed. Cl. 715, 735 (2018) (quoting Centech Grp., Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009)); McVey Co., Inc. v. United States, 111 Fed. Cl. 387, 402 (2013) ("The first step is to demonstrate error, that is, to show that the agency acted in an arbitrary and capricious manner, without a rational basis or contrary to law."); PlanetSpace, Inc. v. United States, 92 Fed. Cl. 520, 531-32 ("Stated another way, a plaintiff must show that the agency's decision either lacked a rational basis or was contrary to law." (citing Weeks Marine, Inc. v. United States, 575 F.3d at 1358)), subsequent determination, 96 Fed. Cl. 119 (2010).

The United States Supreme Court has identified sample grounds which can constitute arbitrary or capricious agency action:

> [W]e will not vacate an agency's decision unless it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 658 (2007) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)); see also F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 552 (2009); Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d at 1358; Ala. Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009), reh'g and reh'g en banc denied (Fed. Cir. 2010); In re Sang Su Lee, 277 F.3d 1338, 1342 (Fed. Cir. 2002) ("[T]he agency tribunal must present a full and reasoned explanation of its decision. . . . The reviewing court is thus enabled to perform meaningful review . . . ."); Textron, Inc. v. United States, 74 Fed. Cl. 277, 285-86 (2006), appeal dismissed sub nom. Textron, Inc. v. Ocean Technical Servs., Inc., 223 F. App'x 974 (Fed. Cir. 2007). The United States Supreme Court also has cautioned, however, that "courts are not free to impose upon

agencies specific procedural requirements that have no basis in the APA." Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 654 (1990).

Under an arbitrary or capricious standard, the reviewing court should not substitute its judgment for that of the agency, but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts. See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 43 ("The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."); see also Dell Fed. Sys., L.P. v. United States, 906 F.3d 982, 990 (Fed. Cir. 2018); Turner Constr. Co., Inc. v. United States, 645 F.3d at 1383; R & W Flammann GmbH v. United States, 339 F.3d 1320, 1322 (Fed. Cir. 2003) (citing Ray v. Lehman, 55 F.3d 606, 608 (Fed. Cir.), cert. denied, 516 U.S. 916 (1995)); Synergy Sols., Inc. v. United States, 133 Fed. Cl. at 735 (citing Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332-33). "'"If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations."'" Weeks Marine, Inc. v. United States, 575 F.3d at 1371 (quoting Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971))); Limco Airepair, Inc. v. United States, 130 Fed. Cl. 544, 550 (2017) (citation omitted); Jordan Pond Co., LLC v. United States, 115 Fed. Cl. 623, 631 (2014); Davis Boat Works, Inc. v. United States, 111 Fed. Cl. 342, 349 (2013); Norsat Int'l [America], Inc. v. United States, 111 Fed. Cl. 483, 493 (2013); HP Enter. Servs., LLC v. United States, 104 Fed. Cl. 230, 238 (2012); Vanguard Recovery Assistance v. United States, 101 Fed. Cl. 765, 780 (2011).

Stated otherwise by the United States Supreme Court:

Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971) (internal citations omitted), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977); see also U.S. Postal Serv. v. Gregory, 534 U.S. 1, 6-7 (2001); Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974), reh'g denied, 420 U.S. 956 (1975); Co-Steel Raritan, Inc. v. Int'l Trade Comm'n, 357 F.3d 1294, 1309 (Fed. Cir. 2004) (In discussing the "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with the law" standard, the Federal Circuit stated: "the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."); In re Sang Su Lee, 277 F.3d at 1342; Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058 ("The arbitrary and capricious standard applicable here

is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. at 285)); Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d 955, 959 (Fed. Cir. 1993); By Light Prof'l IT Servs., Inc. v. United States, 131 Fed. Cl. 358, 366 (2017); BCPeabody Constr. Servs., Inc. v. United States, 112 Fed. Cl. 502, 508 (2013) ("The court 'is not empowered to substitute its judgment for that of the agency,' and it must uphold an agency's decision against a challenge if the 'contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" (internal citations omitted) (quoting Keeton Corrs., Inc. v. United States, 59 Fed. Cl. 753, 755, recons. denied, 60 Fed. Cl. 251 (2004); and Axiom Res. Mgmt., Inc. v. United States, 564 F.3d at 1381)), appeal dismissed, 559 F. App'x 1033 (Fed. Cir. 2014); Supreme Foodservice GmbH v. United States, 109 Fed. Cl. at 382; Alamo Travel Grp., LP v. United States, 108 Fed. Cl. 224, 231 (2012); ManTech Telecomms. & Info. Sys. Corp. v. United States, 49 Fed. Cl. 57, 63 (2001), aff'd, 30 F. App'x 995 (Fed. Cir. 2002).

According to the United States Court of Appeals for the Federal Circuit:

Effective contracting demands broad discretion. Burroughs Corp. v. United States, 223 Ct. Cl. 53, 617 F.2d 590, 598 (1980); Sperry Flight Sys. Div. v. United States, 548 F.2d 915, 921, 212 Ct. Cl. 329 (1977); see NKF Eng'g, Inc. v. United States, 805 F.2d 372, 377 (Fed. Cir. 1986); Tidewater Management Servs., Inc. v. United States, 573 F.2d 65, 73, 216 Ct. Cl. 69 (1978); RADVA Corp. v. United States, 17 Cl. Ct. 812, 819 (1989), aff'd, 914 F.2d 271 (Fed. Cir. 1990). Accordingly, agencies "are entrusted with a good deal of discretion in determining which bid is the most advantageous to the Government." Tidewater Management Servs., 573 F.2d at 73, 216 Ct. Cl. 69.

Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d at 958-59; see also Res-Care, Inc. v. United States, 735 F.3d 1384, 1390 (Fed. Cir.) ("DOL [Department of Labor], as a federal procurement entity, has 'broad discretion to determine what particular method of procurement will be in the best interests of the United States in a particular situation.'" (quoting Tyler Constr. Grp. v. United States, 570 F.3d 1329, 1334 (Fed. Cir. 2009))), reh'g en banc denied (Fed. Cir. 2014); Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990, 995 (Fed. Cir. 1996); Geo-Med, LLC v. United States, 126 Fed. Cl. 440, 449 (2016); Cybertech Grp., Inc. v. United States, 48 Fed. Cl. 638, 646 (2001) ("The court recognizes that the agency possesses wide discretion in the application of procurement regulations."); Furthermore, according to the United States Court of Appeals for the Federal Circuit:

Contracting officers "are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process." Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (internal quotation marks omitted). Accordingly, procurement decisions are subject to a "highly deferential rational basis review." CHE Consulting, Inc. v. United States, 552 F.3d 1351, 1354 (Fed.

Cir. 2008) (internal quotation marks omitted).

PAI Corp. v. United States, 614 F.3d at 1351; see also AgustaWestland N. Am., Inc. v. United States, 880 F.3d 1326, 1332 (Fed. Cir. 2018) ("Where, as here, a bid protester challenges the procurement official's decision as lacking a rational basis, we must determine whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion,' recognizing that 'contracting officers are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process.'" (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332-33 (internal quotation marks and citation omitted))); Weeks Marine, Inc. v. United States, 575 F.3d at 1368-69 ("We have stated that procurement decisions 'invoke [ ] "highly deferential" rational basis review.' Under that standard, we sustain an agency action 'evincing rational reasoning and consideration of relevant factors.'" (alteration in original) (quoting CHE Consulting, Inc. v. United States, 552 F.3d at 1354 (quoting Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058))).

A disappointed bidder has the burden of demonstrating the arbitrary and capricious nature of the agency decision by a preponderance of the evidence. See Tinton Fall Lodging Realty, LLC v. United Sates, 800 F.3d at 1364; see also Grumman Data Sys. Corp. v. Dalton, 88 F.3d at 995-96; Enhanced Veterans Sols., Inc. v. United States, 131 Fed. Cl. 565, 578 (2017); Davis Boat Works, Inc. v. United States, 111 Fed. Cl. at 349; Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. at 340. The Federal Circuit has indicated that "[t]his court will not overturn a contracting officer's determination unless it is arbitrary, capricious, or otherwise contrary to law. To demonstrate that such a determination is arbitrary or capricious, a protester must identify 'hard facts'; a mere inference or suspicion . . . is not enough."  PAI Corp. v. United States, 614 F.3d at 1352 (citing John C. Grimberg Co. v. United States, 185 F.3d 1297, 1300 (Fed. Cir. 1999)); see also Turner Constr. Co., Inc. v. United States, 645 F.3d at 1387; Sierra Nevada Corp. v. United States, 107 Fed. Cl. 735, 759 (2012); Filtration Dev. Co., LLC v. United States, 60 Fed. Cl. 371, 380 (2004).

A bid protest proceeds in two steps. First . . . the trial court determines whether the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract. Second . . . if the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct.

Bannum, Inc. v. United States, 404 F.3d at 1351; T Square Logistics Servs. Corp. v. United States, Fed. Cl. 550, 555 (2017); FirstLine Transp. Sec., Inc. v. United States, 119 Fed. Cl. 116, 126 (2014), appeal dismissed (Fed. Cir. 2015); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. at 22; Archura LLC v. United States, 112 Fed. Cl. at 496. To prevail in a bid protest case, the protestor not only must show that the government's actions were arbitrary, capricious, or otherwise not in accordance with the law, but the protestor also must show that it was prejudiced by the government's actions. See 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error."); see also Glenn Def.

Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 907 ("In a bid protest case, the inquiry is whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial."); IT Enter. Sols. JV, LLC v. United States, 132 Fed. Cl. 158, 173 (2017) (citing Bannum v. United States, 404 F.3d at 1357-58); Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 694-96 (2010). In describing the prejudice requirement, the Federal Circuit also has held that:

> To prevail in a bid protest, a protester must show a significant, prejudicial error in the procurement process. See Statistica, Inc. v. Christopher, 102 F.3d 1577, 1581 (Fed. Cir. 1996); Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996). "To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract." Data General, 78 F.3d at 1562 (citation omitted). Rather, the protester must show "that there was a substantial chance it would have received the contract award but for that error." Statistica, 102 F.3d at 1582; see CACI, Inc.-Fed. v. United States, 719 F.2d 1567, 1574-75 (Fed. Cir. 1983) (to establish competitive prejudice, protester must demonstrate that but for the alleged error, "'there was a substantial chance that [it] would receive an award--that it was within the zone of active consideration.'" (citation omitted)).

Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir.), reh'g denied (Fed. Cir. 1999); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 912; Allied Tech. Grp., Inc. v. United States, 649 F.3d 1320, 1326 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2011); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319; Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332-33; OMV Med., Inc. v. United States, 219 F.3d 1337, 1342 (Fed. Cir. 2000); Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1057; Stratos Mobile Networks USA, LLC v. United States, 213 F.3d 1375, 1380 (Fed. Cir. 2000).

In Data General Corp. v. Johnson, the United States Court of Appeals for the Federal Circuit wrote:

> We think that the appropriate standard is that, to establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract . . . . The standard reflects a reasonable balance between the importance of (1) averting unwarranted interruptions of and interferences with the procurement process and (2) ensuring that protesters who have been adversely affected by allegedly significant error in the procurement process have a forum available to vent their grievances. This is a refinement and clarification of the "substantial chance" language of CACI, Inc.-Fed. [v. United States], 719 F.2d at 1574.

Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir.), reh'g denied, en banc suggestion declined (Fed. Cir. 1996); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 912; Bannum, Inc. v. United States, 404 F.3d at 1353, 1358 ("The trial court was required to determine whether these errors in the procurement process significantly prejudiced Bannum . . . . To establish 'significant prejudice' Bannum must show that there was a 'substantial chance' it would have received the contract award but for the [government's] errors" in the bid process. (citing Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319; Alfa Laval Separation, Inc. v. United States, 175 F.3d at 1367; Statistica, Inc. v. Christopher, 102 F.3d at 1581; and Data Gen. Corp. v. Johnson, 78 F.3d at 1562); see also Todd Constr., L.P. v. United States, 656 F.3d 1306, 1315 (Fed. Cir. 2011); Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1057 (using a "reasonable likelihood" rule); Stratos Mobile Networks USA, LLC v. United States, 213 F.3d at 1380 (using a "substantial chance" test); Am. Corr. Healthcare, Inc. v. United States, 137 Fed. Cl. 395, 410 (2018) (using a "substantial chance" test); Vintage Autoworks, Inc. v. United States, 132 Fed. Cl. 143, 149 (2017) (using a "substantial chance" test); Active Network, LLC v. United States, 130 Fed. Cl. 421, 427 (2017) (using a "substantial chance" test); Archura LLC v. United States, 112 Fed. Cl. at 496 (using a "substantial chance" test); Info. Scis. Corp. v. United States, 73 Fed. Cl. 70, 96 (2006) (using a "substantial chance" test), recons. in part, 75 Fed. Cl. 406 (2007).

In the above-captioned bid protest, Sigmatech argues that the Army "assigned strengths to Digiflight for experience, expertise or proposed solutions that were (at best) equal to those contained in Sigmatech's quotation. Yet despite having an (at least) equivalent - - and much more thoroughly detailed - - quotation, Sigmatech received only 'comments.'" Sigmatech argues that the Army unreasonably and unequally evaluated Sigmatech's and DigiFlight's proposed performance of SAMD Repair and Return and cost analyses, as well as Sigmatech's and DigiFlight's understanding of financial databases. Regarding SAMD Repair and Return, Sigmatech asserts that the Army awarded DigiFlight a strength based on DigiFlight's "substantial experience with R&R," but the Army "merely 'commented' on Sigmatech's experience, and noted that it would be of value to SAMD." Sigmatech contends that "Sigmatech spent almost two full pages describing its extensive experience with R&R."

Sigmatech argues that the Army awarded DigiFlight a strength based on DigiFlight's [redacted] certified cost estimation analysts, notwithstanding that "Digiflight's quotation provides no insight into what [redacted] is, or why it is important." Sigmatech asserts "Sigmatech showed deep expertise with cost analyses," but only received a comment for its experience with cost analyses. Sigmatech contends that the Army "completely ignored a host of other relevant information in Sigmatech's quotation, including: 1) the depth of Sigmatech's expertise with specific financial systems; 2) its use of best practices; 3) its understanding of the laws and regulations that apply to that financial management; and 4) its experience with [redacted]."

Sigmatech also contends that the Army awarded DigiFlight a strength "for its 'superior understanding' of multiple financial databases to support its proprietary [redacted] tool." According to Sigmatech, the Army "completely overlooked that

32

Sigmatech **also** uses [redacted] and **also** has a deep understanding of the Agency's financial management needs." (emphasis in original; internal references omitted). Sigmatech asserts that Sigmatech's quotation "included a graph describing how it had developed [redacted] and, consistent with the DoD's policy, it [redacted] would replace legacy systems," but Sigmatech "received no credit for its extensive [redacted] experience and merely a passing comment regarding its development experience with [redacted]." Sigmatech argues that "[i]t was patently unreasonable for the Agency to heap credit on Digiflight's experience with [redacted] development, while completely ignoring Sigmatech's development experience with [redacted]." Sigmatech argues that the Army's evaluation of SAMD Repair and Return, cost analyses, and understanding of financial databases prejudiced Sigmatech because "[e]ach of these strengths it assigned Digiflight, individually and combined, caused the Agency to conclude that Digiflight established superior technical expertise."

In defendant's cross-motion for judgment on the administrative record, defendant argues that "the Army's evaluations were fair and equal, not disparate, with strengths appropriately awarded to aspects of the offerors' proposals which had merit or exceeded the PWS requirements in a way that will be advantageous to the Army." Defendant asserts that "Sigmatech's assertion of unequal treatment amounts to no more than a mere disagreement with the evaluators." According to defendant, the evaluators appropriately determined that the DigiFlight's detailed explanation of its experience and approach with Repair and Return programs met the definition of a strength and that Sigmatech's proposal "merely recounted in less than two pages its experience with SAMD R&R in an unremarkable way." Defendant asserts that, although both Sigmatech and DigiFlight described their approaches to cost analysis "in a way which generally met this requirement, DigiFlight once again went beyond merely meeting the requirement by offering employees who were trained and certified in using [redacted] for cost analysis." Defendant also contends that the Army's decision to award DigiFlight a strength for its use of [redacted] was rational because DigiFlight's "unique skillset with [redacted] and familiarity with other systems, in the evaluators' determination, would increase the efficiency of financial management of FMS cases and was worthy of a strength."

In defendant-intervenor's cross-motion for judgment on the administrative record, defendant-intervenor argued that Sigmatech has failed to establish an unequal evaluation of Sigmatech's and DigiFlight's Technical Expertise factor because "the truth is that Sigmatech's quotation lacked information and was not equal to DigiFlight's quotation." Defendant-intervenor contends that protestor has failed to establish prejudice because, "[e]ven assuming for the sake of argument that Sigmatech could prevail on one or more of the three instances for which it claims it should have received an additional strength, Sigmatech still could not reach the five strengths assigned to DigiFlight."

The Federal Acquisition Regulation (FAR) requires that contracting officers "[e]nsure that contractors receive impartial, fair, and equitable treatment." See FAR § 1.602-2(b) (2018). "[I]t is beyond peradventure that a contracting agency must treat all offerors equally, evaluating proposals evenhandedly against common requirements and evaluation criteria." Banknote Corp. of Am. v. United States, 56 Fed. Cl. 377, 383 (2003)

(citing <u>Seattle Sec. Servs., Inc. v. United States</u>, 45 Fed. Cl. 560, 569 (2000)); <u>see</u> <u>also</u> <u>Active Network, LLC v. United States</u>, 130 Fed. Cl. at 429 (quoting <u>CW Gov't Travel, Inc. v. United States</u>, 110 Fed. Cl. at 490); <u>Chenega Mgmt., LLC. v. United States</u>, 96 Fed. Cl. 556, 585 (2010) ("[U]nequal treatment claims are the 'quintessential example of conduct which lacks a *rational basis*.'" (emphasis in original) (quoting <u>Hunt Building Co., Ltd. v. United States</u>, 61 Fed. Cl. 243, 273 (2004))). "Indeed, 'an agency action is arbitrary when the agency offered insufficient reasons for treating similar situations differently.'" <u>Afghan Am. Army Servs. Corp. v. United States</u>, 106 Fed. Cl. 714, 729 (quoting <u>Transactive Corp. v. United States</u>, 91 F.3d 232, 237 (D.C. Cir. 1996)), <u>as</u> <u>supplemented</u>, 106 Fed. Cl. 751 (2012); <u>see</u> <u>also</u> <u>Redland Genstar, Inc. v. United States</u>, 39 Fed. Cl. 220, 234 (1997) (quoting <u>Transactive Corp. v. United States</u>, 91 F.3d at 237). "Equal treatment, however, does not require that all proposals be treated the same." <u>Chenega Mgmt., LLC. v. United States</u>, 96 Fed. Cl. at 585 (citing FAR § 1.102-2(c)(3)); <u>see</u> <u>also</u> FAR § 1.102-2(c)(3) (2018) ("All contractors and prospective contractors shall be treated fairly and impartially but need not be treated the same."); <u>Ernst & Young, LLP v. United States</u>, 136 Fed. Cl. 475, 515 (2018) (quoting FAR § 1.102-2(c)(3)). "[O]fferors who are not similarly situated may be treated differently." <u>A-T Sols., Inc. v. United States</u>, 122 Fed. Cl. 170, 183 (2015) (citing <u>NCL Logistics Co. v. United States</u>, 109 Fed. Cl. 596, 626 (2013)); <u>see</u> <u>also</u> <u>Lockheed Martin Corp. v. United States</u>, 124 Fed. Cl. 709, 722 (2016) ("To the extent proposals differ, the government may rationally take different action regarding different proposals.").

In the above-captioned bid protest, Sigmatech's allegations of unequal treatment focus on the strengths the Army assigned under the Technical Expertise factor to sections 2.1.2, 2.2.2, 2.1.1 and 2.1.3[12] of DigiFlight's quotation, which corresponded to sections 2.1.2, 2.2.2., and 2.1.1 and 2.1.3 of the performance work statement attached to the TORFQ. Sigmatech argues that, "[w]hile Sigmatech's proposal described many of these strengths, it did not receive the same credit." Section 2.1.2 of the performance work statement is titled "REQUISITION AND DOCUMENT STATUS" and states that the "contractor shall collect data such as repair status, repair cost, and repair capability from Corpus Christi Army Depot (CCAD) and Letterkenny Army Depot (LEAD), Security Assistance Management Information System and other databases in order to update requisition and document status reports and to provide recommendations on repair requirements." (capitalization in original).

In section 2.1.2 of Sigmatech's quotation, Sigmatech stated that "Sigmatech assists SAMD in managing the Saudi Arabia PAC-3 R&R for Electronic Control Unit kits at LEAD by reviewing R&R Track Sheets to verify funding is not overcommitted and items are repaired in a timely manner." Sigmatech also stated that "[w]e utilize Web Repair of Repairables (WebRoR - DoD's Repair of Repairables Management System for FMS customers) within the Security Cooperation Information Portal (SCIP) to track repair cost, status, and capability of different repair entities." Sigmatech described how Sigmatech "optimize[d] component repair," "update[d] requisition/document status," and "utilize[d]

---

[12] As noted above, the Army assigned a single strength to section 2.1.1 and to section 2.1.3 of DigiFlight's quotation.

WebRoR database to pull current information on R&R assets, along with gathering tracking numbers from the SCIP database."

In the Army's Evaluation Worksheet addressing Sigmatech's quotation, the Army stated that Sigmatech's quotation met all of the technical requirements in the performance work statement. The Army did not assign a strength, which the TORFQ defined "as an aspect of an offeror's quote that has merit or exceeds specified performance capability requirements in a way that will be advantageous to the Government during contract performance," to section 2.1.2 of Sigmatech's quotation. The Army, however, provided a comment referencing section 2.1.2 of Sigmatech's quotation and stating that Sigmatech's "experience with Repair and Return (R&R) will assist SAMD in the analysis of the R&R process and will provide recommendations to expedite and streamline the return of items to the FMS customer." Although Sigmatech asserts that Sigmatech should have received a strength for its "substantial experience with R&R," Sigmatech has not demonstrated why it was irrational for the Army not to assign Sigmatech a strength for Sigmatech's experience with Repair and Return programs. In its quotation, Sigmatech did indicate that it previously had provided Repair and Return support, but Sigmatech has not demonstrated that Sigmatech's previous support of Repair and Return programs exceeded the requirements in the section 2.1.2 of the performance work statement in a manner to warrant a strength. Moreover, the Army's evaluators have broad discretion when exercising technical judgment, "and consequently the court will interject its own assessment only 'in the absence of truly irrational conduct on the part of the agency.'" See Vanguard Recovery Assistance v. United States, 101 Fed. Cl. 765, 783 (2011) (quoting FirstLine Transp. Sec., Inc. v. United States, 100 Fed. Cl. 359, 397 (2011)). The Army acknowledged Sigmatech's experience with Repair and Return programs, which the Army noted would assist the Army with the Repair and Return process, but Sigmatech has not pointed to any material indicating that Sigmatech's Repair and Return experience exceeded the requirement in the performance work statement that a vendor collect repair data and provide recommendations on repair requirements to such an extent as to render the Army's decision not to award Sigmatech a strength irrational.

The Army, however, assigned a strength to section 2.1.2 of DigiFlight's quotation and stated that:

> The Offeror has provided extensive support to R&R programs for over three decades. The Offeror has developed and will provide the SAMD [redacted]. The Offeror also plans to combine the existing expertise with the [redacted] data collection methodology to refine the R&R process to automatically collect Web Repair of Repairable (WebRoR) data for better tracking from Corpus Christi Army Depot (CCAD), Letterkenny Army Depot (LEAD), and industry.

> The Offeror's R&R experience will benefit SAMD by utilizing its innovative SAMD [redacted] in conjunction with the WebRoR system to track and assist in the management of repair requirements, requisition documentation, contract information, and other major commands data to

35

generate R&R reports. The system along with the Offeror's cited very extensive experience with the SAMD R&R process will benefit SAMD by increasing the amount of data and status information collected from CCAD, LEAD, and industry.

Contrary to protestor's argument at the oral argument that the Army "fail[ed] to describe how a blanket statement [by DigiFlight] without any context, we have 30 years of experience, is somehow a creation of a strength," the Army's decision to award DigiFlight a strength under section 2.1.2 only was based in part on Team DigiFlight's three decades of Repair and Return experience.

In section 2.1.2 of DigiFlight's quotation, DigiFlight had noted that "Team DigiFlight has supported multiple country R&R programs for over three decades. We developed the SAMD [redacted] to assist in managing UAE, Egypt, Saudi Arabia, and Kuwait FMS cases." DigiFlight stated in its quotation that:

> Our approach is to continue to use our Team expertise, coupled with [redacted] data collection methodology, to refine R&R processes and automatically collect WebRoR data to track repair status, costs, and capabilities from CCAD, LEAD, and OEMs/industry. In coordination with USASAC, we streamline country notification processes and automate repair recommendation, depot notification, and acceptance processes prior to industry solicitation.

DigiFlight also stated that its "approach is to manage thousands of assets through database systems that maintain accountability by tracking and monitoring R&R assets from FMS Partner requests for repair through return-of-country assets."

Section 2.1.2 of the performance work statement required that the contractor collect data from Corpus Christi Army Depot and Letterkenny Army Depot in order to update requisition reports and provide recommendations on repair requirements. The Army identified Team DigiFlight's development and provision of the SAMD [redacted] as a benefit to the Army and noted that DigiFlight would be combining its experience with [redacted], which is an [redacted] developed by Team DigiFlight, [redacted]. The Army also indicated that Team DigiFlight's experience with the SAMD [redacted], which Team DigiFlight developed, will increase the amount of data and information received from Corpus Christi Army Depot and Letterkenny Army Depot. The Army articulated a rational basis for determining that section 2.1.2 of DigiFlight's quotation exceeded the requirements of the performance work statement and warranted assignment of a strength because the Army determined that DigiFlight's performance would refine the SAMD Repair and Return process and increase the amount of Repair and Return data received. Although disparate treatment claims "can succeed when protesters demonstrate inconsistencies in subjective judgments," see Enhanced Veterans Sols., Inc. v. United States, 131 Fed. Cl. 565, 588 (2017), Sigmatech has asserted that it should have received a strength because "Sigmatech demonstrated equal (at least) R&R experience" as DigiFlight. Sigmatech overlooks the other benefits the Army identified in DigiFlight's

quotation, such as DigiFlight's ability to improve the Army's Repair and Return program, and does not identify information indicating that the Army improperly treated Sigmatech's quotation and DigiFlight's quotation differently.

At the November 13, 2018 oral argument, counsel of record for protestor argued that, in DigiFlight's quotation, DigiFlight did not state that "Digiflight did not intend or promise to use the [redacted]. It [DigiFlight] merely said that it [DigiFlight] had developed it." In DigiFlight's quotation, DigiFlight divided its quotation into two parts, which were labeled "**Understanding**" and "**Methodology**," for each section in the performance work statement. (emphasis and capitalization in original). Under the "**Methodology**" section of DigiFlight's quotation addressing section 2.1.2 of the performance work statement, DigiFlight stated that "[w]e developed the [redacted]," and that "[o]ur tools track and assist in the management of repair requirements, requisition documentation, contract information, other major commands data, and to generate key R&R reports." (emphasis and capitalization in original). Because the statement that Team DigiFlight had developed the SAMD [redacted] was in a section discussing DigiFlight's proposed methodology for performance of section 2.1.2 and in response to a requirement in section 2.1.2 addressing the collection of repair data, the court finds that it was reasonable for the Army to conclude that DigiFlight would use the SAMD [redacted] if awarded a task order under the TORFQ.

Regarding the single strength assigned to sections 2.1.1 and 2.1.3 of DigiFlight's quotation, Sigmatech asserts that the Army awarded DigiFlight a strength because of DigiFlight's use and understanding of [redacted], but overlooked Sigmatech's use and understanding of [redacted] and development of the [redacted], which is referred to by the parties as [redacted]. Section 2.1.1 of the performance work statement stated that the vendor shall "perform financial analyses, verification of FMS monies and provide input and recommendations utilizing automated databases and systems," "track case funding consisting of country level, case level, line level and requisition level data using databases," and "develop and utilize an automated system for FMS financial data collection. This system should access multiple FMS databases and work towards an output that standardizes FMS financial status data reporting." Section 2.1.3 required that a vendor "provide recommendations regarding financial database programs for particular systems and in the establishment of future databases for the budgetary support of the FMS cases" and "provide maintenance of these financial databases for all FMS requirements in order to provide status/information as input to required reports."

In Sigmatech's quotation, Sigmatech stated that Sigmatech employs FMS financial analysts "with decades of relevant experience in supporting the diverse needs of ASAE [Army Security Assistance Enterprise]." Under section 2.1.3, Sigmatech asserted:

> We recommend and support the development of SAMD-unique financial databases, which monitor and report on implemented FMS case line budgets and expenditure. Sigmatech assists in the development and maintenance of FAST financials, which is a compilation of financial reports drawn from GFEBS, PBAS, SOMARDS, and DIFS financial databases.

Sigmatech's quotation also addressed Sigmatech's assistance with the development of the [redacted], as Sigmatech stated:

> We support the migration of legacy SA systems to [redacted], a DoD system which will be common across MILDEPs (**2.1.3.1**). [redacted] will replace the Army legacy systems for logistics and financial processes, such as CISIL and PBAS. Sigmatech has provided SME support to the development of this system, to include analysis of interfaces with the Army-wide GFEBS accounting system. . . . [redacted] will provide the FMS customer with a common and standard system for management of their FMS cases.

(emphasis in original).

In the Army's Evaluation Worksheet, the Army indicated that Sigmatech's quotation met the performance requirements under sections 2.1.1 and 2.1.3 of the TORFQ. The Army commented that, under section 2.1.1, Sigmatech's "experience with various Foreign Military Sales (FMS) financial systems is useful to SAMD in performing financial analysis and providing input and recommendations." Also under section 2.1.1, the Army stated that, while Sigmatech's "experience on the Saudi PATRIOT program is valuable to understanding the importance of organization and financial tracking, it does not support the PWS requirement of developing an automated database that provides standardized reports from multiple systems." Under section 2.1.3, the Army commented that Sigmatech "cites experience under another organization's task order in aiding in the development [sic] the [redacted]. The offeror states this system will aid in case management for the FMS customers and will also support SAMD Case Managers." The Army asserted that Sigmatech "demonstrates experience in aiding in the development of a case management system however; details on how it will perform these tasks in support of SAMD are not provided."

Indeed, in section 2.1.3 of Sigmatech's quotation, Sigmatech primarily focused on the benefits the [redacted] eventually would bring to the Department of Defense when implemented. Sigmatech did not indicate in its quotation when the [redacted] was scheduled to be implemented and noted multiple times that the [redacted] still was being developed. At the November 13, 2018 oral argument, counsel of record for protestor noted that the date on which the Security Enterprise Solution is anticipated to be implemented is "not in the record," but asserted that "[m]y understanding is that it will be in the next five years, but I don't see anything in the record that describes that." Counsel of record for defendant stated that "some day down the road we may have this system [redacted], maybe within the -- maybe within the life span of this contract, maybe not. As -- it's not beyond the pale to believe that a large software system being developed might be delayed." In the Army's Evaluation Worksheet of Sigmatech's quotation, the Army indicated that Sigmatech's generalized, broad statements about the future benefits of the [redacted] did not explicitly address how Sigmatech would address the Army's current needs under section 2.1.3 of the performance work statement. The Army did not ignore Sigmatech's aid in developing the [redacted], but provided a comment in the Evaluation Worksheet that Sigmatech had experience in assisting with the development of a case

management system and that Sigmatech had indicated that the [redacted] will aid in case management for FMS customers. Sigmatech's disagreement with the Army's decision to comment on the Sigmatech's assistance with the development of the [redacted], but not to award a strength for such assistance, is not sufficient to support Sigmatech's claim that the Army irrationally evaluated Sigmatech's quotation. See Centerra Grp., LLC v. United States, 135 Fed. Cl. 587, 604 (2017) ("Disagreements with a procuring agency's evaluation, 'no matter how vigorous, fall far short of meeting the heavy burden of demonstrating that the findings in question were the product of an irrational process and hence were arbitrary and capricious.'" (quoting Banknote Corp. of Am. v. United States, 56 Fed. Cl. at 384)); see also Kvichak Marine Indus., Inc. v. United States, 118 Fed. Cl. 385, 391 (2014) ("Disagreement with the agency's decision is not enough for Kvichak [protestor] to prevail." (citations omitted)).

In DigiFlight's quotation, DigiFlight had stated:

Team DigiFlight uses [redacted] to collect financial transactions (commitments, obligations, and disbursements), automate financial analysis, generate standardized SAMD financial reports, and provide inputs and recommendations based on the analysis and reports. ***Our Team developed*** [redacted]***, maintains the underlying code, and recommends*** [redacted] ***for future SAMD Division and Branch support.*** As shown in ***Figure 2.1***, we maintain and update [redacted] standardized FMS financial reports by accessing access and extract financial data from [redacted]. [redacted]-generated standardized reports provide automated comparisons of source data to quickly identify anomalies, verify [redacted] funding sources, and generate case funding and budget execution reports. Our Team's [redacted] analysts facilitate case funding tracking and report at the country, case, line, and requisition levels. We collect, process, and report [redacted] and [redacted] data to enhance financial case status

(emphasis in original). DigiFlight asserted that, with "the fivefold increase in AMCOM FMS cases over the past decade, an automated FMS financial data collection and standardized reporting system, such as [redacted], is essential to the collection of data to support budgetary processes for management of the $53.2B in undelivered value for over 1,000 SAMD-managed FMS cases." According to DigiFlight, "***Team-developed*** [redacted] automatically retrieves and merges critical FMS financial records from legacy databases, improves accuracy and efficiency, and [redacted]." (emphasis in original). DigiFlight further asserted that "[o]ur [redacted] growth plan is used to provide recommendations to SAMD regarding database programs for specific systems and to establish future Team-developed automated solutions. Our programming team maintains these tools to meet SAMD future requirements."

Regarding section 2.1.1 and 2.1.3 of DigiFlight's quotation, in the Evaluation Worksheet of DigiFlight's quotation, the Army awarded DigiFlight a strength and stated that:

The Offeror's proposal details its response to the Task Order Request for Quotation (TORFQ) and the USG Performance Work Statement's requirements for financial databases, analysis, tracking and use, as well as the updates and maintenance of those databases. The Offeror has developed a financial reporting system called [redacted], which accesses the pertinent SAMD financial systems to include [redacted]. The Offeror demonstrates superior understanding of multiple SAMD databases necessary to support its proprietary [redacted] system that provides an exceptional level of financial support by maintaining and updating [redacted] standardized reports to aid in quickly identifying anomalies and for case managers to use in managing and executing Foreign Military Sales (FMS) case lines. The [redacted] system also collects, processes, and reports data from [redacted]. The Offeror utilizes legacy systems for reporting, maintaining the underlying code for [redacted], and providing recommendations and plans for future growth of the [redacted] system to support SAMD's evolving needs.

The Offeror's specialized knowledge and experience in both legacy and current data systems will be advantageous to SAMD in managing case line and contract financials. The use of the legacy systems and the innovative development of the [redacted] system will enable the Offeror to provide critical recommendations to SAMD for future growth and exceptional support for program resource control. The Offeror's development and maintenance of its innovative [redacted] system will also benefit SAMD by exporting data from multiple SAMD financial databases and will provide a consistent standardized report. The Offeror's unique skillset with [redacted] and legacy systems will increase mission efficiency of financial management by reducing the time to pull reports from multiple systems, simplifying data utilization, and providing automated financial solutions to the FMS case managers.

Consistent with the Army's rationale for awarding DigiFlight's quotation a strength, DigiFlight's quotation discussed, at length, that DigiFlight had developed and maintained the underlying code for [redacted] and explained that [redacted] automatically retrieved existing FMS records from legacy databases, a requirement listed in section 2.1.1 of the performance work statement. The Army identified DigiFlight's experience with [redacted] and legacy systems as providing DigiFlight with the ability to increase the efficiency of collecting financial data, which the Army stated would be beneficial to the Army by reducing the amount of time spent retrieving financial data. By maintaining the underlying code to [redacted], the Army also stated that DigiFlight would be able to further develop [redacted] to support "SAMD's evolving needs," which appears to relate to the requirement in section 2.1.3 of the performance work statement that a vendor provide recommendations regarding the "establishment of future databases for the budgetary support of the FMS cases." The Army's conclusion appears to be supported by DigiFlight's quotation, as DigiFlight's "[redacted] plan" is to provide to the Security Assistance Management Directorate recommendations "regarding database programs

for specific systems and to establish future Team-developed automated solutions." According to the Army's Evaluation Worksheet, DigiFlight's experience with legacy systems and [redacted] also is advantageous to the Army because it permits DigiFlight to support "future growth and exceptional support for program resource control," which appears to be supported by DigiFlight's statement that its resource management approach "provides a *low-cost, time saving, and automated data collection methodology* coupled with analytical processes to track country, case, and line execution; facilitates auditability and traceability; and provides total program resource control." (emphasis in original).

Although Sigmatech did state in its proposal that Sigmatech "[redacted]," Sigmatech only mentioned [redacted] once, and Sigmatech did not elaborate on the benefits Sigmatech's use [redacted] would bring to the Security Assistance Management Directorate in a manner remotely similar to DigiFlight's description. DigiFlight explained and emphasized, at length, the benefits DigiFlight's use of [redacted] provided to the Security Assistance Management Directorate and how DigiFlight could further alter [redacted] to meet the developing needs of the Security Assistance Management Directorate. Sigmatech did not assert that it maintained the underlying code for [redacted] or that Sigmatech had the ability to develop [redacted] to meet the needs of the Security Assistance Management Directorate. Sigmatech's discussion of [redacted] and DigiFlight's discussion of [redacted] differed in detail and in substance, and the Army articulated a basis for assigning a strength to sections 2.1.1 and 2.1.3 of DigiFlight's quotation. As such, the Army did not engage in disparate treatment when awarding a strength to sections 2.1.1 and 2.1.3 of DigiFlight's quotation. Moreover, the Army's evaluators had discretion when assigning strengths to quotations received by the Army, and the strength assigned to sections 2.1.1 and 2.1.3 of DigiFlight's quotation was rational and supported by the administrative record.

Regarding the strength the Army assigned to section 2.2.2 of DigiFlight's quotation, section 2.2.2 of the performance work statement stated that the vendor shall "perform cost estimating and analysis of data prepared and furnished by other contractors and USG agencies" and "provide analysis of the life cycle cost requirements for FMS programs." In section 2.2.2 of DigiFlight's quotation, DigiFlight had stated that "Team DigiFlight uses our Team's [redacted] cost estimating analysts to conduct line-by-line reviews of LOR data provided by PMs, OEMs, and USG agencies. We provide thorough analyses of life cycle costs and recommendations during reviews with SAMD, FMS Partners, and prime contractors." In the Army's Evaluation Worksheet discussing DigiFlight's quotation, the Army assigned a strength to section 2.2.2 of DigiFlight's quotation and stated:

The Offeror demonstrates the unique ability to perform cost analysis by utilizing their [redacted] cost estimation analysts, which are personnel trained and certified using cost analysis methods. This training, already provided to the Offeror's existing workforce, will improve the quality of detailed cost assessments to SAMD.

41

The Army's Evaluation Worksheet of DigiFlight's quotation indicates the Army determined that training in the use of [redacted] was a desirable quality for a vendor to possess because, under section 2.2.2 of the performance work statement, vendors were required to perform cost estimating and analysis. The Army's evaluators explained that the Army believed that DigiFlight's pre-existing training in [redacted] would improve the quality of cost assessments provided to the Security Assistance Management Directorate. Although the Army's discussion of how training in [redacted] will improve the quality of cost assessments is not of ideal clarity, the Army has articulated a rational reason to award DigiFlight a strength, as training in [redacted] appears to support the Army's requirement of cost estimating and analysis of cost data, as well as the Army's conclusion that certification and training in the use of [redacted] will improve the quality of cost assessments. See Info. Scis. Corp. v. United States, 73 Fed. Cl. 70, 108 (2006), recons. granted in part on other grounds, 75 Fed. Cl. 406 (2007). Moreover, the "assignment of technical ratings is a matter that is within the broad discretion of the procuring agency, and this court will not intrude into that area in the absence of truly irrational conduct on the part of the agency." See FirstLine Transp. Sec., Inc. v. United States, 100 Fed. Cl. at 397; see also Kiewit Infrastructure W. Co. v. United States, 137 Fed. Cl. 689, 706 (2018) ("The court will not second-guess the Corps' technical judgment."). Sigmatech has not demonstrated why it was irrational for the Army to conclude that training in [redacted] did not exceed the requirement of cost estimating and analysis of cost data in section 2.2.2 of the performance work statement.

As noted by Sigmatech, the Army did not assign a strength to section 2.2.2 of Sigmatech's quotation, although the Army determined that Sigmatech's quotation met the requirements of the performance work statement. In Sigmatech's quotation, Sigmatech did discuss its technical ability to perform cost analyses. Although Sigmatech argues that Sigmatech "devoted almost a full page describing its approach to the lifecycle cost requirement, including the disciplines it uses and how those disciplines relate to SAMD's mission," Sigmatech's disagreement with the Army's judgment, without more, is not sufficient to overcome the Army's judgment when assigning strengths. See FFL Pro LLC v. United States, 124 Fed. Cl. 536, 558 (2015) (stating that a protestor had "not met its heavy burden of establishing" that the agency's evaluation was unreasonable when the protestor's "contentions amount to nothing more than disagreements with the strengths assigned" by the agency). Sigmatech's quotation and DigiFlight's quotation differed, as Sigmatech did not indicate that its staff were trained or certified in [redacted]. Sigmatech has not demonstrated why the Army engaged in disparate treatment when assigning a strength to section 2.2.2 of DigiFlight's quotation based on training that Sigmatech did not discuss in its quotation. See Enhanced Veterans Sols., Inc. v. United States, 131 Fed. Cl. at 588 ("When a court is not convinced that the aspects of the proposals brought to its attention are indistinguishable for purposes of the evaluation, then the exercise instead crosses the line and involves the second guessing of 'minutiae' which we are not allowed to undertake, see E.W. Bliss Co. [v. United States], 77 F.3d [445,] 449 [(Fed. Cir. 1996)].").

In evaluating the vendors' quotations, the Army is entitled to a presumption of regularity, as "[t]here is a 'strong presumption that government officials act correctly, honestly, and in good faith when considering bids.'" McVey Co., Inc. v. United States, 111

Fed. Cl. at 403-04 (quoting Savantage Fin. Servs., Inc. v. United States, 86 Fed. Cl. 700, 703 (2009), aff'd, 595 F.3d 1282 (Fed. Cir. 2010)); see also Pyramid Real Estate Servs., LLC v. United States, 95 Fed. Cl. 125, 134 (2010) (citation omitted). Sigmatech has not shown that the Army's evaluators acted improperly or otherwise acted not in accordance with the law when evaluating Sigmatech's quotation or DigiFlight's quotation. Sigmatech, therefore, has failed to show that the Army engaged in any disparate treatment when evaluating DigiFlight's quotation and Sigmatech's quotation or that the Army acted irrationally by failing to award strengths to Sigmatech's quotation as suggested by Sigmatech.[13]

Sigmatech also asserts that the Army's Best Value and Fair and Reasonable Determination was flawed. Sigmatech states that Sigmatech and DigiFlight both received a rating of outstanding under the Risk Mitigation and Management factor and that Sigmatech proposed a lower price. Sigmatech asserts that the Army made award to DigiFlight based on a "perceived distinction between the offerors' expertise under the Technical Expertise Factor," and that the Army "was wrong to do so." Sigmatech argues that the Army "improperly attributed Digiflight with development credit for [redacted]," but that "Digiflight did not develop [redacted], nor did it claim to have done so." Sigmatech argues that, "[s]imilarly, Digiflight failed to explain how it would use both the [redacted] and the [redacted] system." According to Sigmatech, "just as problematic, was the Agency's unequal evaluation of proposals," which Sigmatech asserts "zeroed-in on the [redacted] system as the key technological discriminator," but "never accounted for Sigmatech's use of the [redacted] system." Sigmatech also contends that:

> Sigmatech's proposal demonstrated its participation in the development of [redacted] - - the program that will replace [redacted]. But that participation was not mentioned at all in the contemporaneous evaluation record, and certainly was not the basis of a strength as was Digiflight's participation in the development of other tools. That is impermissible.

(internal references and citation omitted).

Defendant contends that the Army's source selection decision was rational and that Sigmatech's argument to the contrary "is no more than a continuation of its unequal treatment arguments addressed above." Defendant argues that the Army's source selection decision was "comprehensively discusses" "[o]ver 27 pages," and that "it is difficult to conceive of how the contracting officer could have provided more of an explanation or documentation of the award decision rationale." Defendant contends:

> Sigmatech does identify one minor error in the best value determination. In the summary of the evaluation findings contained in the best value

---

[13] The GAO also rejected Sigmatech's claim that the Army unreasonably evaluated Sigmatech's quotation and concluded that Sigmatech's "disagreement with the agency's judgment does not provide a basis to sustain the protest." See Sigmatech, Inc., 2018 WL 5110874, at *4 (citation omitted).

discussion, [redacted] was inadvertently listed as one of the tools developed by Team DigiFlight. However, the summary also omitted what the evaluators noted as a strength in DigiFlight's proposal related to [redacted]: offering of cost analysts trained and certified in the [redacted] system. All the strengths assigned to each offeror were listed correctly at the beginning of the SSD [source selection decision], but due to a scrivener's error, when DigiFlight's strengths were summarized for the best value discussion, DigiFlight's strength related to [redacted] was noted incorrectly.

This minor error did not materially impact the result of the best value determination in any way, because it did not involve adding an extra strength to DigiFlight or taking one away from Sigmatech. Rather, this minor error merely mischaracterized in the summary a strength correctly recorded for the particular PWS requirement and recognized earlier in the evaluation document.

 (internal references omitted).

In defendant-intervenor's cross-motion for judgment on the administrative record, defendant-intervenor likewise asserts that the Army's source selection was rational and supported by the administrative record. According to defendant-intervenor, "[b]ecause Sigmatech's evaluation claims fail, so does its objection to the Source Selection Decision."

The parties in the above-captioned bid protest have stipulated that the "TORFQ was issued pursuant to the Army's AMCOM EXPRESS Blanket Purchase Agreements and the procurement procedures of Federal Acquisition Regulation (FAR) 8.405-3(c)." (capitalization in original). The TORFQ stated that the procurement was being conducted under FAR Subpart 8.4, and that award "will be based on the quotation representing the best value, using the evaluation procedures outlined below." Under FAR § 8.405-3(c) (2018), when an order placed against a multiple-award blanket purchase agreement[14] will exceed the simplified acquisition threshold, such as the procurement under the TORFQ, the agency placing the order shall:

(1) Provide an RFQ to all BPA holders offering the required supplies or services under the multiple-award BPAs, to include a description of the supplies to be delivered or the services to be performed and the basis upon which the selection will be made;

(2) Afford all BPA holders responding to the RFQ an opportunity to submit a quote; and

---

[14] The Army's Best Value and Fair and Reasonable Determination states that the "EXPRESS Program BPAs are multiple-award task order type contract vehicles with provisions for time (labor hours at a fixed rate) and material, travel, and other direct costs (ODCs) on a cost reimbursement basis." (capitalization in original).

(3) Fairly consider all responses received and make award in accordance with the selection procedures.

FAR § 8.405-3(c)(iii)(A). The agency "shall document evidence of compliance with these procedures and the basis for the award decision." FAR § 8.405(c)(iii)(B).

When determining which quotation offers the best value to the government in a procurement utilizing the FSS, "[p]rocurement officials have substantial discretion." See Allied Tech. Grp., Inc. v. United States, 94 Fed. Cl. at 49 (citing Blackwater Lodge & Training Ctr., Inc. v. United States, 86 Fed. Cl. 488, 514 (2009)); see also Idea Int'l, Inc. v. United States, 74 Fed. Cl. 129, 140 (2006) (analyzing a protest challenging an award under the FSS and stating that "[t]he Court is mindful that the agency's evaluation and award decision in a best value procurement is an area of wide agency discretion" (citations omitted)). When reviewing an agency's "FAR Part 8 tradeoff analysis, the Court will analyze the CO's tradeoff decision to determine whether it is reasonable and within the agency's discretion." Distributed Sols., Inc. v. United States, 106 Fed. Cl. 1, 24 (2012) (citing Allied Tech. Grp., Inc. v. United States, 94 Fed. Cl. at 50), aff'd, 500 F. App'x 955 (Fed. Cir. 2013). When a contracting officer reasonably exercises independent judgment and makes a business decision justifying the award, the court will not overturn the contracting officer's determination "merely because Allied [the protestor] disagrees with the agency's analysis." See Allied Tech. Grp., Inc. v. United States, 94 Fed. Cl. at 50 (citing E.W. Bliss Co. v. United States, 77 F.3d at 449); see also Holloway & Co., PLLC v. United States, 87 Fed. Cl. 381, 396 (2009) (determining that an agency's best value trade-off determination in a procurement utilizing the FSS was reasonable when the agency "offered a '"coherent and reasonable explanation of its exercise of discretion"'" (quoting Centech Grp., Inc. v. United States, 554 F.3d at 1037 (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332-33))).

In the above-captioned bid protest, the Army noted in its Best Value and Fair and Reasonable Determination that the Technical Expertise factor and the Risk Mitigation and Management factor were of equal weight, and that each factor was more important than the Price factor, which the Army stated was not expected to be the "controlling criterion" under the TORFQ. The Best Value and Fair and Reasonable Determination discussed the ratings, strengths, weaknesses, and deficiencies assigned by the Army's evaluators and provided the following chart summarizing the evaluators' conclusions:

| Offeror | DigiFlight | Sigmatech | S3 |
|---|---|---|---|
| Technical Expertise | Outstanding | Good | [redacted] |
| Risk Mitigation & Management | Outstanding | Outstanding | [redacted] |
| Total Price | $63,001,142.24 | $61,454,297.78 | [redacted] |

The Army noted that all offerors demonstrated a capability to successfully perform the requirements in the TORFQ.

Under the Risk Mitigation and Management factor, in the Best Value and Fair and Reasonable Determination, the Army stated:

> DigiFlight and Sigmatech both received the rating "Outstanding" indicating an exceptional approach. Both demonstrated a thorough approach to Risk Mitigation and Management. Both demonstrated proven techniques in their abilities to obtain and retain qualified personnel, ability to bring together the right team to perform PWS requirements and the ability to effectively manage the project; thus providing continuous support and risk mitigation through the performance of the PWS requirements.

The Army had assigned three strengths to the Risk Mitigation and Management factor in both DigiFlight's quotation and Sigmatech's quotation.

The Army's Best Value and Fair and Reasonable Determination noted that, under the Technical Expertise factor, DigiFlight was the only vendor who received a rating of outstanding, as Sigmatech [redacted] received ratings of good under the Technical Expertise factor. According to the Army, DigiFlight's quotation provided "superior responses describing their capability to accomplish the PWS requirements and how they plan to meet requirements through examples of relevant experience associated with each PWS paragraph." The Army stated that DigiFlight demonstrated "exceptional capability" and presented "virtually no risk to the Government." Indeed, DigiFlight received five strengths under the Technical Expertise factor, as compared to Sigmatech [redacted], who the Army noted had each received one strength under the Technical Expertise factor. The Army identified other benefits DigiFlight's proposed performance would provide to the Army, including:

> DigiFlight demonstrated exceptional understanding in the use of current and legacy data systems. DigiFlight developed and implemented numerous systems and databases such as [redacted]. The implementation of these programs will significantly aid in collecting, processing and refining, analyzing and tracking data. The use of such innovative databases/systems will effectively redefine data collection and processing.

The Army's Best Value and Fair and Reasonable Determination, therefore, identified multiple benefits associated with DigiFlight's quotation under the Technical Expertise factor.

Regarding the Price factor, the Army stated:

> Based upon a price comparison of the Offerors, all three Offerors total quoted prices are lower than the Independent Government Estimate (IGE). DigiFlight's total quoted price of $63,001,142.24 is 2% higher than

> Sigmatech's total quoted price of $61,454, 297.78 and [redacted] lower than S3's quoted price of [redacted]. Sigmatech's total quoted price of $61,454,297.78 is 6% lower than S3's quoted price of [redacted].

(capitalization in original). The Army's discussion of price accurately approximated the differences in the vendors' proposed prices, as DigiFlight's proposed price, $63,001,142.24, is approximately 2.517 percent higher than Sigmatech's proposed price of $61,454,297.78. DigiFlight's proposed price, $63,001,142.24, is approximately [redacted] percent lower than S3's proposed price of [redacted].

The Army concluded in the Best Value and Fair and Reasonable Determination that, "[d]ue to its ratings of 'Outstanding' for Technical Expertise and Risk Mitigation and Management and the 2% price premium between it and Sigmatech, DigiFlight's proposal offers the best value to the Government." In a section of the Best Value and Fair and Reasonable Determination titled "Trade-Off Discussion," the Army stated:

> The Government considered DigiFlight's strengths in the critical requirements for both its Technical Expertise and Risk Mitigation and Management. There were no weaknesses in either of these categories. DigiFlight demonstrated the capability and experience to successfully perform the requirements of the PWS with virtually no risk to the Government. Consistent with the evaluation criteria, Technical Expertise and Risk Mitigation and Management are of greater importance than Price. DigiFlight demonstrated a far superior approach in both Technical Expertise and Risk Mitigation and Management. DigiFlight received the highest ratings in the two most important criteria (Technical and Risk Mitigation and Management), and only presented a slight disadvantage over Sigmatech in the least important criteria of Price. DigiFlight's significant strengths exceeds specified performance capability requirements in a way that will be advantageous to the Government during contract performance. Consequently, DigiFlight's strengths in Technical Expertise and Risk Mitigation and Management support the Government's payment of a higher price premium and will provide the Government the best value.

(capitalization in original).

Although DigiFlight and Sigmatech both received ratings of outstanding under the Risk Mitigation and Management factor, under the Technical Expertise factor, DigiFlight received a rating of outstanding, which, under the terms of the TORFQ, indicates an "exceptional level of expertise" and that strengths "far outweigh any weaknesses." Sigmatech only received a rating of good under the Technical Expertise factor, which, according to the TORFQ, indicates that Sigmatech had a "thorough level of expertise," and that Sigmatech's strengths "outweigh any weaknesses." Moreover, under the Technical Expertise factor, DigiFlight received five strengths, while Sigmatech only received one strength. Under the terms of the TORFQ, the Technical Expertise factor and the Risk Mitigation factor were of equal value, which indicates that DigiFlight's quotation's

higher rated Technical Expertise factor and equally rated Risk Mitigation factor was of more value to the Army than Sigmatech's quotation under those two factors. In addition to noting that DigiFlight's quotation had received a higher rating under the Technical Expertise factor, the Army also identified multiple benefits in DigiFlight's quotation under the Technical Expertise factor, as discussed above. The Army's Best Value and Fair and Reasonable Determination indicates that the Army determined that DigiFlight's proposed performance justified paying an approximately two percent price premium to DigiFlight in order to obtain DigiFlight's "far superior approach in both Technical Expertise and Risk Mitigation and Management" at only a "slight disadvantage" in price. The Army's best value trade-off decision appears to have been made in accordance with the evaluation criteria in the TORFQ, which stated that the Risk Mitigation and Management factor and the Technical Expertise factor both were of greater importance than price. The Army documented its business judgments when choosing to pay a premium of approximately only two percent in exchange for a quotation the Army believed to have the strongest technical approach, as well as a risk mitigation and management approach that also received the highest adjectival rating under the TORFQ, which indicates that the Army rationally exercised its discretion when conducting a best value trade-off under FAR § 8.405-3(c). See Allied Tech. Grp., Inc. v. United States, 94 Fed. Cl. at 50 (citing E.W. Bliss Co. v. United States, 77 F.3d at 449); see also Holloway & Co., PLLC v. United States, 87 Fed. Cl. at 396.

Regarding Sigmatech's argument that the Army "improperly attributed Digiflight with development credit for [redacted]," in the Army's Best Value and Fair and Reasonable Determination, the Army stated that "DigiFlight developed and implemented numerous systems and databases" and provided a list that included the "[redacted] and incorporating the use of [redacted]." In DigiFlight's quotation, DigiFlight had stated that "Team DigiFlight uses our Team's [redacted] cost estimating analysts," but did not discuss the development of [redacted]. Although the Army appears to have inadvertently included [redacted] in a list of systems developed and to be utilized by DigiFlight, award to DigiFlight does not appear to have been premised on the Army's incorrect statement that DigiFlight developed [redacted]. Prior to stating that DigiFlight had developed [redacted], in the Army's Best Value and Fair and Reasonable Determination, the Army correctly noted that the Army had awarded DigiFlight a strength based on DigiFlight's use of [redacted], not because DigiFlight had developed [redacted]. The Army also correctly identified the five strengths DigiFlight received under the Technical Expertise factor and the ratings assigned to DigiFlight's quotation, and the one minor misstatement in the Army's Best Value and Fair and Reasonable Determination does not override the Army's determination that the use of [redacted] was a strength in DigiFlight's quotation or the Army's sufficiently documented decision that DigiFlight's quotation offered the best value to the Army.

Regarding Sigmatech's argument that the Army's Best Value and Fair and Reasonable Determination was flawed because "Digiflight failed to explain how it would use both the [redacted] and the [redacted]," in its quotation, DigiFlight stated that "[w]e developed the SAMD [redacted] to assist in managing UAE, Egypt, Saudi Arabia, and Kuwait FMS cases. Our tools track and assist in the management of repair requirements,

requisition documentation, contract information, other major commands data, and to generate key R&R reports." DigiFlight also stated:

> ***Team-developed*** [redacted] ***tool includes*** [redacted] ***and is available at no additional development cost to SAMD.*** [redacted] facilitates retrieval of products to respond rapidly to partner questions and can be used to develop inputs for issue papers, briefings, program booklets, FMS documentation, handbooks, and training courses IAW the CDRL [contract data requirements list].

(emphasis in original). DigiFlight asserted that "[redacted] and [redacted] automate and integrate program management and multiple simultaneous users; provide enhanced risk identification and resolution; and delivers in-country and regional support to COCOMs and FMS Partners." (emphasis in original). DigiFlight's quotation indicated that DigiFlight uses both the [redacted] and the [redacted] and described the purpose of both the [redacted] and the [redacted]. Sigmatech's argument that DigiFlight "failed to explain" how DigiFlight would use the [redacted] and the [redacted], therefore, is factually incorrect and unsupported by the administrative record.

Sigmatech's argument that the Army's best value determination was flawed because the Army improperly credited DigiFlight's use of [redacted] but did not "account[]" for Sigmatech's use of [redacted] and assistance with the development of the [redacted] is repetitive of Sigmatech's unavailing disparate treatment claim discussed above and also fails. As discussed above, the Army rationally awarded DigiFlight a strength based on Team DigiFlight's development and use of [redacted], as well as Team DigiFlight's retention of the underlying code for [redacted], which the Army stated could be modified to meet the future needs of the Security Assistance Management Directorate. It was rational for the Army to not award a strength to Sigmatech based on Sigmatech's one-line statement that Sigmatech "assists in the development and maintenance of [redacted] financials" because Sigmatech did not fully discuss its use of [redacted], the benefits of [redacted], or indicate that Sigmatech maintained the underlying code for [redacted] with the ability to modify [redacted] to meet the Army's future needs. The Army also noted that Sigmatech's development of the [redacted], a system that is still being developed, "demonstrates experience in aiding in the development of a case management system," but rationally determined that Sigmatech did not provide "details on how it will perform these tasks in support of SAMD." The Army's Best Value and Fair and Reasonable Determination was not flawed because it stated that DigiFlight developed and utilized [redacted], which was a strength rationally awarded to Team DigiFlight's quotation. Sigmatech, therefore, has failed to demonstrate that the Army's best value trade-off decision was flawed.

In Sigmatech's complaint in the above-captioned bid protest, Sigmatech further asserts that

> KBRWyle (and therefore, DigiFlight) has an organizational conflict of interest—that is, as the subcontractor to DigiFlight under the RFQ and as

the contractor under the DS TAT task order, KBRWyle would have to monitor and evaluate its own work under the DS TAT task order an impermissible impaired objectivity OCI.

In Sigmatech's motion for judgment on the administrative record, Sigmatech argues that the Army's evaluation "of KBRWyle's impaired objectivity OCI resulting from its work on related task orders was arbitrary, capricious, and contrary to law." According to Sigmatech, "if DigiFlight is awarded the TORFQ, KBRWyle will be overseeing and providing the inputs for its own work, resulting in a gross violation of the impaired objectivity OCI rules." Sigmatech states:

> It is true that DS TAT is managed by Defense Technical Information Center on behalf of the Program Executive Office – Missiles and Space Defense, and the current TORFQ will be issued and managed by SAMD. But that distinction does not resolve the interaction and consequential impaired objectivity OCI carried by KBRWyle's dual role.

Sigmatech argues:

> Here is a concrete (hypothetical) example of KBRWyle's conflicting roles: the Kuwaiti government discovers that a piece of equipment on its Patriot missiles, such as an igniter, does not work properly. The LTPO Patriot Missile program management office, populated and supported by KBRWyle, would conduct an engineering study to understand the problem. That office might determine that the igniter is incompatible with a generator being used. The LTPO Patriot Division would then coordinate with SAMD, populated and supported by KBRWyle, to procure the appropriate igniter. SAMD would analyze the contractual requirements and identify funding. SAMD and LTPO Patriot Division, both populated and supported by KBRWyle, would then brief both Kuwaiti and Agency personnel at a program or contract management review. LTPO and SAMD, again via KBRWyle, would work together to identify a selling source and SAMD would purchase the igniter. SAMD and LTPO, both utilizing KBRWyle personnel, would then work together to deliver and field the igniter to the Kuwaitis. This is merely one of hundreds of interactions between the 71 contractor employees currently assigned to SAMD and the countless KBRWyle employees spread throughout program offices on half a dozen contracts under the DS TAT task orders.

Sigmatech further contends that the Army cannot "argue that the level of OCI is not substantial because of the distinct organizational structures" because "the entire right side of the LTPO Patriot Division organizational chart involves providing Patriot missile support to foreign countries." According to Sigmatech:

> SAMD's own organizational chart shows that it has no day-to-day employees overseeing the actions of contractor-employees in several

> offices, including: the LTPO Foreign Liaison Offices; the LTPO Saudi/UAE Branch; **the LTPO OCONUS Kuwait Field Office**; the Apache Egypt Front Office; the Aviation Utility Systems Division for the United Arab Emirates; and the Cargo helicopter branch for the United Kingdom. No Agency employee oversees the daily interactions of these individuals, all of whom are currently **Sigmatech** personnel. No amount of government supervision can account for contractor personnel sitting alone and unsupervised.

(emphasis in original; internal references omitted). Sigmatech asserts that the Army cannot solely rely on government oversight to remedy an impaired objectivity OCI.

In defendant's cross-motion for judgment on the administrative record, defendant argues that "KBRwyle will never be in a situation where it will be overseeing or evaluating the work of other KBRwyle contract employees performing under other task orders." According to defendant, contracting officer Ashantas Cornelius determined that, "contrary to Sigmatech's representations, KBRWyle's task orders with the Army are distinct from each other, are performed for separate agency offices under Government supervision, and primarily consist of providing information to Government decision-makers." Defendant contends that Sigmatech's hypothetical is "an inaccurate representation of how the task orders operate" because the

> fatal flaw in the scenario sketched out by Sigmatech, [sic] is that it does not accurately reflect how LTPO and SAMD would address the situation presented. In reality, the original equipment manufacturer (OEM) and its suppliers are used for cases when PATRIOT components are not operating correctly in FMS systems. The OEM and its suppliers conduct engineering studies to understand any performance issues and provide solutions to the Government for approval. Once these findings are presented to the Government, the support contractor – *i.e.*, KBRWyle – may be involved with providing independent assessment and recommendations as inputs to the Government to make their decisions. KBRWyle is not an OEM, nor does it have a contractual role with any OEM suppliers for the PATRIOT Air and Missile Defense System. The situation described in Sigmatech's hypothetical is simply not a possibility.

(internal references omitted; emphasis in original). Defendant also argues that Sigmatech's hypothetical "shows how KBRwyle's performance of the various task orders could work together *to benefit* the agency," and that "[t]here simply are no competing 'push-pull' interests presented in the hypothetical." (emphasis in original).

Defendant-intervenor asserts that Sigmatech has failed to establish an impaired objectivity OCI and that Sigmatech's "rambling hypothetical" is "unsupported by any citations to the record and ultimately establishes no OCI and no more than a mere possibility that KBRwyle employees might be called upon to 'work together' under different task orders supporting SAMD and LTPO." Defendant-intervenor argues that the Army need not rely on a government oversight defense, as Sigmatech alleges, because

the contracting officer did not rely on a government oversight defense, but, rather, found that no impaired objectivity OCI existed, regardless of government oversight. Defendant-intervenor also argues that Sigmatech's "alleged OCI involves matters of contract administration that are beyond the jurisdiction of this Court."[15] Defendant-intervenor contends that DigiFlight has not yet determined which portions of the contract awarded under the TORFQ KBRWyle will perform and that, "[i]f, during contract administration, the Contracting Officer and/or DigiFlight perceive that KBRwyle 'will be in a position to oversee, evaluate, test and influence' work performed by KBRwyle for LTPO, any perceived OCI can be avoided by DigiFlight not allocating that particular work to KBRwyle." According to defendant-intervenor, "[i]n essence, what Sigmatech is protesting is contingent on future events that may never happen. Accordingly, the OCI allegations concerning other task orders are not ripe and therefore not justiciable." In Sigmatech's November 9, 2018 response and reply, Sigmatech did not address defendant-intervenor's argument that Sigmatech's impaired objectivity OCI involved concerns related to contract administration.[16]

The statute at 28 U.S.C. § 1491(b)(1) "confers exclusive jurisdiction upon the Court of Federal Claims over bid protests against the government." Distributed Sols., Inc. v. United States, 539 F.3d 1340, 1344 (Fed. Cir. 2008). Matters involving questions of contract administration, however, are not within this court's bid protest jurisdiction under 28 U.S.C. § 1491(b)(1). See Kellogg Brown & Root Servs., Inc. v. United States, 117 Fed. Cl. 764, 770 (2014); see also Coast Prof'l, Inc. v. United States, 136 Fed. Cl. 467, 474 (2018) ("Entitlement to a certain number of accounts based on a contract is not in the Court's bid protest purview, and instead is a contract administration matter under the Contracts Disputes Act, 41 U.S.C. §§ 7101-09."). A Judge of the United States Court of Federal Claims has stated:

> When a party objects to a decision by a federal agency that was made because that party was a government contractor, and not because the party was an offeror for a contract to be awarded, then the matter is properly viewed as seeking "relief arising under or relating to the contract" held by the party, 48 C.F.R. § 2.101, rather than presenting a circumstance in which the party's "direct economic interest would be affected by the award of the contract or by failure to award the contract," 31 U.S.C. § 3551(2).

Itility, LLC v. United States, 124 Fed. Cl. 452, 458 (2015).

"Under FAR § 9.504(a), a CO [contracting officer] must '[i]dentify and evaluate potential organizational conflicts of interest as early in the acquisition process as possible' and '[a]void, neutralize, or mitigate *significant potential conflicts* before contract award." Turner Constr. Co. v. United States, 645 F.3d at 1386 (emphasis and alterations in

---

[15] In defendant's motion for judgment on the administrative record, defendant did not argue that this court lacks jurisdiction over Sigmatech's impaired objectivity OCI.

[16] As discussed above, at the November 13, 2018 oral argument, counsel of record for protestor withdrew protestor's OCI claim involving Eileen Whaley.

original) (quoting FAR § 9.504(a)); <u>see also</u> FAR § 9.504(a) (2018). "'A significant potential conflict of interest is one which provides the bidding party a substantial and unfair competitive advantage during the procurement process on information or data not necessarily available to other bidders.'" <u>Turner Constr. Co. v. United States</u>, 645 F.3d at 1386 (quoting <u>PAI Corp. v. United States</u>, 614 F.3d at 1352); <u>see also</u> <u>ViON Corp. v. United States</u>, 122 Fed. Cl. 559, 579 (2015) (quoting <u>Turner Constr. Co. v. United States</u>, 645 F.3d at 1386). "However, the FAR recognizes that the identification of OCIs and the evaluation of mitigation proposals are fact-specific inquiries that require the exercise of considerable discretion." <u>Axiom Res. Mgmt., Inc. v. United States</u>, 564 F.3d at 1381-82 (citing FAR § 9.505); <u>see also</u> <u>Monterey Consultants, Inc. v. United States</u>, 120 Fed. Cl. 567, 572 (2015). Therefore, "[t]he CO has considerable discretion in determining whether a conflict is significant." <u>Turner Constr. Co. v. United States</u>, 645 F.3d at 1386 (citing <u>PAI Corp. v. United States</u>, 614 F.3d at 1352); <u>see also</u> <u>Parcel 49C Ltd. P'ship v. United States</u>, 130 Fed. Cl. 109, 123 (2016) (citing <u>PAI Corp. v. United States</u>, 614 F.3d at 1352). Further, the identification of an OCI "must be based on 'hard facts; a mere inference or suspicion of an actual or apparent conflict is not enough.'" <u>Turner Constr. Co. v. United States</u>, 645 F.3d at 1387 (quoting <u>PAI Corp. v. United States</u>, 614 F.3d at 1352); <u>see also</u> <u>Loch Harbour Grp., Inc. v. United States</u>, 128 Fed. Cl. 294, 302 (2016) ("But, to prove an OCI, LHG [protestor] must identify hard facts to support this claim. A mere inference or suspicion of an actual or apparent conflict is not enough." (citing <u>PAI Corp. v. United States</u>, 614 F.3d at 1352)); <u>Macaulay-Brown, Inc. v. United States</u>, 125 Fed. Cl. 591, 602 (2016) (quoting <u>Turner Constr. Co. v. United States</u>, 645 F.3d at 1387).

Although defendant-intervenor DigiFlight asserts that, "because DigiFlight's proposal does not identify the work that will be subcontracted to KBRwyle, the earliest that the Contracting Officer can comply with her duties under FAR § 9.504(a)(1) is during the administration of the task order," the administrative record indicates that the Army was able to identify work KBRWyle will perform under the DigiFlight Task Order and evaluate Sigmatech's impaired objectivity OCI claim. Contracting officer Ashantas Cornelius was able to review the relevant tasks orders and conclude that KBRWyle's performance under the DigiFlight Task Order will not include evaluating KBRWyle's performance under other task orders awarded by the Lower Tier Project Office and the Security Assistance Management Directorate.

In the Army's October 2, 2018 Determination and Findings analyzing Sigmatech's impaired objectivity OCI, contracting officer Ashantas Cornelius stated that

> it has not been determined by the prime contractor (DigiFlight) which specific tasks that KBRWyle/CAS will perform. DigiFlight, the Government and KBRWyle/ CAS, Inc. will review and determine the best use of labor categories in of the AMCOM SAMD programmatic support mission. Upon review and approval, KBRWyle will be assigned specific labor tasks in accordance with the BPA and applicable clauses.

(internal references omitted). Ashantas Cornelius, however, also stated that she "found no evidence of impaired objectivity with KBRWyle/CAS, Inc. in performance of their duties

supporting the EXPRESS Task Order and the DTIC Task Orders. KBRwyle working on the EXPRESS task order will not be monitoring or evaluating the work of KBRwyle employees on the DTIC task orders." In the November 1, 2018 declaration signed by contracting officer's representative Susan Teir, which was submitted to the court, Susan Teir identified work to be performed by KBRWyle under the DigiFlight Task Order awarded under the TORFQ. In the November 1, 2018 declaration signed by contracting officer's representative Susan Teir, Susan Teir stated that:

> In support of the SAMD Programmatic Contract, under the EXPRESS task order being protested, KBRwyle will provide programmatic services or independent evaluation, assessments and support for SAMD efforts. Similarly to their support of LTPO under the DS TAT task orders, KBRwyle provides independent technical expertise, assistance and provides inputs/recommendations for the Government's consideration.

Moreover, in the September 25, 2018 email message sent by Susan Teir, Susan Teir was able to sufficiently identify the work to be performed by KBRWyle under the DigiFlight Task Order to reach a conclusion as to whether KBRWyle will be evaluating its own work under other task orders. In the September 25, 2018 email message sent by Susan Teir, she also stated that, under the DigiFlight Task Order awarded under the TORFQ, KBRWyle will not be evaluating KBRWyle's work under another task order issued by the Security Assistance Management Directorate.

Moreover, the TORFQ required vendors and subcontractors to submit an Organizational Conflict of Interest Certification. In its quotation in response to the TORFQ, Sigmatech submitted an Organizational Conflicts of Interest Certificate signed by an employee of KBRWyle. In KBRWyle's Organizational Conflict of Interest Certificate, KBRWyle marked a box on the certificate indicating that "my firm does not presently have any organizational conflict of interest which would diminish its capacity to give impartial, technically sound and objective assistance and advice or would result in a biased work product or may result in an unfair competitive advantage." Although "labor categories" may not yet have been assigned to KBRWyle under the DigiFlight Task Order, the FAR required that an Army contracting officer "[i]dentify and evaluate potential organizational conflicts of interest as early in the acquisition process as possible." See FAR § 9.504. The administrative record in the above-captioned bid protest permits the court to review Ashantas Cornelius' determination as to whether Sigmatech has identified an impaired objectivity OCI regarding KBRWyle's performance under the DigiFlight Task Order, which is connected to the Army's procurement of a task order for programmatic support services under the TORFQ. The court, therefore, has jurisdiction over Sigmatech's impaired objectivity OCI.

An "impaired objectivity" OCI "occurs when a government contractor has conflicting obligations under different government contracts, that compromises the contractor's ability to render impartial judgment." See Axiom Res. Mgmt., Inc. v. United States, 78 Fed. Cl. at 592 n.17 (citing FAR § 9.505-3; and Aetna Gov't Health Plans, Inc., B-254397 et al., 1995 WL 449806, at *8-9 (Comp. Gen. July 27, 1995)); see also L-3 Commc'ns

Corp. v. United States, 99 Fed. Cl. 283, 297 (2011) ("The impaired objectivity OCI occurs 'where a firm's work under one contract might require it to evaluate itself under another contract.'" (quoting Turner Constr. Co. v. United States, 94 Fed. Cl. 561, 569 (2010), aff'd, 645 F.3d 1377 (Fed. Cir. 2011))). A Judge of the United States Court of Federal Claims has stated that the "primary concern" of an impaired objectivity OCI is that "a firm might not be able to render 'impartial advice.'" Turner Constr. Co. v. United States, 94 Fed. Cl. at 569 (quoting Aetna Gov't Health Plans, Inc., 1995 WL 449806, at *8); see also A-P-T Research, Inc., B-413731.2, 2017 WL 1462127, at *9 (Comp. Gen. Apr. 3, 2017) (stating that an impaired objectivity OCI "principally concerns the contractor's ability to perform its contractual obligations free of improper bias"). "In order to show an 'impaired objectivity' OCI, there must be hard facts showing that 'a government contractor's "work under one government contract could entail its evaluating itself, either through an assessment of performance under another contract or an evaluation of proposals."'" Aegis Techs. Grp., Inc. v. United States, 128 Fed. Cl. 561, 575 (2016) (quoting Ala. Aircraft Indus., Inc.-Birmingham v. United States, 83 Fed. Cl. 666, 687 (2008) (quoting Aetna Gov't Health Plans, Inc., 1995 WL 449806, at *9), rev'd on other grounds, 586 F.3d 1372 (Fed. Cir. 2009)).

In the above-captioned bid protest, in the Army's October 2, 2018 Determination and Findings, contracting officer Ashantas Cornelius states that Sigmatech alleges that DigiFlight has an impaired objectivity OCI as a result of its subcontracting agreement with KBRWyle under the DigiFlight Task Order awarded under the TORFQ. Ashantas Cornelius states that Sigmatech argues that, under the DigiFlight Task Order, KBRWyle "would provide oversight and/or approval over its own work performance and deliverables performed under other task orders awarded through the Defense Technical Information Center (DTIC) Defense Systems Technical Area Task (DS-TAT) program."[17]

In the Army's October 2, 2018 Determination and Findings, Ashantas Cornelius discussed the award of two task orders to KBRWyle for "technical support" by the Lower Tier Project Office and the Security Assistance Management Directorate, respectively, under the "Defense Technical Information Center (DTIC) Defense Systems Technical Area Task (DS-TAT) program."[18] According to Ashantas Cornelius, the Lower Tier Project Office is the "Project Office of Record" for the "PATRIOT weapon system. Lower Tier Project Office is multi-disciplined with responsibility for budgeting, contracting system engineering, software engineering, quality assurance, tests and evaluation, production and logistics/whole life support of the PATRIOT weapon system." Ashantas Cornelius states that, "[s]ummarily, LTPO provides requirements based upon 'production contracts',

---

[17] As noted above, the task orders awarded under the "Defense Technical Information Center (DTIC) Defense Systems Technical Area Task (DS-TAT) program" were awarded to "Wyle Laboratories, Inc., a part of KBRWyle/CAS, Inc., located in Huntsville, Alabama."

[18] The Security Assistance Management Directorate also awarded the task order under the TORFQ to DigiFlight. As stated above, the Security Assistance Management Directorate issued the TORFQ under the Aviation and Missile Command EXPRESS program.

providing foreign military customers with a weapon system/end product." Ashantas Cornelius states that the Lower Tier Project Office is part of the Program Executive Office Missiles and Space.

In the Army's October 2, 2018 Determination and Findings, Ashantas Cornelius asserts that the Security Assistance Management Directorate

> manages the sale of AMCOM managed aviation and missile systems; validation/verification, production, interoperability, transfer and sustainment to our allied nations. Simply stated, AMCOM SAMD provides management support services based upon "services contracts", providing foreign military customers with services; effectively assisting in the management of foreign military sales cases and the sustainment of weapons systems.

Ashantas Cornelius states that the Security Assistance Management Directorate is part of the Aviation and Missile Command, which "is not a part of" the Program Executive Office Missiles and Space, in which the Lower Tier Project Office is located.

Ashantas Cornelius, however, states that the Security Assistance Management Directorate has "divisions that are co-located with the respective Missile and Space Program Executive Office (PEO)/Aviation Program Executive Office (PEO) Weapon Systems Program Offices. However, each organization performs duties and responsibilities specific to that organization's mission." (internal references omitted). In support of her statement regarding "co-located" divisions, Ashantas Cornelius cites a September 25, 2018 email message from contracting officer's representative Susan Teir, in which Ms. Teir states that "SAMD and LTPO are two totally separate entities with different commanders/command teams," but that "'[m]ost' of the SAMD Divisions are co-located with their respective Missiles and Space PEO/Aviation PEO Weapon Systems Program Offices," including a Security Assistance Management Directorate "PATRIOT Division." According to the September 25, 2018 email message from Susan Teir:

> SAMD does not provide oversight management to LTPO nor does LTPO provide oversight management to SAMD. SAMD has a PATRIOT Division co-located at the LTPO 106 Wynn Drive location that consists of SAMD employees and SAMD contractors only. SAMD PATRIOT Division employees work Letters of Agreement (LOA) for our foreign allies who are purchasing and sustaining the PATRIOT Missile System for their particular country. Our SAMD PATRIOT Division does not perform work to support the U.S. Government LTPO Mission.

The Security Assistance Management Directorate and the Lower Tier Project Office, therefore, appear to be two separate entities, but appear to have certain divisions located within the same buildings.

According to the Army's October 2, 2018 Determination and Findings, both the Lower Tier Project Office and Security Assistance Management Directorate had a

requirement for "technical support services." Ashantas Cornelius states that "both organizations acquired technical supports [sic] services through the use of the DTIC Defense Systems Technical Area Task (DS-TAT) Indefinite Delivery Indefinite Quantity (IDIQ) contracts managed by Defense Technical Information Center (DTIC) personnel located at Ft. Belvoir, VA." Specifically, on May 20, 2017, KBRWyle was awarded a task order, which was Delivery No. FA807517F1374 (the 1374 LTPO Task Order). The 1374 LTPO Task Order stated that the primary purpose of the 1374 LTPO Task Order is to

> study, analyze, provide advice, research, and develop deliverables to advance/DS [defense systems] related scientific and technical information (STI) through the application of knowledge and resources in achieving the requiring activity's mission requirements defined herein.

> The objective of this TAT [Technical Area Task] is to provide the Government the necessary multi-disciplined support to execute the extremely challenging effort of managing the PATRIOT weapon system. The scope of this TAT will ensure the Government is provided with the technical assistance needed to assist the Government in performing the role of overall weapon system acquisition management.

On September 28, 2017, the Security Assistance Management Directorate had awarded KBRWyle a task order, which was Delivery No. FA807517F1389 (the 1389 SAMD Task Order). The 1389 SAMD Task Order indicated that the primary purpose of the 1389 SAMD Task Order is to

> study, analyze, advise, research, and develop deliverables to advance FMS DS related Scientific and Technical Information (STI) through the application of knowledge and resources in achieving the Requiring Activity's mission requirements defined above.

> The objective of this DS TAT PWS is to obtain improved reliability, interoperability, and reduced cost of ownership for all AMCOM managed aviation and missile FMS programs. To achieve this objective the contractor shall provide services to perform and document RMQSI [reliability, maintainability, quality, supportability, and interoperability] analyses and strategies in addition to logistics, testing, systems engineering, program management, and life cycle/cost analyses to refine and improve FMS sustainability.

(capitalization in original). In the Army's October 2, 2018 Determination and Findings, Ashantas Cornelius states that the 1374 LTPO Task Order and the 1389 SAMD Task Order were issued by separate entities and "function independently of each other in support of two different commands with varying missions."

Ashantas Cornelius states in the Army's October 2, 2018 Determination and Findings that:

The DTIC IDIQ contract has a Contracting Officer Representative (COR) appointed by the DTIC Contracting Officer. This COR provides government oversight of the IDIQ and is located at the DTIC Center in Ft. Belvoir, VA. In order to provide proper government oversight and ensure contractor performance, the individual task orders are managed by the respective requiring organizations/activities. As a result, the DTIC Contracting Officer appoints primary and alternate Contracting Representatives (CORs) co-located with the contractors.

(internal references omitted). Ashantas Cornelius also states that "each task order is allocated a Program Manager; whose primary duty and responsibility is to manage his/her specific program (task order)." (internal references omitted).

Regarding the DigiFlight Task Order the Security Assistance Management Directorate awarded under the TORFQ, Ashantas Cornelius states that the DigiFlight Task Order requires DigiFlight to provide "programmatic services to AMCOM SAMD." Ashantas Cornelius asserts that "[p]rogrammatic services entails [sic] support in monitoring, assessing, coordinating, analyzing and integrating component programs/activities, including briefings/ presentations and agendas for the total life cycle systems. This program is in response to the SAMD's mission and supports only the SAMD Foreign Military Sales (FMS) functions." (internal references omitted). Ashantas Cornelius states that a contracting officer's representative will oversee the DigiFlight Task Order, and that the DigiFlight Task Order "is allocated a Program Manager and/or a task order lead whose primary duty and responsibility is to manage/ provide oversight in support of his/her specific task order."

Regarding the differences between the 1389 SAMD Task Order and the DigiFlight Task Order awarded by the Security Assistance Management Directorate, Ashantas Cornelius states:

The DTIC task order [1389 SAMD Task Order] and the EXPRESS task order [DigiFlight Task Order] provide direct support to the AMCOM SAMD office independently and for separate categories of service. The task order awarded by the DTIC IDIQ provides technical support while the EXPRESS task order provides programmatic support. Government oversight is provided by the COR(s). The CORs are appointed in writing by the cognizant Contracting Officer. Oversight of all SAMD contracts/task orders are provided by their respective CORS and company program managers. At no time are contractors allowed to provide oversight of other contractor's personnel or performance. Based upon FAR Part 7.5 (Inherently Governmental Functions) and due to the nature of the services, contractors do not provide oversight to other contractor's work. Regarding KBRWyle's performance in support of the EXPRESS task order, it has not been determined by the prime contractor (DigiFlight) which specific tasks that KBRWyle/CAS will perform. DigiFlight, the Government and

58

KBRWyle/CAS, Inc. will review and determine the best use of labor categories in of the AMCOM SAMD programmatic support mission. Upon review and approval, KBRWyle will be assigned specific labor tasks in accordance with the BPA and applicable clauses.

Ashantas Cornelius states:

I have thoroughly reviewed the tasks to be performed under the EXPRESS task order and the tasks KBRwyle performs under the DS-TAT task orders for both LTPO and SAMD, and have found no evidence of impaired objectivity with KBRWyle/CAS, Inc. in performance of their duties supporting the EXPRESS Task Order and the DTIC Task Orders.

Ashantas Cornelius asserts that "KBRwyle working on the EXPRESS task order will not be monitoring or evaluating the work of KBRwyle employees on the DTIC task orders," and that the "work performed under the EXPRESS task order is different from the work performed under the DTIC task orders, involving different categories of services, with the EXPRESS task order providing program support services and the DTIC task orders focused on scientific and technical tasks."

The Army's October 2, 2018 Determination and Findings reflect that the 1374 LTPO Task Order and the 1389 SAMD Task Order require KBRWyle to analyze and provide Scientific and Technical Information to the Lower Tier Project Office and the Security Assistance Management Directorate, respectively. The 1374 LPTO Task Order indicates that KBRWyle will be providing the Scientific and Technical Information in support of the Lower Tier Project Office's management of the "PATRIOT weapon system." Section 1.1 of the performance work statement of the TORFQ states that the vendor will be providing programmatic support to assist the Security Assistance Management Directorate with its "contractual obligations for the procurement, delivery and sustainment of weapon systems entered into via the Foreign Military Sales (FMS) process between the United States Government (USG) and numerous foreign governments." Ashantas Cornelius noted that the Lower Tier Project Office and the Security Assistance Management Directorate are two separate entities with different chains of command and with different purposes. The Lower Tier Project Office does not provide oversight of the Security Assistance Management Directorate's work, nor does the Security Assistance Management Directorate provide oversight of the Lower Tier Project Office's work. Ashantas Cornelius indicates that certain divisions within the Lower Tier Project Office and Security Assistance Management Directorate are co-located within the same offices, but having divisions co-located does not indicate that KBRWyle will be placed in a position to improperly evaluate its own performance or in a position that comprises KBRWyle's ability to provide impartial advice to the government under the 1374 Task Order or the DigiFlight Task Order.

Regarding the 1389 SAMD Task Order and the DigiFlight Task Order, under the 1389 SAMD Task Order, KBRWyle will be providing the Scientific and Technical Information in support of the Security Assistance Management Directorate's FMS efforts. Under the 1389 SAMD Task Order, KBRWyle will be providing to the Security Assistance Management Directorate

> detailed quantitative research and analyses addressing system engineering, maintenance/fault detection/isolation and resolution practices, failure modes, root cause analysis, safety/risk analysis, logistics/sustainment management planning and analysis, technical publications, training, and Reliability, Availability and Maintainability (RAM) testing and analyses. The goal of these support functions is the increase in AMCOM FMS weapons systems availability, reduced cost of ownership and reduced maintenance support requirements.

The performance work statement of the TORFQ indicates that, under the DigiFlight Task Order, DigiFlight and its subcontractors will be providing "programmatic services for independent evaluation, assessments and analysis" of "FMS programs for our foreign allies." Under the 1389 SAMD Task Order, KBRWyle will be providing Scientific and Technical Information to provide "improved reliability, interoperability, and reduced cost of ownership for all AMCOM managed aviation and missile FMS programs." Under the DigiFlight Task Order, DigiFlight and its team of subcontractors will be providing programmatic support "for implementation and sustainment of current program actions and future programs." The purpose and objectives of the 1389 SAMD Task Order and the DigiFlight Task Order do not conflict, as both require the provision of support for the Security Assistance Management Directorate's FMS program, albeit in different ways and with different types of information. As noted by Ashantas Cornelius, the 1389 SAMD Task Order and the DigiFlight Task Order operate "independently and for separate categories of service." Protestor has not demonstrated how KBRWyle's provision of Scientific and Technical Information to reduce the cost of aviation and missile systems in the FMS program will impair Team DigiFlight's ability to provide programmatic support of current and future FMS programs. Protestor also has not identified any requirement in the 1374 LTPO Task Order or the 1389 SAMD Task Order requiring KBRWyle to evaluate or monitor KBRWyle's provision of programmatic support to the Security Assistance Management Directorate.

Moreover, contracting officer Ashantas Cornelius stated that the task orders awarded by the Lower Tier Project Office and the Security Management Assistance Directorate are managed by the respective agencies, not by other contractors. Each task order is assigned a government contracting officer's representative, as well as a government program manager, to manage and evaluate performance under the task order. In the October 2, 2018 Determination and Findings, Ashantas Cornelius indicated that contractors do not monitor or approve other contractor's work "[b]ased upon FAR Part 7.5 (Inherently Governmental Functions) and due to the nature of the services." (capitalization in original). The November 1, 2018 declaration signed by Susan Teir supports Ashantas Cornelius conclusion that, under the DigiFlight Task Order, KBRWyle

will not be monitoring KBRWyle's performance under other task orders, as Susan Teir states that "KBRwyle provides independent assessments and inputs to the government to support their decisions. KBRwyle is not the decision maker for government approval of studies or procurements." Final approval of government procurements, therefore, remains with government employees.

In the October 2, 2018 Determination and Findings, Ashantas Cornelius also states:

> Furthermore, additional last-minute information was provided by Sigmatech regarding KBRWyle performing other DS TAT task Orders. These tasks orders provide support to various Program Management Offices (PMOs) to include Cargo Helicopter, Unmanned Aircraft Systems, Fixed Wing and Future Vertical Lift. Additionally, information has been provided indicating that DigiFlight is a subcontractor on several of KBRWyle's task orders. While Sigmatech has not provided sufficient information to fully investigate these last-minute additions to its impaired objectivity OCI allegations, because these DS TAT task orders are all managed in the manner as previously stated, sufficient government oversight is provided to successfully eliminating [sic] any possibility of impaired objectivity.

Under the May 4, 2017 task order awarded to KBRWyle, KBRWyle will provide Scientific and Technical Information, research, and analysis "to develop recommendations to the CH PMO [Cargo Helicopter Project Management Office], FW [Fixed Wing Project Office] and its international partners (through Foreign Military Sales (FMS) or Memorandum of Understanding (MOU)) to increase availability, improve reliability, and reduce the support costs for their assigned systems." Under the June 21, 2016 task order awarded to KBRWyle, KBRWyle is to provide Scientific and Technical Information, research, and analysis to the Fixed Wing Project Office "to develop recommendations to enhance the Government units' airborne intelligence operations." Under the December 29, 2017 task order awarded to KBRWyle, KBRWyle will be providing to the Unmanned Aircraft Systems Project Office Scientific and Technical Information to "enable the PEO Aviation Program Managers (PMs) to increase availability, improve reliability, and reduce the support costs of UAS [unmanned aircraft system] programs. Specific consideration shall be focused on airworthiness; data interoperability and Information Assurance; hardware interchangeability; testing and evaluation; maintenance management; data analyses; obsolescence management; and systems engineering practices."

The May 4, 2017, June 21, 2016, and the December 29, 2017 task orders do not indicate that KBRWyle will be evaluating or monitoring KBRWyle's performance under the DigiFlight Task Order, in which DigiFlight and its team of subcontractors will be providing programmatic support in order to implement and sustain the Security Assistance Management Directorate's "current program actions and future programs." Nor does it appear that, under the DigiFlight Task Order, KBRWyle will be evaluating the provision of Scientific and Technical Information under the May 4, 2017 task order

awarded to KBRWyle, the June 21, 2016 task order awarded to KBRWyle, or the December 29, 2017 task order awarded to KBRWyle. Ashantas Cornelius indicated that the May 4, 2017 task order, the June 21, 2016 task order, and the December 29, 2017 task order all awarded to KBRWyle "are all managed in the manner as previously stated" and indicated that three tasks orders do not require oversight or evaluation of the programmatic support services that will be provided under the DigiFlight Task Order. The provision of Scientific and Technical Information to improve the availability and cost of weapon systems does not appear to conflict with the provision of programmatic support services under the DigiFlight task order.

Sigmatech identified sections 2.2.2.1 and 2.4.6 of the performance work statement attached to the TORFQ as two examples of when Team DigiFlight would be evaluating work of other contractors under other task orders. Section 2.2.2.1 of the performance work statement states that "[t]he contractor shall perform cost estimating and analysis of data prepared and furnished by other contractors and USG agencies." Although KBRWyle may be analyzing data furnished by other contractors, Sigmatech does not provide "hard facts" demonstrating that KBRWyle would be "evaluating itself, either through an assessment of performance under another contract or an evaluation of proposals." See Aegis Techs. Grp., Inc. v. United States, 128 Fed. Cl. at 575 (internal quotation marks and citations omitted). Nor does analyzing data furnished by other contractors indicate that KBRWyle "might not be able to render 'impartial advice,'" which is the "primary concern" of an impaired objectivity OCI. See Turner Constr. Co. v. United States, 94 Fed. Cl. at 569. Sigmatech has not sufficiently supported its assertion that KBRWyle will have "the opportunity to review its own decision-making and benefit itself at the Agency's expense" because, at most, under the DigiFlight Task Order, Team DigiFlight will be evaluating data provided by government agencies and government contractors. The administrative record does not indicate that KBRWyle employees will be inputting data for KBRWyle employees to analyze and review in a manner that would benefit KBRWyle at the expense of the Army. Section 2.4.6 states:

> The contractor shall provide all levels of weapon system integration support. The contractor shall provide advice and recommendations on the component subsystems and how the subsystems function together as a whole, to include preliminary design review PDR; critical design review (CDR);milestone [sic] and program reviews; program strategy develop; and program execution management. The contractor shall provide advice and recommendations on interoperability of weapons systems to interface with other products or systems.

Sigmatech has not demonstrated why Team DigiFlight will be unable to provide impartial advice on the interoperability of weapon systems and subsystems due to KBRWyle's provision of Scientific and Technical Information to the Army in order to provide "improved reliability, interoperability, and reduced cost of ownership for all AMCOM managed aviation and missile FMS programs," as KBRWyle is doing under the 1389 SAMD Task Order. The purposes of the task orders simply do not conflict or entail evaluating the performance of other contractors.

At the November 13, 2018 oral argument, counsel of record for protestor argued that the Army did not consider sufficient information when determining whether there was an impaired objectivity OCI. Ashantas Cornelius reviewed statements from the contracting officer's representative, alternate contracting representatives, and DigiFlight, as well as the organizational charts of the Lower Tier Project Office and the Security Assistance Management Directorate. Ashantas Cornelius compared and analyzed the requirements in the 1374 LTPO Task Order, the 1389 SAMD Task Order, and the DigiFlight Task Order, as well as the requirements in the May 4, 2017 task order, the June 21, 2016 task order, and the December 29, 2017 task order, all awarded to KBRWyle. Although protestor argues that Ashantas Cornelius did not consider "[w]hether Agency personnel sit in those offices" where KBRWyle employees are located or "[h]ow much oversight a handful of Agency personnel seated in different offices than the bulk of contractor-personnel perform are able to exercise," Ashantas Cornelius noted that the Lower Tier Project Office and the Security Assistance Management Directorate have divisions that are co-located, and that the Security Assistance Management Directorate and certain Program Executive Offices are co-located. Moreover, Ashantas Cornelius determined that contractors would not be evaluating other contractors' work and that a program manager is assigned to oversee each task order. In the September 25, 2018 email message from contracting officer's representative Susan Teir to Ashantas Cornelius, Susan Teir stated that "[c]ontractors sitting together may work under differing contracts, but none of them oversees or manages someone working underneath a different contract. Sigmatech, DigiFlight (and subs/team members) and KBR Wyle (and subs) contractors are not allowed to oversee anyone not working under their particular contract."

As the contracting officer assigned to investigate Sigmatech's impaired objectivity OCI, Ashantas Cornelius had considerable discretion when determining the extent of her OCI investigation and when determining whether a potential or actual OCI existed. See PAI Corp. v. United States, 614 F.3d at 1352-53 ("[T]he FAR provides a contracting officer with considerable discretion to conduct fact-specific inquiries of acquisition proposals to identify potential conflicts and to develop a mitigation plan in the event that a significant potential conflict exists." (citations omitted)). As noted above, "the FAR recognizes that the identification of OCIs and the evaluation of mitigation proposals are fact-specific inquiries that require the exercise of considerable discretion." Axiom Res. Mgmt., Inc. v. United States, 564 F.3d at 1382; see also IBM Corp. v. United States, 119 Fed. Cl. 145, 161 (2014) (stating that a contracting officer has discretion when evaluating an OCI and determining the scope of an OCI inquiry). The record before the court indicates that Ashantas Cornelius thoroughly investigated Sigmatech's impaired objectivity OCI and rationally concluded that no impaired objectivity OCI existed.

Moreover, both parties have moved to supplement the administrative record with materials related to Sigmatech's allegation of an impaired objectivity OCI. Protestor moved to supplement the administrative record with an October 15, 2018 declaration signed by Phillip Roman, an employee of Sigmatech, attached to which are "Sigmatech's Performance Work Statement and Deliverables List, which described Sigmatech's

deliverables and the level of oversight anticipated by the Task Order," a "current, accurate, and complete list of Sigmatech employees assigned to the Task Order and their duty locations," a "SAMD organizational matrix that demonstrates where Sigmatech's contractor-employees are located and to whom they report, if anybody," and an "article written by Major General James H. Pillsbury that, describes the Agency's view of the interaction between program management offices and SAMD's FMS duties."[19] Sigmatech asserts that, based on the administrative record before the court, the "Court cannot determine whether the Agency ignored salient information without understanding where contractor-employees are placed and whether the Agency oversees those employees; the scope of the Agency's oversight; and how the Agency integrates FMS into its program management." Sigmatech argues that the contracting officer determined that "sufficient government oversight existed to mitigate an organizational conflict of interest," and that "Sigmatech had no basis for knowing the Contracting Officer's defense at any time before the Department of Justice released the Contracting Officer's findings."

Defendant argues that the court should deny protestor's motion to supplement the administrative record because protestor had an opportunity to submit information to the contracting officer prior to the Army's issuance of its October 2, 2018 Determination and Findings, but failed to submit the documents that are attached to the October 15, 2018 declaration signed by Phillip Roman.[20] Defendant-intervenor asserts that, "[b]eyond Sigmatech's failure to provide the information to the Contracting Officer, Mr. Roman's declaration does not support the existence of an OCI. Therefore, consideration of Mr. Roman's declaration is not necessary for effective judicial review." Defendant-intervenor

_____

[19] The article written Major General Pillsbury is from a March-April 2005 edition of a publication titled Army Logistician.

[20] Defendant states:

> Prior to the contracting officer issuing the [sic] (D&F), counsel for defendant contacted counsel for Sigmatech and DigiFlight on September 24, 2018, and requested that the parties provide any information related to the impaired OCI issue that they wished the contracting officer to consider by September 28, 2018. On October 1, 2018, counsel for defendant advised the parties that the contracting officer was close to issuing the D&F, and reminded them that they should provide any information concerning the OCI allegation that they wished the contracting officer to review. Sigmatech identified several task orders that it believed DigiFlight's subcontractor was performing for the Army, but did not provide nor identify any of the information with which it now seeks to supplement the record despite that information – *i.e.*, a Sigmatech performance work statement, Sigmatech employee list, an Army organizational matrix listing Sigmatech employees, and an article by an agency official – unquestionably being within its possession or else ability to obtain.

(internal references omitted; emphasis in original).

contends that, "[c]ontrary to Sigmatech's argument, the Contracting Officer's determination does not rely on a 'government oversight' defense. The Contracting Officer's investigation adequately explains that there is no actual or potential OCI, irrespective of the amount of government oversight."

Although review under the Administrative Procedure Act (APA) is to be applied to an agency's decision based on the record the agency presents to the court, the court may supplement the administrative record when omission of the supplemental material precludes effective judicial review. See AgustaWestland N. Am., Inc. v. United States, 880 F.3d at 1331-32; see also Axiom Res. Mgmt., Inc. v. United States, 564 F.3d at 1380. In the above-captioned bid protest, the Army concluded in the October 2, 2018 Determination and Findings that KBRWyle's "performance of the DTIC DS-TAT task orders does not create an impaired objectivity organizational conflict of interest that would impact its ability to provide impartial advice to the Government or otherwise jeopardize contractor performance." The court does not need "Sigmatech's Performance Work Statement and Deliverables List" or a "complete list of Sigmatech employees assigned to the Task Order and their duty location" to determine whether KBRWyle will be placed in a position of compromised impartiality as a result of being a subcontractor on the DigiFlight Task Order. The "SAMD organizational matrix" offered by Sigmatech is dated March 14, 2018 and appears to be an outdated version of the Security Assistance Management Directorate organizational chart dated September 21, 2018,[21] which is cited in the Army's October 2, 2018 Determination and Findings and included in the administrative record. The 2005 article from the Army Logistician does not discuss KBRWyle's current obligations under the 1374 LTPO Task Order, the 1389 SAMD Task Order, or the DigiFlight Task Order, but discusses more generally "*the LCMC* [life-cycle management command] *initiative and what it means for logisticians in the field*." (emphasis in original). The court, therefore, does not need protestor's proposed additional materials to analyze protestor's impaired objectivity OCI and denies protestor's motion to supplement the administrative record. The court, however, notes that protestor's proffered materials do not support protestor's argument of an impaired objectivity OCI.

Additionally, in response to protestor's hypothetical involving a foreign government determining that a piece of equipment on a particular missile system, "such as an igniter, does not work properly," defendant submitted a November 1, 2018 declaration signed by Susan Teir, who states that she has been a contracting officer's representative with the Security Assistance Management Directorate for almost twenty years. Susan Teir states that the "purpose of this declaration is to describe the errors in that [Sigmatech's] 'hypothetical example' which make it useless to demonstrate how the contractor operates under the task orders." In defendant's motion to supplement the administrative record, defendant argues that the November 1, 2018 declaration signed by Susan Teir is "necessary for effective judicial review of a protest ground brought by Sigmatech" and to "fill a gap in the administrative record" regarding Sigmatech's impaired objectivity OCI

---

[21] In the "SAMD organizational matrix" offered by Sigmatech, Sigmatech highlighted the names of Sigmatech employees by placing the names of the Sigmatech employees on the "SAMD organizational matrix" in a red font.

allegation. According to defendant, Sigmatech's hypothetical is factually inaccurate and was not presented "to the contracting officer before she made her determination that no OCI existed, so there was no opportunity to enter evidence rebutting the hypothetical into the record at that time." At the November 13, 2018 oral argument, counsel of record for defendant argued that Sigmatech's statement in its motion for judgment on the administrative record that KBRWyle would conduct an engineering study was factually inaccurate and that "[t]he COR states in her declaration that, no, that's what the original equipment manufacturer would be doing." Sigmatech, however, argues that the court should not supplement the administrative record with the November 1, 2018 declaration signed by Susan Teir because the "plain text of Ms. Tier's [sic] declaration demonstrates that it is a *post hoc* attempt to add information to the record and may not therefore serve as a supplement to the record." (emphasis in original).

Based on the record before the court, Sigmatech first raised its hypothetical situation involving a defective igniter in its October 19, 2018 motion for judgment on the administrative record, seventeen days after the Army issued the October 2, 2018 Determination and Findings. The originally filed administrative record[22] does not include the Army's position on the accuracy of protestor's hypothetical involving the acquisition of a defective igniter on a particular missile system or how the Army would address such a situation. In the November 1, 2018 declaration signed by Susan Teir, Ms. Teir asserts that:

> In a situation like the one described in the [Sigmatech] hypothetical, the original equipment manufacturer ("OEM") and its suppliers are used for cases when PATRIOT components are not operating correctly in Foreign Military Sales (FMS) systems. The OEM and its suppliers conduct engineering studies to understand any performance issues and provide solutions to the government for approval. Once these findings are presented to the government, the government support contractor (KBRwyle, here) may be involved with providing independent assessments and recommendations as inputs to the government to make their decisions. KBRwyle is not an Original Equipment Manufacturer (OEM), nor does it have a contractual role with any of the OEM suppliers for the PATRIOT Air and Missile Defense System.

Ms. Teir further asserts that "KBRwyle is not the decision maker for government approval of studies or procurements" and that the "situation described in Sigmatech's 'hypothetical

---

[22] Defendant filed the administrative record in the above-captioned bid protest on October 1, 2018. On October 3, 2018, defendant filed an amendment to the administrative record, which included certain documents relied on by Ashantas Cornelius when issuing the October 2, 2018 Determination and Findings involving the impaired objectivity OCI allegation. On October 19, 2018, defendant filed a second amendment to the administrative record, which included three documents defendant stated "should have been included in the administrative record of the OCI investigation when that record was filed on October 3, 2018."

example' is not a possibility." In order to analyze protestor's "concrete (hypothetical) example of KBRWyle's conflicting roles," the court supplements the administrative record with the November 1, 2018 declaration signed by Susan Teir. See AgustaWestland N. Am., Inc. v. United States, 880 F.3d at 1331-32; see also Axiom Res. Mgmt., Inc. v. United States, 564 F.3d at 1380.

Sigmatech has not supported its hypothetical with any citation to any material in the administrative record or provided any reason as to doubt the validity of the statements in the November 1, 2018 declaration signed by Susan Teir. The November 1, 2018 declaration signed by Susan Teir indicates that the original equipment manufacturer, not KBRWyle, would conduct an engineering study to determine why the igniter in Sigmatech's hypothetical was dysfunctional, and that KBRWyle does not provide approval of government studies or procurements. Based on the record before the court, Sigmatech's hypothetical appears to be factually flawed and does not demonstrate that Ashantas Cornelius irrationally found that there was no impaired objectivity OCI in the Army's October 2, 2018 Determination and Findings.

## CONCLUSION

The court **DENIES** protestor's October 23, 2018 motion to supplement the administrative record. The court **GRANTS** defendant's November 2, 2018 motion to supplement the administrative record. The court **DENIES** protestor's October 19, 2018 motion for judgment on the administrative record. The court **GRANTS** defendant's cross-motion for judgment on the administrative record and defendant-intervenor's cross-motion for judgment on the administrative record. The Clerk of the Court shall enter **JUDGMENT** consistent with this Opinion.

**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**