# In the United States Court of Federal Claims

**No. 18-1425C**
**Filed: June 26, 2019**
**Redacted Version Issued for Publication: August 1, 2019[1]**

```
* * * * * * * * * * * * * * * * * * *    *
SIGMATECH, INC.,                         *
                                         *
              Protestor,                 *
                                         *
v.                                       *
                                         *    Motion for Relief from Judgment;
UNITED STATES,                           *    RCFC 60(b)(2); Organizational
                                         *    Conflict of Interest; Newly
              Defendant,                 *    Discovered Evidence.
                                         *
v.                                       *
                                         *
DIGIFLIGHT, INC.,                        *
                                         *
              Defendant-Intervenor.      *
* * * * * * * * * * * * * * * * * * *    *
```

**W. Brad English**, Maynard, Cooper & Gale, P.C., Huntsville, AL, for protestor. Of counsel were **J. Andrew Watson**, **J. Dale Gipson**, **Michael W. Rich**, and **Katherine E. McGuire**, Maynard, Cooper & Gale, P.C., Huntsville, AL.

**Joseph E. Ashman**, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him were **Patricia M. McCarthy**, Assistant Director, Commercial Litigation Branch, **Robert E. Kirschman, Jr.**, Director, Commercial Litigation Branch, and **Joseph H. Hunt**, Assistant Attorney General. Of counsel was **Lieutenant Colonel Robert B. Nelson**, Judge Advocate, United States Army Legal Services Agency, Fort Belvoir, VA.

**Christopher L. Lockwood**, Wilmer & Lee, P.A., Huntsville, AL, for defendant-intervenor. Of counsel were **Jerome S. Gabig** and **Richard J.R. Raleigh, Jr.**, Wilmer & Lee, P.A., Huntsville, AL.

---

[1] This Order was issued under seal on June 26, 2019. The parties were asked to propose redactions prior to public release of the June 26, 2019 Order. Defendant and intervenor did not propose any redactions to the court's June 26, 2109 Order. Protestor initially proposed redactions before withdrawing all of its proposed redactions. The original June 26, 2019 Order is hereby unsealed and reissued without redaction.

**O R D E R**

**HORN, J.**

On November 30, 2018, the court issued a sealed Opinion in the above-captioned bid protest granting defendant's and defendant-intervenor's cross-motions for judgment on the administrative record and directing the Clerk of the United States Court of Federal Claims to enter judgment in favor of defendant and defendant-intervenor. Sigmatech, Inc. v. United States, 141 Fed. Cl. 284, 338 (2018), appeal dismissed, No. 2019-1384 (Fed. Cir. 2019). Also on November 30, 2018, the Clerk of the United States Court of Federal Claims entered judgment in favor of defendant and defendant-intervenor. On January 2, 2019, after the parties had proposed redactions to the court's sealed Opinion, the court issued a redacted Opinion for publication. See id. at 284 n.1.

On December 26, 2018, protestor, Sigmatech, Inc. (Sigmatech), filed a notice of appeal. On January 23, 2019, protestor filed a voluntary dismissal of its appeal in the United States Court of Appeals for the Federal Circuit. On January 24, 2019, the United States Court of Appeals for the Federal Circuit issued an Order, as a mandate, dismissing protestor's appeal.

While protestor's appeal in the United States Court of Appeals for the Federal Circuit was pending, protestor filed a "Verified Petition for Review of Agency Action" in the United States District Court for the Northern District of Alabama on January 15, 2019. See Sigmatech, Inc. v. U.S. Dep't of Def., 365 F. Supp. 3d 1202, 1203 (N.D. Ala. 2019). In protestor's "Verified Petition for Review of Agency Action," protestor argued that the Department of Defense's actions constituted a de facto debarment. Id. The United States District Court for the Northern District of Alabama stated that the "focal point" of Sigmatech's petition was the award of "Task Order 18." Id. at 1203. According to the United States District Court for the Northern District of Alabama:

> Sigmatech challenged the Agency's award of Task Order 18 to DigiFlight by first filing a protest with the U.S. Government Accountability Office ("GAO"), which was ultimately unsuccessful. Then, on September 18, 2018, Sigmatech filed a bid-protest complaint in the United States Court of Federal Claims ("CFC"), in which it challenged the Agency's decision to award Task Order 18 to DigiFlight as being irrational, arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with the law. The CFC made extensive factual findings regarding the particulars of the Agency's decision and ultimately held that Sigmatech was not entitled to relief. Sigmatech v. United States, 141 Fed. Cl. 284 (2018). Sigmatech appealed the CFC's decision to the United States Court of Appeals for the Federal Circuit [Case No. 2019-1384] but moved to dismiss the appeal shortly after filing the instant petition in this Court.

Sigmatech, Inc. v. U.S. Dep't of Def., 365 F. Supp. 3d at 1204.

2

The United States District Court for the Northern District of Alabama dismissed protestor's "Petition" for lack of subject-matter jurisdiction because the Northern District of Alabama determined that protestor's <u>de</u> <u>facto</u> debarment claim should have been brought in the United States Court of Federal Claims.[2] <u>Id.</u> at 1207-08. The United States District Court for the Northern District of Alabama stated:

> In the present case, there is no question that Sigmatech is challenging "a proposed award or the award of a contract," i.e., the follow on to Task Order 18, to DigiFlight. Even viewing this case solely as a *de facto* debarment claim, it follows that Sigmatech believes it was prevented from competing for work on other contracts and is challenging the award of those contracts to other entities. Therefore, Sigmatech's claim in the present case falls within ambit of the ADRA [Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, 110 Stat. 3870 (1996) (codified at 28 U.S.C. § 1491(b)(1)-(4) (2012))].

<u>Id.</u> (emphasis in original).

On March 29, 2019, W. Brad English on behalf of protestor filed a motion in this court stating that "Sigmatech, pursuant to Rule 60(b)(2), RCFC [Rules of the United States Court of Federal Claims] requests that the Court give it relief from its November 30, 2018 judgment" and requested the court to "reinstate this case to its docket for further proceedings."[3] (footnote omitted). Thereafter, defendant and defendant-intervenor filed responses to protestor's motion for relief from judgment, and protestor filed a reply. This Order addresses defendant's motion for relief from judgment under RCFC 60(b)(2) (2018).

---

[2] In the case before this court, which resulted in the November 30, 2018 Opinion by the court, and the subsequently, voluntarily dismissed appeal before the United States Court of Appeals for the Federal Circuit, protestor did not assert a <u>de</u> <u>facto</u> debarment claim.

[3] Jon Levin of Maynard, Cooper & Gale, PC originally was counsel of record for protestor in the above-captioned protest. On March 29, 2019, protestor filed a motion to substitute W. Brad English for Mr. Levin as counsel of record, both of Maynard, Cooper & Gale, PC, which the court granted. W. Brad English previously had been designated as of counsel for protestor throughout the litigation. Jon Levin is not designated as of counsel in the protestor's filings related to protestor's March 29, 2019 motion for relief from judgment.

# BACKGROUND[4]

On May 22, 2018, the Department of the Army, Army Contracting Command – Redstone (the Army) awarded a task order to DigiFlight, Inc. (DigiFlight),[5] which was issued as Contract No. W31P4Q-18-A-0035 and labeled as Order Number 0001 (the DigiFlight Task Order). Sigmatech, Inc. v. United States, 141 Fed. Cl. at 289. The DigiFlight Task Order was issued under a solicitation referred to as Task Order Request for Quotation No. 2015P-06 (the TORFQ). Id. The performance work statement in the TORFQ, under which the DigiFlight Task Order was issued, stated:

> 1.1 The Security Assistance Management Directorate (SAMD) has a requirement for programmatic support to meet contractual obligations for the procurement, delivery and sustainment of weapon systems entered into via the Foreign Military Sales (FMS) process between the United States Government (USG) and numerous foreign governments. The objective of this Performance Work Statement (PWS) is to provide support for implementation and sustainment of current program actions and future programs.
>
> 1.2 The contractor shall provide programmatic services for independent evaluation, assessments and analysis. The contractor shall provide programmatic support necessary to monitor, coordinate and integrate FMS [Foreign Military Sales] programs for our foreign allies. The contractor shall supply the necessary personnel labor and travel, facilities and materials to fulfill this objective except as identified in Paragraph 5.0., Government Furnished Property (GFP).

Id. at 290.

On June 4, 2018, Sigmatech filed a post-award bid protest at the United States Government Accountability Office (GAO) challenging the Army's award to DigiFlight under the TORFQ. Id. at 300. On July 16, 2018, Sigmatech filed a supplemental bid protest at the GAO. Id. On September 11, 2018, the GAO denied in part and dismissed

---

[4] The court's November 30, 2018 Opinion set forth the facts relevant to the above-captioned protest and are incorporated into this Order. See Sigmatech, Inc. v. United States, 141 Fed. Cl. at 289-305. Certain facts from the court's November 30, 2018 Opinion which are relevant to protestor's motion for relief from judgment are repeated in this Order. The court's Order also will address additional factual allegations contained in the parties' filings related to protestor's motion for relief from judgment.

[5] Prior to when the court issued its November 30, 2018 Opinion and judgment, DigiFlight had filed an unopposed motion to intervene in the above-captioned protest, which the court granted. DigiFlight also has submitted filings related to protestor's March 29, 2019 motion for relief from judgment under RCFC 60(b)(2).

in part Sigmatech's protest at the GAO. Id. at 301 (citing Sigmatech, Inc., B-415028.3 et al., 2018 WL 5110874, at *1 (Comp. Gen. Sept. 11, 2018)).

On September 18, 2018, Sigmatech filed a complaint in this court challenging the Army's award of the DigiFlight Task Order under the TORFQ to DigiFlight.[6] Sigmatech, Inc. v. United States, 141 Fed. Cl. at 302. On September 19, 2018, protestor filed a motion for a protective order in the above-captioned protest, which the court granted.[7] In its complaint, Sigmatech had argued that the Army arbitrarily and capriciously evaluated Sigmatech's quotation and engaged in disparate treatment. According to Sigmatech's complaint, the Army's source selection decision was unequal, arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law. Id. In addition to the impaired objectivity organizational conflict of interest (OCI) discussed below, Sigmatech also had argued that the Army "failed to adequately consider the former Acting Director's [Eileen Whaley's] access to information and setting of requirements, who is now a KBRWyle[8] employee working on the LPTO Task Order, was a conflict of interest." Id. At the November 13, 2018 oral argument, counsel of record for Sigmatech at the time, Jon Levin, specifically withdrew Sigmatech's argument that KBRWyle's employment of Eileen Whaley created a conflict of interest. Id. As stated in the court's November 30, 2018 Opinion:

> During a discussion of the alleged conflict of interest involving Eileen Whaley at the November 13, 2018 oral argument, counsel of record for protestor stated "I will formally withdraw it." Counsel of record for protestor stated "I will fully admit, having reviewed the briefs, that I do not believe the Eileen Whaley argument is particularly strong" and counsel officially withdrew protestor's claim involving Eileen Whaley.

Id.

In its complaint, Sigmatech also had argued that the Army failed to consider "the DigiFlight team's organizational conflicts of interest" involving KBRWyle's performance of a task order "under the Defense System Technical Area Task ('DS TAT') contract for

---

[6] During a September 19, 2018 hearing in the above-captioned protest, counsel of record for defendant represented that the Army had voluntarily agreed to stay performance of the DigiFlight Task Order until December 14, 2018. The court's Opinion granting defendant's cross-motion for judgment on the administrative record and defendant-intervenor's cross-motion for judgment on the administrative record was issued on November 30, 2018.

[7] Protestor filed a redacted, publicly available version of its complaint on the docket in this protest on September 28, 2019, more than two months before the court issued its November 30, 2018 Opinion.

[8] KBRWyle is one of DigiFlight's subcontractors under the DigiFlight Task Order.

Patriot Technical Support at the 'Lower Tier Project Office System Engineering Directorate.'" Id. (capitalization in original).  According to Sigmatech's complaint:

> KBRWyle (and therefore, DigiFlight) has an organizational conflict of interest—that is, as the subcontractor to DigiFlight under the RFQ and as the contractor under the DS TAT [Defense System Technical Area Task] task order, KBRWyle would have to monitor and evaluate its own work under the DS TAT task order an impermissible impaired objectivity OCI.

Id.

On October 2, 2018, Army contracting officer Ashantas Cornelius issued a Determination and Findings regarding Sigmatech's impaired objectivity OCI allegation involving KBRWyle's performance of task orders. See id. at 302-03. In the October 2, 2018 Determination and Findings, Ashantas Cornelius stated:

> As the Contracting Officer responsible for the acquisition of the Programmatic Support Services Task Order Request for Quote and subsequent award, I have thoroughly reviewed the tasks to be performed under the EXPRESS task order and the tasks KBRwyle performs under the DS-TAT task orders for both LTPO [Lower Tier Project Office] and SAMD, and have found no evidence of impaired objectivity with KBRWyle/CAS, Inc. in performance of their duties supporting the EXPRESS Task Order and the DTIC [Defense Technical Information Center] Task Orders. KBRwyle working on the EXPRESS task order will not be monitoring or evaluating the work of KBRwyle employees on the DTIC task orders. As stated above, oversight of contractor personnel and performance is done by the Government, through Contracting Officer Representative and Program Managers, and not by other contractors. Furthermore, the work performed under the EXPRESS task order is different from the work performed under the DTIC task orders, involving different categories of services, with the EXPRESS task order providing program support services and the DTIC task orders focused on scientific and technical tasks.

Regarding the "oversight of contractor personnel and performance," Ms. Cornelius stated:

> The DTIC IDIQ contract has a Contracting Officer Representative (COR) appointed by the DTIC Contracting Officer. This COR provides government oversight of the IDIQ and is located at the DTIC Center in Ft. Belvoir, VA. In order to provide proper government oversight and ensure contractor performance, the individual task orders are managed by the respective requiring organizations/activities. As a result, the DTIC Contracting Officer appoints primary and alternate Contracting Representatives (CORs) co-located with the contractors.

Id. at 331. Ashantas Cornelius also noted that "each task order is allocated a Program Manager; whose primary duty and responsibility is to manage his/her specific program (task order)." Id.

Sigmatech also had an opportunity to submit information to the Army prior to the completion of the October 2, 2018 Determination and Findings. See id. at 333, 336 n.20. In the October 2, 2018 Determination and Findings, Ashantas Cornelius stated:

> Furthermore, additional last-minute information was provided by Sigmatech regarding KBRWyle performing other DS TAT task Orders. These tasks orders provide support to various Program Management Offices (PMOs) to include Cargo Helicopter, Unmanned Aircraft Systems, Fixed Wing and Future Vertical Lift. Additionally, information has been provided indicating that DigiFlight is a subcontractor on several of KBRWyle's task orders. While Sigmatech has not provided sufficient information to fully investigate these last-minute additions to its impaired objectivity OCI allegations, because these DS TAT task orders are all managed in the manner as previously stated, sufficient government oversight is provided to successfully eliminating [sic] any possibility of impaired objectivity.

Id. at 333.

In the November 30, 2018 Opinion, the court described its denial of protestor's motion to supplement the administrative record with an October 15, 2018 declaration signed by Philip Roman, who protestor states is "Sigmatech's Vice President of Security Cooperation and Security Assistance." Id. at 335-37. As stated in the court's November 30, 2018 Opinion:

> Protestor moved to supplement the administrative record with an October 15, 2018 declaration signed by Phillip Roman, an employee of Sigmatech, attached to which are "Sigmatech's Performance Work Statement and Deliverables List, which described Sigmatech's deliverables and the level of oversight anticipated by the Task Order," a "current, accurate, and complete list of Sigmatech employees assigned to the Task Order and their duty locations," a "SAMD organizational matrix that demonstrates where Sigmatech's contractor-employees are located and to whom they report, if anybody," and an "article written by Major General James H. Pillsbury that, describes the Agency's view of the interaction between program management offices and SAMD's FMS duties."

Id. at 335. The court discussed the documents submitted by protestor and concluded: "The court, therefore, does not need protestor's proposed additional materials to analyze protestor's impaired objectivity OCI and denies protestor's motion to supplement the administrative record. The court, however, notes that protestor's proffered materials do not support protestor's argument of an impaired objectivity OCI." Id. at 336-37.

In the court's November 30, 2018 Opinion, the court rejected protestor's argument that "KBRWyle (and therefore, DigiFlight) has an organizational conflict of interest." See id. at 325-38. Based on the record before the court, the court reviewed five task orders awarded to KBRWyle and determined that Sigmatech had failed to demonstrate that KBRWyle's performance under any of the five task orders created an OCI under the DigiFlight Task Order. See id. One of the tasks orders analyzed in the October 2, 2018 Determination and Findings by the court was a task order labeled as Delivery/Order Call No. FA807517F1389, which was issued under Contract No. FA8075-14-D-0025. See Sigmatech, Inc. v. United States, 141 Fed. Cl. at 330. The court referred to Delivery/Order Call No. FA807517F1389 as "the 1389 SAMD Task Order."[9] See id. The 1389 SAMD Task Order has a "DATE OF ORDER/CALL NO." of September 28, 2017, more than one year before the court issued its November 30, 2018 Opinion. The court found that KBRWyle's performance under the 1389 SAMD Task Order did not create an implied objectivity OCI. See Sigmatech, Inc. v. United States, 141 Fed. Cl. at 333. Moreover, the court determined:

> As the contracting officer assigned to investigate Sigmatech's impaired objectivity OCI, Ashantas Cornelius had considerable discretion when determining the extent of her [Ms. Cornelius'] OCI investigation and when determining whether a potential or actual OCI existed. See PAI Corp. v. United States, 614 F.3d [1347,] at 1352-53 [(Fed. Cir. 2010)] ("[T]he FAR provides a contracting officer with considerable discretion to conduct fact-specific inquiries of acquisition proposals to identify potential conflicts and to develop a mitigation plan in the event that a significant potential conflict exists." (citations omitted)). As noted above, "the FAR recognizes that the identification of OCIs and the evaluation of mitigation proposals are fact-specific inquiries that require the exercise of considerable discretion." Axiom Res. Mgmt., Inc. v. United States, 564 F.3d [1374,] at 1382 [(Fed. Cir. 2009)]; see also IBM Corp. v. United States, 119 Fed. Cl. 145, 161 (2014) (stating that a contracting officer has discretion when evaluating an OCI and determining the scope of an OCI inquiry). The record before the court indicates that Ashantas Cornelius thoroughly investigated Sigmatech's impaired objectivity OCI and rationally concluded that no impaired objectivity OCI existed.

Sigmatech, Inc. v. United States, 141 Fed. Cl. at 335.

In the court's November 30, 2018 Opinion, the court also determined that protestor had failed to demonstrate that the Army had engaged in disparate treatment when evaluating Sigmatech's quotation and DigiFlight's quotation. See id. at 311-321. The court also determined that the Army had not acted irrationally by failing to award strengths to Sigmatech's quotation, as asserted by protestor. Id. Regarding protestor's argument that

---

[9] The 1389 SAMD Task Order was not issued under the TORFQ solicitation, under which the DigiFlight Task Order was issued.

the Army's Best Value and Fair and Reasonable Determination was arbitrary and capricious, the court stated:

> Although DigiFlight and Sigmatech both received ratings of outstanding under the Risk Mitigation and Management factor, under the Technical Expertise factor, DigiFlight received a rating of outstanding, which, under the terms of the TORFQ, indicates an "exceptional level of expertise" and that strengths "far outweigh any weaknesses." Sigmatech only received a rating of good under the Technical Expertise factor, which, according to the TORFQ, indicates that Sigmatech had a "thorough level of expertise," and that Sigmatech's strengths "outweigh any weaknesses." Moreover, under the Technical Expertise factor, DigiFlight received five strengths, while Sigmatech only received one strength. Under the terms of the TORFQ, the Technical Expertise factor and the Risk Mitigation factor were of equal value, which indicates that DigiFlight's quotation's higher rated Technical Expertise factor and equally rated Risk Mitigation factor were of more value to the Army than Sigmatech's quotation under those two factors. In addition to noting that DigiFlight's quotation had received a higher rating under the Technical Expertise factor, the Army also identified multiple benefits in DigiFlight's quotation under the Technical Expertise factor, as discussed above. The Army's Best Value and Fair and Reasonable Determination indicates that the Army determined that DigiFlight's proposed performance justified paying an approximately two percent price premium to DigiFlight in order to obtain DigiFlight's "far superior approach in both Technical Expertise and Risk Mitigation and Management" at only a "slight disadvantage" in price. The Army's best value trade-off decision appears to have been made in accordance with the evaluation criteria in the TORFQ, which stated that the Risk Mitigation and Management factor and the Technical Expertise factor both were of greater importance than price. The Army documented its business judgments when choosing to pay a premium of approximately only two percent in exchange for a quotation the Army believed to have the strongest technical approach, as well as a risk mitigation and management approach that also received the highest adjectival rating under the TORFQ, which indicates that the Army rationally exercised its discretion when conducting a best value trade-off under FAR § 8.405-3(c). See Allied Tech. Grp., Inc. v. United States, 94 Fed. Cl. [16,] at 50 [(2010)] (citing E.W. Bliss Co. v. United States, 77 F.3d [445,] at 449 [Fed. Cir. 1996)])[, aff'd, 649 F.3d 1320 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2011)]; see also Holloway & Co., PLLC v. United States, 87 Fed. Cl. [381,] at 396 [(2009)].

Sigmatech, Inc. v. United States, 141 Fed. Cl. at 323-24. The court also found protestor's arguments that the Army's Best Value and Fair and Reasonable Determination was "flawed" to be without merit. See id. at 324-25.

In protestor's March 29, 2019 motion for relief from judgment under RCFC 60(b)(2), protestor now asserts that "newly discovered evidence shows a serious undisclosed, unanalyzed, and unremediated organizational conflict of interest stemming from that Program." Protestor's RCFC 60(b)(2) motion defined the "Program" as "DigiFlight team member's (the 'Team Member') ownership and development of, and familiarity with, a particular piece of financial analysis software (the 'Program')."[10] Protestor asserts that, "[o]n reading the public version of the Court's opinion," which was issued on January 2, 2019, "Philip Roman, Sigmatech's Vice President of Security Cooperation and Security Assistance, was able to identify the Program from his extensive knowledge of SAMD Operations." (footnote omitted). Protestor states that "Roman believes that the Program is the Financial Analysis Support Tool, commonly known as 'FAST,'" and that, "[b]ecause he could not understand the Program's vital role in the Agency's source-selection decision, Roman investigated further."

In the motion for relief from judgment, protestor argues that, during what protestor refers to as Philip Roman's "investigation," Philip Roman met with:

1. Lee Mullis, who protestor states is a branch chief in SAMD's Attack Systems Division, in January 2019;
2. Daniel Hernandez, who protestor states is the "Chief of the Tactical Missile Systems Division" in SAMD, in January 2019;
3. Brandy Ray, who protestor states is "SAMD'S [sic] Business Management Office Chief," in January 2019;
4. and Jim Jones, who protestor states is the chief of SAMD's Non-Standard Missiles Division, on March 7, 2019.[11]

Protestor states that Philip Roman was "surprised" to "learn[]" during his "investigation" that there was a "charge associated with the Program [FAST]," and "learned that SAMD has paid more than $1,000,000.00 per year for the Program [FAST]."[12]

---

[10] In its motion for relief from judgment, protestor chose not to use the proper names, but refers to the 1389 SAMD Task Order as the "Program Contract," FAST as "the Program," and KBRWyle as the "Team Member."

[11] In the April 15, 2019 Determination and Findings, Ashantas Cornelius cites to email exchanges between her and "the branch chiefs named in Mr. Philip Roman's declaration," and states that, "[b]ased on these statements [from the branch chiefs], it appears that Mr. Roman may have misrepresented and/or misinterpreted the conversations he held with these SAMD executives."

[12] Defendant-intervenor submitted an April 10, 2019 declaration signed by Stephen Smith, who states that he is KBRWyle's program manager for the United States Army Aviation and Missile Command (AMCOM) SAMD. In his April 10, 2019 declaration, Stephen Smith asserts that, "[d]uring the last two years of unwarranted delays and denied protests, all six SAMD Divisions funded FAST for development, sustainment and generation of financial data at a cost significantly less than $1 million dollars annually."

According to protestor's RCFC 60(b)(2) motion:

As recently as January of 2019 (and likely much earlier), only one of the (then) six SAMD divisions intended to continue using the Program [FAST]. Discontinuance would have negatively affected the Team Member [KBRWyle] and its Program Contract [the 1389 SAMD Task Order], but since performance began, the Program has enjoyed a renaissance at SAMD. Several divisions have reversed course, and now intend to use the Program. Thus, it appears likely that the Team Member has been able to rescue its ongoing Program Contract.

Protestor also asserts:

Roman also discovered that the government had the use of the Program through the Program Contract, which was managed through the Business Management Office, and that seven of the Team Member's [KBRWyle's] employees were assigned to support the Program Contract. These employees include **developers**, analysts, and programmers. That developers support the Program Contract is important for two reasons. First, it shows that the Team Member does not update the Program at its own expense. Second, it suggests that the Team Member occupies a position in which it can recommend that SAMD request development work that will increase its work under the Program Contract.

(emphasis in original) (internal references omitted). Attached to its motion for relief now before this court was a March 28, 2019 declaration signed by Philip Roman, which provides many of the alleged facts included in protestor's RCFC 60(b)(2) motion and which contains allegations related to FAST which were not included Philip Roman's October 15, 2018 declaration.

In its RCFC 60(b)(2) motion, protestor argues that it is entitled to relief from the November 30, 2018 judgment because:

After entry of judgment, Sigmatech discovered that the Agency was already paying for development and improvement of the Program [FAST] and that there was an undisclosed organizational conflict of interest relating to the Team Member's ownership of the Program [FAST] (which had fallen out of favor with several SAMD divisions), and its interest in driving revenues to the Program Contract [the 1389 SAMD Task Order]. Had they been before the Court, these issues would have clearly led to a different result. In fact, the Team Member's [KBRWyle's] failure to disclose a possible conflict of interest, as its Organizational Conflict of Interest Certification required (see Sigmatech, 141 Fed. Cl. at 328), should have led to DigiFlight's disqualification from award. See Furniture by Thurston v. United States, 103 Fed. Cl. 505, 518 (2012) (Agency may not accept materially nonconforming

offers). Sigmatech could not have known and had no reason to suspect the facts giving rise to these issues.

Protestor asserts that its most recent OCI allegation in its motion for relief from judgment is supported by "hard facts" because "under the [DigiFlight] Task Order the Team Member [KBRWyle] is the end-user of the Program [FAST], while under the Program Contract it is its developer." According to protestor's RCFC 60(b)(2) motion:

> Before entry of judgment, Sigmatech believed that the government could use the Program [FAST] without a license or other contract. Instead, the Team Member [KBRWyle] holds the Program Contract [the 1389 SAMD Task Order], and receives approximately $1 million annually under its terms. Because DigiFlight holds the Task Order, the Team Member is able to recommend potential modifications to the Program [FAST], which then drives work to the Team Member [KBRWyle] on the Program Contract [the 1389 SAMD Task Order]. Further, as an end user of the Program [FAST], the Team Member [KBRWyle] will be able to influence government decision-makers about the Program's [FAST's] performance, in effect evaluating its own work product.

(internal reference omitted). In its current motion, protestor also alleges that it was unreasonable for the Army to assign a strength to DigiFlight's quotation based on DigiFlight's use of FAST because "the Agency pays the Team Member [KBRWyle] to support and modify the Program [FAST] on the Program Contract [the 1389 SAMD Task Order]."[13]

Defendant filed a response to protestor's motion for relief from judgment under RCFC 60(b)(2), in which defendant argues that the court should reject Sigmatech's attempt "to take a fourth bite at the apple in challenging the Army's May 22, 2018, task order award to DigiFlight, Inc." Defendant asserts that protestor's motion fails under RCFC 60(b)(2) because the "record demonstrates that Sigmatech possessed the facts necessary to bring its OCI allegation during the litigation and prior to judgment." Defendant argues that, even if protestor's RCFC 60(b)(2) motion is "timely," protestor's OCI allegation is without merit. Defendant attached to its response to protestor's motion for relief from judgment an April 15, 2019 Determination and Findings signed by Army contracting officer Ashantas Cornelius, in which Ashantas Cornelius indicated she had reviewed protestor's new OCI allegation included in its current March 29, 2019 motion for relief from judgment under RCFC 60(b)(2) and executed a new Determination and Findings regarding protestor' new OCI allegation, as is discussed below.

---

[13] As noted above, in Sigmatech's original September 18, 2018 complaint, Sigmatech unpersuasively had argued that the "FAST tool is not DigiFlight's, but a proprietary tool owned by its teammate KBRWyle," and that the Army unreasonably awarded a strength to DigiFlight's quotation based on DigiFlight's proposed use of FAST.

Defendant-intervenor, the contractor which currently is performing the awarded DigiFlight Task Order, also filed a response to plaintiff's motion for relief from judgment, in which defendant-intervenor asserted that the court should deny plaintiff's motion for relief. According to defendant-intervenor, by dismissing the appeal in the United States Court of Appeals for the Federal Circuit "with actual knowledge of the 'newly discovered evidence,' Sigmatech failed to exercise reasonable diligence and is not entitled to relief under Rule 60(b)(2)." Moreover, defendant-intervenor contends that KBRWyle's performance as a subcontractor under the DigiFlight Task Order does not create an OCI. Defendant-intervenor also asserts that events occurring after the court's November 30, 2018 Opinion, such as the alleged decisions of a few SAMD divisions to continue using FAST, are not newly discovered evidence under RCFC 60(b)(2), and that, even if an OCI did arise under the DigiFlight Task Order, such an OCI would be a matter of contract administration outside of this court's bid protest jurisdiction. Additionally, defendant-intervenor argues that "Sigmatech knew or should have known that FAST was associated with a cost and a contract," and that the court should reject the March 28, 2019 declaration signed by Philip Roman because it contains "un-ascribed hearsay" because "Mr. Roman's declaration recounts discussions with various individuals he sought out."

In an April 15, 2019 Determination and Findings attached to defendant's response to protestor's current motion for relief from judgment, Ashantas Cornelius states:

> In its [Sigmatech's March 29, 2019] Motion, Sigmatech alleges, among other things, that DigiFlight's use of KBRWyle as a team member/subcontractor creates impaired objectivity in which KBRWyle's performance on the EXPRESS SAMD Task Order would put it in a position to promote SAMD's use of and modifications to the Financial Analyst Support Tool (FAST) program under a task order [the 1389 SAMD Task Order] awarded through the Defense Technical Information Center (DTIC) Defense Systems Technical Area Task (DS-TAT) program to Wyle Laboratories, Inc., directly benefiting the KBRWyle[14] family of companies.

> Based on Sigmatech's allegation of an OCI involving KBRWyle/Wyle Laboratories, Inc., I have reviewed the EXPRESS Task Order and Performance Work Statement and the materials related to the DTIC DS-TAT task order, including the performance work statement (PWS) and Task Order (FA 807514D0025), as well as declarations and answers to questions submitted by persons from SAMD and DTIC with relevant knowledge of the two task orders award and contractor performance, and have concluded that no OCI exists.

---

[14] In the April 15, 2019 Determination and Findings, Ashantas Cornelius stated that "[a]ffiliated companies KBRWyle, Inc. and Wyle Laboratories are hereinafter both referred to as 'KBRWyle'." As stated in the court's November 30, 2018 Opinion, the 1389 SAMD Task Order was awarded to Wyle Laboratories, Inc. Sigmatech, Inc. v. United States, 141 Fed. Cl. at 329 n.17.

(footnote omitted). As indicated above, the 1389 SAMD Task Order was a task order issued to KBRWyle under Contract No. FA8075-14-D-0025, which is cited by Ashantas Cornelius, although Ms. Cornelius does not specifically reference the number of the actual task order at issue. In the April 15, 2019 Determination and Findings, Ashantas Cornelius states that "AMCOM SAMD provides management support services based upon services contracts, providing foreign military customers with services; effectively assisting in the management of foreign military sales cases and the sustainment of weapons systems." (internal quotation marks omitted).

In the April 15, 2019 Determination and Findings, Ashantas Cornelius described FAST as follows:

> The FAST program serves as a consolidation point of data from numerous United States Government financial database systems. Specifically, supporting the SAMD mission, KBRWyle employees use FAST to pull data from the Standard Operation and Maintenance Army Research Development System (SOMARDS), Centralized Information System for International Logistics (CISIL), Defense Integrated Finance Systems (DIFS), Program Budget and Accounting System (PBAS) and General Fund Enterprise Business System (GFEBS). This data is pulled together into one report which is provided to the Army, providing resource management support in accordance with the EXPRESS Programmatic Task Order award. The purpose of the FAST program is: (1) Eliminate labor-intensive FMS financial manual data collection processes (2) Integrate multiple data sources into a single view (3) Digitize and capture auditable source data (3) [sic] Standardize the FMS financial analysis and reporting process (4) Evolve with the progression of the US Army financial database systems.

Ms. Cornelius states in the April 15, 2019 Determination and Findings that a KBRWyle employee developed FAST approximately fifteen years ago.

According to the April 15, 2019 Determination and Findings:

> SAMD acquires the services supporting the FAST program through the use of the Defense Technical Information (DTIC) Defense Systems Technical Area Task (DS-TAT) Indefinite Delivery Indefinite Quantity (IDIQ) contract managed by Defense Technical Information Center (DTIC) personnel located at Ft. Belvoir, VA. A task order for technical support for SAMD was awarded on September 28, 2017. The task order [the 1389 SAMD Task Order] was awarded to Wyle Laboratories, Inc., a part of KBRWyle/CAS, Inc. located in Huntsville, Alabama. In addition to providing support to the SAMD Program Office, this task order [the 1389 SAMD Task Order] is used to support other organizations such as the Lower Tier Project Office (LTPO) and the Missile Defense Agency Foreign Liaison Officers (MDA, FLO).

Under this DS-TAT task order [the 1389 SAMD Task Order], SAMD acquires the product - the report generated by FAST - and the data analysis services for the financial assistance provided by the programmers. There were no contracts used in the research and development or material costs of the FAST program. The task order supporting the FAST programs is for labor only, supporting the necessary data updates, and the report and data analysis. In previous years, the services for the FAST program have been acquiring [sic] using numerous contract vehicles. Due to numerous delays and protests within the past two years, the FAST program has been funded through these numerous contract vehicles for the six (6) divisions within the SAMD Program Office.

In the April 15, 2019 Determination and Findings, Ashantas Cornelius also discussed how KBRWyle's 1389 SAMD Task Order is managed, stating:

The DTIC task order [the 1389 SAMD Task Order] is managed by the SAMD Business Management Office (BMO) and a Contracting Officer Representative (COR) has been appointed, ensuring extensive government oversight. The BMO has provided funding; incorporating a training program for government and contractor personnel working within the SAMD Program Office. Contractor Personnel have been trained on the FAST Program; supporting their daily duties and responsibilities in accordance with the applicable PWS for their contract/task order. The funding for the FAST program services is provided by the Division/Branches with the SAMD Program Office. Each division/branch determines independently if FAST is required for their section and provides funding. At its height of use, all six divisions of the SAMD Program Office used the FAST program. Due to ever-changing division requirements and budgetary constraints, currently two of the six divisions (PATRIOT and Tactical Missile) and one branch within the SAMD Program Office use FAST. Any changes to the program are made at the Army's request. Changes are based upon the mission requirement and needs of the organization. For example, there have been twenty-seven (27) customized reports added to the FAST tool by the request of SAMD. Moreover, the FAST program is not used exclusively by the SAMD Program Office, this is a widely known program throughout the Department of Defense and used by other Program/Project Offices such as PEO [Program Executive Office] Aviation.

Regarding the utilization of FAST under the 1389 SAMD Task Order, Ashantas Cornelius stated that the "DTIC DS TAT technical task order (FA80751D0025) [the 1389 SAMD Task Order] provides service support for the FAST program in accordance with ten tasks as specified in the Performance Work Statement (PWS). The FAST program is not listed specifically in the PWS however; its major performance requirements are contained in PWS paragraph 3.10.2 . . . ." According to Ashantas Cornelius' April 15, 2019 Determination and Findings, KBRWyle provides two full-time employees to support the requirements involving FAST under the KBRWyle 1389 SAMD Task Order.

In the April 15, 2019 Determination and Findings, Ashantas Cornelius further discussed the DigiFlight Task Order, stating:

> The EXPRESS Programmatic Task Order (W31P4Q-18-A-0035-0001) awarded on 23 May 2018 to DigiFlight, Inc. [the DigiFlight Task Order] for which KBRWyle serves as a team member, provides programmatic services supporting the SAMD Mission. As a team member, KBRWyle provides contractor supporting two sections of the programmatic PWS: (1) International Program Support (2.6) and Security Assistance Program Support (2.7). In providing this support, KBRWyle provides one contracted employee supporting the International Program Support and seventeen (17) contracted employees supporting the Security Assistance Program Support.

Ashantas Cornelius asserted that the "contracted employees supporting task [sic] provided in support of the EXPRESS task order [the DigiFlight Task Order] do not have interacting tasks with the contracted employees under the DTIC DS TAT task order [the 1389 SAMD Task Order]." According to Ashantas Cornelius:

> In addition, the Government provides extensive government oversight, through the use of the COR and the Division/Branch Chiefs. The Divisions/Branches determine at their discretion if the use of the FAST program is necessary and affordable in support of their missions. In fact, several branch chiefs have decided *not* to use FAST for their branch, while others have considered ceasing to use the program but decided to continue use. If required, the Division/Branch will provide the funding required for the support of the program for their section. Additionally, the division/branch chiefs determine what information is needed and/or required based upon their mission requirements. The appropriate Government supervisors within the divisions/branches provide additional oversight and recommendations to the data required and requested with approval through the Division/Branch chiefs.

(emphasis in original) (footnote omitted).

In the April 15, 2019 Determination and Findings, Ashantas Cornelius asserted that, "[w]hile KBRWyle can make recommendations as to the use of and changes to FAST, it is the Government that determines if it will use the services provided by FAST and what changes it would like to see to the program to better support the mission." Ashantas Cornelius stated:

> Based on all the foregoing, I conclude that KBRwyle, Inc., performance of the DTIC DS-TAT task orders does not create an impaired objectivity organizational conflict of interest that would impact its ability to provide impartial advice to the Government or otherwise jeopardize contractor

performance. The functions and oversight of the DTIC Task Orders and the EXPRESS Task Order are proper in all respects.

After reviewing the October 2, 2018 Determination and Findings and the April 15, 2019 Determination and Findings, the court recognized that the October 2, 2018 Determination and Findings and the April 15, 2019 Determination and Findings each analyzed the 1389 SAMD Task Order. The court, however, noticed some unexplained, non-substantive differences between the task order attached to the October 2, 2018 Determination and Findings and the task order attached to the April 15, 2019 Determination and Findings. On May 17, 2019, the court issued an Order directing the parties to submit simultaneous filings to the court addressing the relationship between the task order analyzed by Ashantas Cornelius in her October 2, 2018 Determination and Findings, the task order analyzed by Ashantas Cornelius in her April 15, 2019 Determination and Findings, and the DT-16-1389 performance work statement attached to protestor's complaint.

In response to the court's May 17, 2019 Order, protestor states that there were "clearly" differences between the task order attached to the October 2, 2018 Determination and Findings and the task order attached to the April 15, 2019 Determination and Findings. Protestor states that "[s]ubstantively, however, the Performance Work Statement in Section C of the October 2018 Document appears to be the same as the PWS in the April 2019 document." Protestor also states the "PWS from the October 2018 and April 2019 Documents appear to be substantively identical to the document labeled 'DT 16-1389' and included in the Appendix of Sigmatech's original complaint in this protest."

In defendant's filing in response to the court's May 17, 2019 Order, defendant states that the "difference between the two documents is that the task/delivery order attached to the October 2, 2018 D&F [Determination and Findings] is the originally signed version of that order, and the task/delivery order attached to the April 15, 2019 D&F is the conformed version of the order that incorporates subsequent modifications. They are the same task/delivery order [the 1389 SAMD Task Order]." (internal references omitted). Defendant asserts that the DT-16-1389 performance work statement is the performance work statement included in the 1389 SAMD Task Order. Defendant also submitted a May 21, 2019 declaration signed by Ashantas Cornelius, in which Ms. Cornelius states that the formatting of the task order attached to the October 2, 2018 Determination and Findings and the task order attached to the April 15, 2019 Determination and Findings differ because of a change in "contract writing system" that occurred in January 2019. Ashantas Cornelius also states that the task order attached to the October 2, 2018 Determination and Findings and the task order attached to the April 15, 2019 Determination and Findings are the "same task order." According to Ms. Cornelius, the DT-16-1389 performance work statement is the performance work statement within the task order attached to both Determination and Findings, which is the 1389 SAMD Task Order. In the May 21, 2019 declaration, Ashantas Cornelius further states:

The number on the PWS (Page 104 of "ECF 1-1"), DT 16-1389, is a DTIC internal tracking number used to reference the task order which was awarded to Wyle Laboratories as FA807517F1389 [the SAMD Task Order]. This PWS number references the year (2016) in which the requirement was received as an acquisition requirement by the DTIC Customer Support Office and the assignment number (1389). This DTIC assignment number becomes the last four numbers of the task order number entered in Block 2 of the task order.

In defendant-intervenor's submission in response to the court's May 17, 2019 Order, defendant-intervenor states that the task order analyzed in the October 2, 2018 Determination and Findings is the same task order analyzed in the April 15, 2019 Determination and Findings, and that the DT-16-1389 performance work statement is the performance work statement within the task order attached to the two Determination and Findings. Defendant-intervenor states that there were some "minor differences," such as formatting, between the task order attached to the October 2, 2018 Determination and Findings and the task order attached to the April 15, 2019 Determination and Findings. As noted above, the task order attached to the October 2, 2019 Determination and Findings and the April 15, 2019 Determination and Findings is KBRWyle's 1389 SAMD Task Order.

## DISCUSSION

In the above-captioned protest, defendant argues that protestor's motion for relief under RCFC 60(b)(2) is "untimely" because:

These two facts – that DigiFlight proposed the KBRWyle-furnished FAST for performance of the TORFQ, and that KBRWyle held a separate task order with the Army for the maintenance of FAST, forms the basis of Sigmatech's new OCI allegations. See Pl.'s Mot. at 9 ("In other words, under the Task Order the Team Member [*i.e.* KBRWyle] is the end-user of the Program, while under the Program Contract it is the developer."). The record is clear that Sigmatech possessed all of the information necessary to assert this impaired objectivity OCI with its protest and prior to judgment.

(emphasis, capitalization, and alterations in original). Defendant further asserts:

The fundamental flaw in Sigmatech's motion is the reliance on when one of Sigmatech's corporate officers allegedly learned that: DigiFlight had proposed the FAST tool as provided by KBRWyle; the Army had evaluated DigiFlight's proposal positively based upon that attribute; and that KBRWyle held a separate task order with the Army for the maintenance of FAST. It is Sigmatech the corporate entity that is the party in this action – not its individual officers. Thus, the issue is when did Sigmatech – and not Mr. Roman – obtain the facts upon which its present OCI allegation is based. The record is clear that Sigmatech possessed all of the facts necessary to

have included the present OCI allegation in its briefing during the litigation and prior to judgment.

> It is well established that a plaintiff is charged with the knowledge of its attorneys. Sigmatech, through its attorneys, clearly possessed actual knowledge that DigiFlight had proposed FAST as provided by KBRWyle, that KBRWyle was the developer of FAST, the Army had rated that proposal attribute positively, and that KBRWyle had maintained a separate Army task order by which it maintained FAST.

(citations omitted).

Defendant further asserts that protestor, in the complaint, had argued that DigiFlight received a strength for its proposed use of FAST, which, in the complaint, protestor had asserted was owned by KBRWyle. Defendant argues that protestor attached the performance work statement for the 1389 SAMD Task Order to its complaint, and that protestor argued in the complaint that KBRWyle was performing that tasks in the performance work statement. According to defendant:

> [T]he record demonstrates that Sigmatech had in its actual possession all of the information necessary to have brought its OCI claim during the litigation without having to make any additional inquiries at all. Sigmatech knew during the litigation that DigiFlight had proposed FAST as provided by KBRWyle, KBRWyle developed FAST, the Army had assessed DigiFlight's proposal strength based upon that attribute, and the [sic] KBRWyle performed maintenance of FAST on a separate Army task order. There was no impediment at all preventing Sigmatech from bringing the present OCI allegation during litigation and prior to judgment, and its Rule 60 motion should be denied on that basis.

Defendant-intervenor also notes that protestor attached a copy of the DT-16-1389 performance work statement for the 1389 SAMD Task Order to its complaint. Defendant-intervenor, therefore, argues that protestor was aware of the 1389 SAMD Task Order when it filed its complaint. Defendant-intervenor asserts that, "[g]iven that Sigmatech expressly understood FAST to be a 'proprietary tool' owned by KBRwyle, Sigmatech could not have reasonably believed that this 'proprietary tool' was free."

Protestor, however, argues that the evidence upon which it attempts to rely to support its motion for relief from judgment under RCFC 60(b)(2) is newly discovered evidence. Protestor argues that, "[a]t the time the judgment was entered, Sigmatech did not know and, based on its long history on this effort had no reason to even suspect, that the Team Member [KBRWyle] held a lucrative contract to develop the Program, creating an organizational conflict of interest for DigiFlight." Protestor also argues that "[b]oth DigiFlight and the Agency point out that, although Sigmatech was ignorant of the evidence and facts underlying its [protestor's RCFC 60(b)(2)] Motion, its attorneys were not." According to protestor:

Sigmatech's attorneys obtained the information the United States and DigiFlight seek to impute to Sigmatech subject to a protective order[15] specifically forbidding disclosure of that information to Sigmatech. Though, in an ordinary case, Sigmatech's attorneys would have had a duty to disclose this information to Sigmatech, the Court's protective order reversed that duty, interposing a wall of confidentiality between Sigmatech and its counsel. Charging Sigmatech with knowledge the Court specifically forbade its attorneys from disclosing would turn the logic of imputation on its head and render protective orders superfluous.

(internal references omitted). Protestor contends that, "while the Agency and DigiFlight may ignore the effect of the Court's protective order, **Sigmatech's counsel did not**. As Roman's declaration made clear, Sigmatech was not privy to materials the protective order covered." (emphasis in original). There is no evidence before the court indicating that counsel of record for defendant or counsel of record for defendant-intervenor "ignore[d]" or violated the requirements of the court's September 19, 2018 Protective Order.

Protestor also argues that "Sigmatech could not have divined that task order DT-16-1389 was a contract for FAST through reasonable diligence" because the 1389 SAMD Task Order does not explicitly mention FAST and protestor was not able "to divine its existence from this muddle" in the DT-16-1389 performance work statement within the 1389 SAMD Task order. Protestor contends that "Sigmatech did not know the Agency was paying to use FAST, despite knowing that it was proprietary to KBRWyle. Sigmatech's understanding was reasonable, and the Court should not charge it with prior knowledge of the Program Contract [the 1389 SAMD Task Order]." Protestor argues that the performance work statement in the 1389 SAMD Task Order "does not serve to put a reasonable reader on notice that KBRWyle is developing FAST" under the 1389 SAMD Task Order.

The rule at RCFC 60(b)(2) provides:

On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons . . . newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under RCFC

---

[15] Protective orders often are issued in bid protests to solicitations in order to protect sensitive, confidential, and propriety information, as well as procurement evaluations, especially in the event that a protest is successful and the protested contract or task order is resolicited.

59(b).[16]

RCFC 60(b)(2). An RCFC 60(b)(2) motion for relief from judgment must be filed "within a reasonable time" and must be filed within one year after the entry of judgment. RCFC 60(c). A motion for relief from judgment under RCFC 60(b)(2) "is 'one for extraordinary relief entrusted to the discretion of the Court . . . which may be granted only in extraordinary circumstances.'" See TDM Am., LLC v. United States, 100 Fed. Cl. 485, 490 (2011) (omission in original) (quoting Sioux Tribe of Indians v. United States, 14 Cl. Ct. 94, 101 (1987), aff'd, 862 F.2d 275 (Fed. Cir. 1988), cert. denied, 490 U.S. 1075 (1989)); see also Wagstaff v. United States, 118 Fed. Cl. 172, 175 (citation omitted), aff'd, 595 F. App'x 975 (Fed. Cir. 2014). "The grant or denial of a motion for relief from judgment is discretionary." Yachts Am., Inc. v. United States, 779 F.2d 656, 662 (Fed. Cir. 1985).

Judges of this court have stated that to be entitled to relief under RCFC 60(b)(2):

[A] party must show "(1) that the evidence was actually 'newly discovered,' that is, it must have been discovered subsequent to trial; (2) that the movant exercised due diligence; and (3) that the evidence is material, not merely impeaching or cumulative, and that a new trial would probably produce a different result."

TDM Am., LLC v. United States, 100 Fed. Cl. at 490 (quoting Yachts Am., Inc. v. United States, 8 Cl. Ct. 278, 281 (quoting Warner v. Transamerica Ins. Co., 739 F.2d 1347, 1353 (8th Cir. 1984)), aff'd, 779 F.2d 656 (Fed. Cir. 1985), cert. denied, 479 U.S. 832 (1986)); see also Wagstaff v. United States, 118 Fed. Cl. at 176 (citations omitted). Judges of this court also have stated: "To warrant relief under Rule 60(b)(2), the moving party 'must show that the newly discovered evidence, if introduced at trial, clearly would have produced a different result if presented before the original judgment.'" Madison Servs., Inc. v. United States, 94 Fed. Cl. 501, 507 (2010) (quoting Venture Indus. Corp. v. Autoliv ASP, Inc., 457 F.3d 1322, 1328 (Fed. Cir. 2006)); see also Spengler v. United States, 128 Fed. Cl. 338, 344 (2016) (quoting Venture Indus. Corp. v. Autoliv ASP, Inc., 457 F.3d at 1328 (quoting Good v. Ohio Edison Co., 149 F.3d 413, 423 (6th Cir. 1998))), aff'd, 688 F. App'x 917 (Fed. Cir. 2017); see also Q Integrated Cos., LLC v. United States, 131 Fed. Cl. 125, 131 (quoting Madison Servs., Inc. v. United States, 94 Fed. Cl. at 507), appeal dismissed, No. 17-2090, 2017 WL 5633406 (Fed. Cir. July 24, 2017); Wagstaff v. United States, 118 Fed. Cl. at 176 (quoting Venture Indus. Corp. v. Autoliv ASP, Inc., 457 F.3d at 1328).

Case law in this court indicates that, under RCFC 60(b)(2), newly discovered evidence "is 'limited to ""evidence of facts which existed at the time of decision and of which the aggrieved party was excusably ignorant.""'" Q Integrated Cos., LLC v. United States, 131 Fed. Cl. at 131 (quoting TDM Am., LLC v. United States, 100 Fed. Cl. at 490

---

[16] A motion for a new trial or for reconsideration under RCFC 59(a)(1)(A)-(B) (2018) must be filed no later than twenty-eight days after judgment has been entered. RCFC 59(b) (2018).

(quoting Yachts Am., Inc. v. United States, 8 Cl. Ct. at 281)); see also Wagstaff v. United States, 118 Fed. Cl. at 176 (citations omitted); TDM Am., LLC v. United States, 100 Fed. Cl. at 490 (citations omitted). "When a movant seeks to reopen a judgment based on newly discovered evidence under Rule 60(b)(2), the movant cannot have possessed that evidence prior to trial." Kawa v. United States, No. 06-448C, 2009 WL 1704462, at *1 (Fed. Cl. June 12, 2009) (citing JGB Enters., Inc. v. United States, 71 Fed. Cl. 468, 473 (2006)); see also Spengler v. United States, 128 Fed. Cl. at 344 ("Spengler knew of the existence of the documents he would now have this Court consider, as well as their relevance, by May 21, 2016. As noted above, any motion for reconsideration under RCFC 59 was due by August 18, 2016. Thus Exhibit B is not 'newly discovered evidence that, with reasonable diligence, could not have been discovered in time' to file a motion under RCFC 59 as required by RCFC 60(b)(2)." (quoting RCFC 60(b)(2))); JGB Enters., Inc. v. United States, 71 Fed. Cl. at 473 ("To the extent plaintiff still seeks relief under RCFC 60(b)(2), plaintiff is not entitled to such relief because the MIPR [Military Interdepartmental Purchase Request] Chronology Sheet was readily available to plaintiff in advance of trial, and plaintiff points to no other newly discovered evidence.").

As discussed above, protestor's motion for relief from judgment indicates that the alleged newly discovered evidence is that KBRWyle is providing services related to FAST to the Army under the "Program Contract," which, as stated above, is the KBRWyle 1389 SAMD Task Order, and that KBRWyle is collecting fees from the Army based on KBRWyle's provision of FAST to the Army. In protestor's original complaint in the above-captioned protest, however, protestor previously included the following statement, although with respect to its challenge to the evaluation of Sigmatech's offer:

> DigiFlight received a strength for its "superior understanding" of multiple financial databases to support its proprietary [Financial Analysis Support Tool] ("FAST") tool." The FAST tool is not DigiFlight's, but a proprietary tool owned by its teammate KBRWyle. But the Agency completely overlooked that Sigmatech **also** uses FAST and **also** has a deep understanding of the Agency's financial management needs.

(emphasis and alterations in original). Protestor's complaint also argued that the Army improperly evaluated DigiFlight's experience with FAST. The record before the court, therefore, indicates that, as of the time the original protest complaint was filed, protestor was aware that KBRWyle owned FAST, and that DigiFlight uses FAST and had proposed to use FAST in performing the tasks listed in the TORFQ, which was the solicitation under which the DigiFlight Task Order was issued.

Regarding the alleged impaired objectivity OCI involving KBRWyle, in its complaint, protestor also asserted in its complaint:

> KBRWyle is also the prime contractor under a separate DS TAT task order [the 1389 SAMD Task Order] to provide programmatic support to SAMD itself. (Appx. p. A102.) KBRWyle's work on SAMD includes some of the tasks it would perform under the TORFQ [under which the DigiFlight Task

Order was issued]." (Appx. pp. A105-106.) And this DS TAT task order requires KBRWyle to evaluate and oversee aspects of its own work on the LTP Patriot Missile program. (Appx. p. A103.)

The references to pages in the "Appx." in protestor's complaint refer to an appendix that was attached to protestor's complaint. Beginning at page 102 of protestor's appendix was a performance work statement for Defense Systems Technical Area Task for SAMD, which was labeled DT-16-1389. According to the May 21, 2019 declaration signed by Army contracting officer Ashantas Cornelius, the DT-16-1389 performance work statement was included in a separate solicitation under which the 1389 SAMD Task Order was issued to KBRWyle. Ashantas Cornelius states in the May 21, 2019 declaration that the DT-16-1389 performance work statement was "included with the [separate] solicitation and serves as the basis for the offerors' proposals. The [DT-16-1389] PWS is incorporated into the subsequent award of the task order, where it is serves as the guide for the contractor's performance of the task order." In the 1389 SAMD Task Order KBRWyle is performing, the performance work statement is labeled DT-16-1389. Protestor, defendant, and defendant-intervenor all have indicated the DT-16-1389 performance work statement is included as the performance work statement within KBRWyle's 1389 SAMD Task Order. Thus, at the time protestor filed its complaint, protestor had in its possession the performance work statement within KBRWyle's 1389 SAMD Task Order, which is the task order that forms a basis of protestor's RCFC 60(b)(2) motion. Protestor's complaint also demonstrates that protestor's counsel knew that KBRWyle was performing the tasks listed in the performance work statement labeled DT-16-1389 under a separate task order as of the time the complaint was filed in the above-captioned protest. Protestor's complaint specifically cited to the DT-16-1389 performance work statement and asserted "KBRWyle is also the prime contractor under a separate DS TAT task order to provide programmatic support to SAMD itself."

Moreover, in its complaint, protestor cited to the DT-16-1389 performance work statement and argued that there was an OCI because KBRWyle "possesses a separate DS TAT task order to provide programmatic support to SAMD. Many of KBRWyle's duties under that task order appear to be substantively identical to the TORFQ requirements." In the October 2, 2018 Determination and Findings, Ashantas Cornelius had analyzed KBRWyle's performance of the 1389 SAMD Task Order and KBRWyle's position as a subcontractor under the DigiFlight Task Order and determined that an impaired objectivity OCI did not exist.[17] See Sigmatech, Inc. v. United States, 141 Fed. Cl. at 303-04. The

_____

[17] As noted in Ashantas Cornelius' October 2, 2018 Determination and Findings:

In its protest, Sigmatech alleges, among other things, that DigiFlight, Inc. entered into a teaming/subcontractor agreement with KBRWyle/CAS Inc. (KBRWyle), creating impaired objectivity in which KBRWyle, in performing the EXPESS Task Order [the DigiFlight Task Order], would provide oversight and/or approval over its own work performance and deliverables performed under other task orders awarded through the Defense Technical

court also analyzed the 1389 SAMD Task Order, in addition to four other task orders KBRWyle was performing, and the DigiFlight Task Order and concluded that the Army had not acted arbitrarily and capriciously and determined that an impaired objectivity OCI did not exist. See id. at 330-37. Furthermore, a copy of the 1389 SAMD Task Order was attached to the October 2, 2018 Determination and Findings and included in the administrative record in this protest. The record which was before the court prior to the issuance of the November 30, 2018 Opinion, therefore, demonstrates that protestor's counsel had the DT-16-1389 performance work statement and the 1389 SAMD Task Order on which it bases its current RCFC 60(b)(2) motion well before the court's issuance of its November 30, 2018 Opinion. Protestor's counsel also would appear to have understood the relevance of the 1389 SAMD Task Order prior to the court's decision and judgment. Protestor's impaired objectivity OCI assertions in the complaint and subsequent filings submitted by protestor's counsel alleged that KBRWyle's performance of the 1389 SAMD Task Order and KBRWyle's role as a subcontractor under the DigiFlight Task Order created an impaired objectivity OCI. Protestor's OCI arguments involving KBRWyle's performance of the 1389 SAMD Task Order were general, high-level, and without specific detail, and did not precisely assert that KBRWyle was providing FAST under the 1389 SAMD Task order. Protestor's impaired objectivity OCI argument involving the 1389 SAMD Task Order, however, was analyzed by contracting officer Ashantas Cornelius, fully briefed by the parties, addressed at oral argument, and analyzed by the court prior to the issuance of the November 30, 2018 Opinion and judgment.

Protestor's argument that KBRWyle was providing services related to FAST under the 1389 SAMD Task Order is not "newly discovered evidence" because protestor's counsel knew, prior to judgment, that KBRWyle was performing the 1389 SAMD Task Order and protestor's counsel possessed a copy of the performance work statement in the 1389 SAMD Task Order, which also was part of the sealed administrative record before the court. Protestor's argument involving FAST is based on the same evidence as its previously asserted impaired objectivity OCI, i.e. KBRWyle's performance of the 1389 SAMD Task Order and performance as a subcontractor under the DigiFlight Task Order.

Moreover, the court is not persuaded by protestor's argument that "Sigmatech could not have divined that task order DT-16-1389 was a contract for FAST through reasonable diligence." As stated in Ashantas Cornelius' April 15, 2019 Determination and Findings, under the 1389 SAMD Task Order, KBRWyle "provides service support for the FAST program in accordance with ten tasks as specified in the Performance Work Statement (PWS)," which protestor had when it filed the complaint in this protest, with the "major performance requirements" being listed in "PWS paragraph 3.10.2." In DigiFlight's quotation in response to the TORFQ, DigiFlight stated that "**_Team-developed FAST_** automatically retrieves and merges critical FMS financial records from legacy databases, improves accuracy and efficiency, and **_reduces a 300-hour data retrieval process to minutes_**." (emphasis in original). In the performance work statement in the 1389 SAMD

_____

Information Center (DTIC) Defense Systems Technical Area Task (DS-TAT) program.

Task Order, paragraph 3.10.2 states that the contractor shall:

> Assist with the development of FMS Financial Management pricing processes in support of Non-Recurring cost assessments, Offsets, Travel, Royalty fees & payments, FMS case fund flow and FMS Admin Fund flow. This requires USG approved access to USG financial database systems to include utilizing Automated Retrieval Transaction Information System (ARTIS), Automated Time Attendance and Production (ATAAPS), Centralized Information System for International Logistics (CISIL), Commodity Command Standard System (CCSS), Defense Integrated Finance System (DIFS), Defense Security Assistance Management System (DSAMS), Defense Travel System (DTS), Electronic Document Access (EDA), Federal Logistics Record (FEDLOG), General Fund Enterprise Business System (GFEBS), Major Item Pricing (IMPART) System, Logistics Modernization Program (LMP), Military Standard Billing Systems (MILSBILLS), MILSBILLS Inquiry System (MILSINQ), Mechanization of Contract Administration Services (MOCAS), Program Budget and Accounting System (PBAS), Property Book Unit Supply Enhanced (PBUSE), Standard Operation and Maintenance Army Research Development System (SOMARDS), Security Cooperation Information Portal (SCIP) or other automated databases and systems (Deliverable 4.12: FMS Pricing Assessment).

Paragraph 3.1.3.9 of the performance work statement in the KBRWyle 1389 SAMD Task Order, which was attached to protestor's complaint, states that the contractor shall:

> Develop a software application to facilitate financial data collection from USG databases such as Standard Operation and Maintenance Army Research System (SOMARDS), Department of Insurance and Financial Services (DIFS), Centralized Integrated System-International Logistics (CISIL), Planning, Budgeting, and Accounting System (PBAS), and General Fund Enterprise Business System (GFEBS) to augment the annual budget submissions (Deliverable 4.10: Software Development Report).

In DigiFlight's quotation in response to the TORFQ, DigiFlight discussed FAST at length. See Sigmatech, Inc. v. United States, 141 Fed. Cl. at 318. The attorneys representing Sigmatech had DigiFlight's entire quotation submitted in response to the TORFQ, which was included without redaction as tab 9 in the sealed administrative record. DigiFlight's quotation stated:

> Team DigiFlight uses FAST to collect financial transactions (commitments, obligations, and disbursements), automate financial analysis, generate standardized SAMD financial reports, and provide inputs and recommendations based on the analysis and reports. ***Our Team developed FAST, maintains the underlying code, and recommends FAST growth plans for future SAMD Division and Branch support.*** As

shown in **Figure 2.1**, we maintain and update 27 standardized FMS financial reports by accessing access and extract financial data from SOMARDS, PBAS, CISIL, DIFS, and GFEBS.

(emphasis in original). DigiFlight's quotation stated that Team DigiFlight developed FAST, which creates financial reports by "extract[ing]" data from: (1) SOMARDS; (2) PBAS; (3) CISIL; (4) DIFS; and (5) GFEBS. The KBRWyle 1389 SAMD Task Order performance work statement required KBRWyle to develop a software that could collect financial data from: (1) SOMARDS; (2) PBAS; (3) CISIL; (4) DIFS; and (5) GFEBS. The software identified in the performance work statement of the KBRWyle 1389 SAMD Task Order corresponds with the description of FAST in DigiFlight's quotation. Had protestor's attorneys compared the performance work statement requirements in KBRWyle's 1389 SAMD Task Order with the description of FAST in DigiFlight's quotation, the similarities would have been apparent to protestor's attorneys. Protestor's RCFC 60(b)(2) motion fails because protestor's argument involving FAST is not "newly discovered evidence that, with reasonable diligence, could not have been discovered" because reasonable diligence and examination of the materials in protestor's attorneys' possession and in the record would have led protestor to recognize the overlap between the 1389 SAMD Task Order and FAST. See RCFC 60(b)(2). If concerned, during the litigation of the protest, protestor's attorneys could have alleged that KBRWyle was providing FAST under the 1389 SAMD Task Order resulting in an alleged OCI.

Protestor's counsel also argues that the court should not "impute" the knowledge protestor's attorneys obtained during the course of litigation to their client, Sigmatech, because of the court's September 19, 2018 Protective Order.[18] In essence, protestor is asking the court, because of the Protective Order, to overlook the knowledge in the possession of protestor's attorneys[19] who litigated the protest leading to the court's November 30, 2018 Opinion, and to disregard that protestor's counsel had documents in their possession, including the 1389 SAMD Task Order, and could have or should have recognized a connection between FAST and the performance work statement in the 1389 SAMD Task Order. If accepted, protestor's attorneys' unpersuasive argument potentially would leave a bid protest litigated with a protective order subject to a RCFC 60(b)(2) motion for relief from judgment based on "newly discovered evidence" pending a client's review of the court's public decision, regardless of whether an argument could or should have been made by the attorneys who extensively litigated the protest on the client's behalf. Counsel for protestor could have inquired to Sigmatech employees as to programs proposed by Sigmatech in its quotation without violating the Protective Order, which

---

[18] On September 18, 2018, protestor filed a motion for a protective order in the above-captioned protest, in which protestor argued that the "administrative record in this procurement protest case contains (or will contain) proprietary and confidential pricing information, source selection information, sensitive plans or specifications, and/or other competition-sensitive procurement information."

[19] Sigmatech is represented by attorneys who are listed the law firm's website as part of the firm's government contracts group.

included the FAST program. Counsel of record for protestor could have discussed the allegations in the complaint with Sigmatech in a manner as to not violate the Protective Order in order to gather the relevant information as necessary to litigate the protest.

Moreover, some of the documents, such as protestor's redacted complaint and the DT-16-1389 performance work statement, discussed above, which were in protestor's attorneys' possession, also were publicly available on the docket in the above-captioned protest. A redacted version of protestor's complaint was voluntarily filed by protestor's counsel on the court's docket on September 28, 2018, more than two months before the court issued its November 30, 2018 Opinion. In the redacted complaint, neither defendant nor protestor chose to redact the following assertion, which remained unredacted:

> KBRWyle is also the prime contractor under a separate DS TAT task order to provide programmatic support to SAMD itself. (Appx. p. A102.) KBRWyle's work on SAMD includes some of the tasks it would perform under the TORFQ. (Appx. pp. A105-106.) And this DS TAT task order requires KBRWyle to evaluate and oversee aspects of its own work on the TP Patriot Missile program. (Appx. p. A103.)

The citations to the appendix in protestor's redacted complaint refer to the DT-16-1389 performance work statement, which was incorporated into the 1389 SAMD Task Order and served as the performance work statement within the 1389 SAMD Task Order. The entire DT-16-1389 performance work statement was filed by protestor on the docket on September 28, 2018 and was and is unredacted.

The public and Sigmatech, including Philip Roman, therefore, had access to the evidence which now forms the basis of the protestor's current RCFC 60(b)(2) motion as of September 28, 2018. Protestor now argues that "[i]t should be noted that the key information Sigmatech [the entity] discovered was the existence of the Program Contract [the 1389 SAMD Task Order]. Its knowledge of the Program Contract arose out of an investigation to determine why FAST was so important to this procurement." The DT-16-1389 performance work statement within the 1389 SAMD Task Order, however, was publicly available as of September 28, 2018. The relevance of the DT-16-1389 was indicated in the September 28, 2018 redacted, publicly available complaint, in which protestor asserted an impaired objectivity OCI based on KBRWyle's performance under a task order containing the DT-16-1389 performance work statement. A Sigmatech employee could have carried out an OCI "investigation" into KBRWyle's performance of task orders, and would have had the relevant performance work statement of the relevant task order, the 1389 SAMD Task Order, to conduct such an "investigation" as of September 2018, in enough time to do so before the November 30, 2018 Opinion was issued. The Sigmatech employee also would have been aware that protestor's counsel alleged in the redacted complaint that KBRWyle's performance under the task order containing the DT-16-1389 performance work statement contained overlap with KBRWyle's performance as a subcontractor under the task order issued under the TORFQ, to which Sigmatech responded to with a quotation. Instead, Philip Roman's "investigation" did not occur until after the parties had fully litigated the protest, including

27

multiple rounds of briefing and oral argument and after the court had entered judgment in favor of defendant and defendant-intervenor and after Sigmatech had filed an appeal.[20]

Although, for the reasons discussed above, protestor's motion for relief under RCFC 60(b)(2) fails, the substance of protestor's argument raised in its RCFC 60(b)(2) motion also fails. "Under FAR § 9.504(a), a CO [contracting officer] must '[i]dentify and evaluate potential organizational conflicts of interest as early in the acquisition process as possible' and '[a]void, neutralize, or mitigate *significant potential conflicts* before contract award." Turner Constr. Co. v. United States, 645 F.3d 1377, 1386 (Fed. Cir.) (emphasis and alterations in original) (quoting FAR § 9.504(a)), reh'g en banc denied (Fed. Cir. 2011); see also FAR § 9.504(a) (2018). "'A significant potential conflict of interest is one which provides the bidding party a substantial and unfair competitive advantage during the procurement process on information or data not necessarily available to other bidders.'" Turner Constr. Co. v. United States, 645 F.3d at 1386 (quoting PAI Corp. v. United States, 614 F.3d at 1352); see also ViON Corp. v. United States, 122 Fed. Cl. 559, 579 (2015) (quoting Turner Constr. Co. v. United States, 645 F.3d at 1386). "However, the FAR recognizes that the identification of OCIs and the evaluation of mitigation proposals are fact-specific inquiries that require the exercise of considerable discretion." Axiom Res. Mgmt., Inc. v. United States, 564 F.3d at 1381-82 (citing FAR § 9.505); see also Monterey Consultants, Inc. v. United States, 120 Fed. Cl. 567, 572 (2015). Therefore, "[t]he CO has considerable discretion in determining whether a conflict is significant." Turner Constr. Co. v. United States, 645 F.3d at 1386 (citing PAI Corp. v. United States, 614 F.3d at 1352); see also Parcel 49C Ltd. P'ship v. United States, 130 Fed. Cl. 109, 123 (2016) (citing PAI Corp. v. United States, 614 F.3d at 1352). The identification of an OCI "must be based on 'hard facts; a mere inference or suspicion of an actual or apparent conflict is not enough.'" Turner Constr. Co. v. United States, 645 F.3d at 1387 (quoting PAI Corp. v. United States, 614 F.3d at 1352); see also Loch

---

[20] Moreover, in the March 28, 2019 declaration signed by Philip Roman, Philip Roman states that he helped prepared Sigmatech's quotation in response to the TORFQ. In Sigmatech's quotation, Sigmatech had discussed its proposed performance and use of FAST. See Sigmatech, Inc. v. United States, 141 Fed. Cl. at 293. Philip Roman also stated that, as the incumbent contractor, Sigmatech employees used FAST during performance of Sigmatech's prior task order, albeit "sparingly." Philip Roman, therefore, appears to have been aware that performance of the task order issued to DigiFlight under the TORFQ would require at least some use of FAST. In the April 10, 2019 declaration signed by KBRWyle employee Stephen Smith, Mr. Smith asserts that Sigmatech employees have access to FAST and use FAST "frequently." Although the court's public Opinion redacted all of the references to DigiFlight's use of FAST, in his March 28, 2019 declaration, Mr. Roman states, "[b]ecause of my knowledge of SAMD operations, I quickly knew the name of the Program" after reading the public version of the court's Opinion. Given Mr. Roman's knowledge of FAST and SAMD operations, it is unclear why Mr. Roman did not realize that the publicly available copy of KBRWyle's DT-16-1389 performance work statement, which involved KBRWyle developing or producing a software system with the same functions and requirements as FAST, may have involved FAST.

Harbour Grp., Inc. v. United States, 128 Fed. Cl. 294, 302 (2016) ("But, to prove an OCI, LHG [protestor] must identify hard facts to support this claim. A mere inference or suspicion of an actual or apparent conflict is not enough." (citing PAI Corp. v. United States, 614 F.3d at 1352)); Macaulay-Brown, Inc. v. United States, 125 Fed. Cl. 591, 602 (2016) (quoting Turner Constr. Co. v. United States, 645 F.3d at 1387).

An "impaired objectivity" OCI "occurs when a government contractor has conflicting obligations under different government contracts, that compromises the contractor's ability to render impartial judgment." See Axiom Res. Mgmt., Inc. v. United States, 78 Fed. Cl. at 592 n.17 (citing FAR § 9.505-3; and Aetna Gov't Health Plans, Inc., B-254397 et al., 1995 WL 449806, at *8-9 (Comp. Gen. July 27, 1995)); see also L-3 Commc'ns Corp. v. United States, 99 Fed. Cl. 283, 297 (2011) ("The impaired objectivity OCI occurs 'where a firm's work under one contract might require it to evaluate itself under another contract.'" (quoting Turner Constr. Co. v. United States, 94 Fed. Cl. 561, 569 (2010), aff'd, 645 F.3d 1377 (Fed. Cir. 2011))). A judge of the United States Court of Federal Claims has stated that the "primary concern" of an impaired objectivity OCI is that "a firm might not be able to render 'impartial advice.'" Turner Constr. Co. v. United States, 94 Fed. Cl. at 569 (quoting Aetna Gov't Health Plans, Inc., 1995 WL 449806, at *8); see also A-P-T Research, Inc., B-413731.2, 2017 WL 1462127, at *9 (Comp. Gen. Apr. 3, 2017) (stating that an impaired objectivity OCI "principally concerns the contractor's ability to perform its contractual obligations free of improper bias"). "In order to show an 'impaired objectivity' OCI, there must be hard facts showing that 'a government contractor's ""work under one government contract could entail its evaluating itself, either through an assessment of performance under another contract or an evaluation of proposals."""" Aegis Techs. Grp., Inc. v. United States, 128 Fed. Cl. 561, 575 (2016) (quoting Ala. Aircraft Indus., Inc.-Birmingham v. United States, 83 Fed. Cl. 666, 687 (2008) (quoting Aetna Gov't Health Plans, Inc., 1995 WL 449806, at *9), rev'd on other grounds, 586 F.3d 1372 (Fed. Cir. 2009)).

The case law in this court indicates that, under RCFC 60(b)(2), the court only is able to consider evidence that occurred before the court's issuance of its November 30, 2018 Opinion because "newly discovered evidence" under RCFC 60(b)(2) "only encompasses facts which existed at the time the court made its decision and entered judgment." See Q Integrated Cos., LLC v. United States, 131 Fed. Cl. at 132 (citing TDM Am., LLC v. United States, 100 Fed. Cl. at 490). In protestor's motion for relief from judgment, protestor argues that, "since performance began, the Program [FAST] has enjoyed a renaissance at SAMD. Several divisions have reversed course, and now intend to use the Program." When the court issued its November 30, 2018 Opinion in the above-captioned case, performance under the DigiFlight Task Order was voluntarily stayed by defendant and DigiFlight had not begun performance under the DigiFlight Task Order. According to Ashantas Cornelius' April 15, 2019 Determination and Findings, Team DigiFlight's performance under the DigiFlight Task Order commenced in February 2019. Allegations concerning a "renaissance" "since performance" of the DigiFlight Task Order "began" under the DigiFlight Task Order, therefore, involve events that occurred after the court issued its November 30, 2018 Opinion. Protestor's alleged events involving the alleged "renaissance" that has occurred "since performance began" under the DigiFlight

Task Order do not constitute "newly discovered evidence" under RCFC 60(b)(2) because the alleged "renaissance" had not yet occurred at the time when the court issued its November 30, 2018 Opinion and after the Clerk's Office entered judgment that same day.

Regarding the 1389 SAMD Task Order, which was in existence when the court issued its November 30, 2018 Opinion and judgment and was addressed therein, in the April 15, 2019 Determination and Findings, Ashantas Cornelius asserts that, "[w]hile KBRWyle can make recommendations as to the use of and changes to FAST, it is the Government that determines if it will use the services provided by FAST and what changes it would like to see to the program to better support the mission." Ashantas Cornelius concludes that KBRWyle's "performance of the DTIC DS-TAT task orders does not create an impaired objectivity organizational conflict of interest that would impact its ability to provide impartial advice to the Government or otherwise jeopardize contractor performance."

The 1389 SAMD Task Order that KBRWyle is performing is an incrementally funded task order "established in the amount of $43,679,493 for a period of fifty-seven (57) months." The $43,679,493.00 consists of "ESTIMATED COST" amounts that are listed as not-to-exceed amounts, as well as a "FIXED FEE" amount of $2,239,210.00. (capitalization in original). The 1389 SAMD Task Order indicates that the task order is "CPFF" (cost-plus-fixed-fee). "A cost-plus-fixed-fee contract is a cost-reimbursement contract that provides for payment to the contractor of a negotiated fee that is fixed at the inception of the contract." FAR § 16.306(a) (2019).

As stated by Ashantas Cornelius in the April 15, 2019 Determination and Findings, "KBRWyle can make recommendations as to the use of and changes to FAST" under the DigiFlight Task Order, although "it is the Government that determines if it will use the services provided by FAST and what changes it would like to see to the program to better support the mission." If there are government-approved changes to FAST under the DigiFlight Task Order, KBRWyle would make those changes to FAST pursuant to the 1389 SAMD Task Order. The increased work associated with changes to FAST would not increase the fixed fee being paid to KBRWyle under the 1389 SAMD Task Order, although KBRWyle would be able to bill for additional work at the same costs and rate of fees if the use of FAST is increased by the government. The possible financial benefit to KBRWyle, however, is speculative. None of the parties have addressed KBRWyle's compensation under the 1389 SAMD Task Order in any depth. In Ashantas Cornelius' April 15, 2019 Determination and Findings, Ms. Cornelius states that the 1389 SAMD "task order supporting the FAST programs is for labor only, supporting the necessary data updates, and the report and data analysis," but she did not further discuss the definition of "labor" under the 1389 SAMD Task Order. Moreover, FAST is available to a number of Department of Defense programs, which could account for other increases in FAST utilization.

It also is speculative as to how much work would be generated if the government accepted a KBRWyle proposed change to FAST under the DigiFlight Task Order and required KBRWyle to make a proposed change under the 1389 SAMD Task Order.

According to the April 15, 2019 Determination and Findings, KBRWyle employees under the 1389 SAMD Task Order and the DigiFlight Task Order "are performing different tasks even though they are from the same company" and "are not co-located and have very little to no interaction concerning work duties and responsibilities." In the April 10, 2019 declaration signed by KBRWyle employee Zach Smith, Mr. Smith indicates that KBRWyle employees performing under the 1389 SAMD Task Order provide updates to FAST for when "the Army upgrades its operating systems (ie, Windows 7, 8, 10) and upgrades its Army Financial databases." Zach Smith further asserts that, "[o]ver the last 15 years, 27 customized reports have been added to FAST by request of SAMD and as requirements change, more customized reports may be added." Protestor argues that KBRWyle's position as a subcontractor under the DigiFlight Task Order permits KBRWyle to "'drive work to itself,'" but the record is speculative as to the extent of actual work KBRWyle is able to propose to government decisionmakers and potentially have accepted by the government. None of the parties have sufficiently addressed the type of or the extent of recommendations to FAST that KBRWyle can propose under the DigiFlight Task Order or a probable number of such recommendations. The record does not provide the court with sufficient information to conclude that the government's use of FAST will or will not increase in performance because of KBRWyle proposed recommendations which may be proposed to government officials for review and potential acceptance.

Moreover, Ashantas Cornelius' April 15, 2019 Determination and Findings suggests that there is substantial government oversight of KBRWyle's performance under the DigiFlight Task Order. According to Ashantas Cornelius, the "Chiefs" of "Divisions/Branches determine at their discretion if the use of the FAST program is necessary and affordable in support of their missions."[21] It does not appear that KBRWyle is involved with the decisions of the "Chiefs" as to whether FAST is necessary for a SAMD Branch or that KBRWyle provides any recommendation regarding a decision as to whether a particular SAMD branch will use FAST. Ashantas Cornelius further asserts in her April 15, 2019 Determination and Findings that, if FAST is required, "the division/branch chiefs determine what information is needed and/or required based upon their mission requirements. The appropriate Government supervisors within the divisions/branches provide additional oversight and recommendations to the data required and requested with approval through the Division/Branch chiefs." A contracting officer's representative also provides "oversight," although Ashantas Cornelius did not discuss the role of the contracting officer's representative in providing oversight.

Protestor argues: "That a government official makes the final decision on a recommendation does not cure an organizational conflict of interest." Based on the court's review of decisions involving OCI allegations, in certain situations, government oversight may not be sufficient to prevent an OCI from occurring or sufficient to remedy an identified OCI. See Nortel Gov't Sols., Inc., B-299522.5 et al., 2008 WL 5473616, at *5 (Comp. Gen. Dec. 30, 2008) (stating that "[o]ur conclusion that a potential impaired objectivity

---

[21] Based on Ashantas Cornelius' April 15, 2019 Determination and Findings, only two of the six SAMD divisions and one SAMD branch used FAST at the time of her April 15, 2019 Determination and Findings.

OCI exists is not altered by" the agency's assertion that "it does not rely on the EMS [enterprise management system] contractor alone for advice, nor by its reliance on the fact that the government retains the ultimate decisionmaking authority" when agency personnel had indicated "it would be 'negligent' not to have the" contractor's advice). In other situations, government oversight may prevent an impaired objectivity OCI from occurring or mitigate an impaired objectivity OCI. See Wyle Labs., Inc., B-288892 et al., 2001 WL 1735068, at *4 (Comp. Gen. Dec. 19, 2001) ("[T]he Air Force reports that well before the RFP [request for proposal] was issued, the source selection evaluation team considered whether a potential conflict of interest problem existed, and determined that operation of the AFPSL [Air Force Primary Standards Laboratory] and one or more PMELs [Precision Measurement Equipment Laboratories] by the same contractor would not constitute a conflict of interest because government personnel are responsible for monitoring and measuring contractor performance under both contracts and rely primarily on information other than feedback from other contractors in performing these functions. We see nothing unreasonable in this determination." (internal reference omitted)). Protestor's attempted, asserted bright-line rule "[t]hat a government official makes the final decision on a recommendation does not cure an organizational conflict of interest" fails because, as the United States Court of Appeals for the Federal Circuit has recognized, "the identification of OCIs and the evaluation of mitigation proposals are fact-specific inquiries that require the exercise of considerable discretion." Axiom Res. Mgmt., Inc. v. United States, 564 F.3d at 1381-82 (citing FAR § 9.505).

In the court's November 30, 2018 Opinion, the court stated:

Sigmatech has not demonstrated why Team DigiFlight will be unable to provide impartial advice on the interoperability of weapon systems and subsystems due to KBRWyle's provision of Scientific and Technical Information to the Army in order to provide "improved reliability, interoperability, and reduced cost of ownership for all AMCOM managed aviation and missile FMS programs," as KBRWyle is doing under the 1389 SAMD Task Order. The purposes of the task orders [the 1389 SAMD Task Order and the DigiFlight Task Order] simply do not conflict or entail evaluating the performance of other contractors.

Sigmatech, Inc. v. United States, 141 Fed. Cl. at 334. The court's above-quoted conclusion in its November 30, 2018 Opinion still remains true, even after considering the additional arguments asserted by protestor. KBRWyle's role under the DigiFlight Task Order may permit KBRWyle to provide recommendations on how the Army should update FAST, but the ultimate decision as to whether to use FAST, and whether to accept any of KBRWyle's proposed changes to FAST, appears to remain with the government officials. Moreover, there is no evidence indicating that, under the DigiFlight Task Order, KBRWyle will be evaluating KBRWyle's performance under the 1389 SAMD Task Order. Under the DigiFlight Task Order, KBRWyle only appears to have the ability to make recommendations regarding FAST to government employees, and government contracting officers and government supervising personnel must make the final decisions as to KBRWyle's proposed recommendations.

It also is less than clear, what financial benefit, if any, KBRWyle receives if KBRWyle recommended changes to FAST are approved by government officials. As discussed above, judges of this court have stated that a motion for relief under RCFC 60(b)(2) should be granted if actual newly discovered evidence "'"'"clearly would have produced a different result if presented before the original judgment."'"'" See, e.g., Spengler v. United States, 128 Fed. Cl. at 344 (quoting Venture Indus. Corp. v. Autoliv ASP, Inc., 457 F.3d at 1328 (quoting Good v. Ohio Edison Co., 149 F.3d at 423)).[22] Under a standard such as the "clearly would have produced a different result" standard, protestor's motion under RCFC 60(b)(2) fails because the lack of an established, non-speculative benefit to KBRWyle and because government officials decide, without input from KBRWyle, whether even to use FAST. Moreover, government officials are trained in FAST and retain the authority as to whether to approve a KBRWyle recommended change to FAST. On the record before the court, the court is not persuaded that, as suggested in protestor's RCFC 60(b)(2) motion, the knowledge protestor now contends is newly discovered "'"'"clearly would have produced a different result if presented before the original judgment."'"'" See, e.g., Spengler v. United States, 128 Fed. Cl. at 344 (quoting Venture Indus. Corp. v. Autoliv ASP, Inc., 457 F.3d at 1328 (quoting Good v. Ohio Edison Co., 149 F.3d at 423)). Because of the uncertainty as to the benefits KBRWyle could receive and because of the asserted, and uncontroverted, extensive government control on decisions involving FAST, protestor's motion would fail if protestor's RCFC 60(b)(2) motion relied on newly discovered evidence.

Other judges of this court also have stated that newly discovered evidence must be "'material, not merely impeaching or cumulative, and that a new trial would probably produce a different result.'" TDM Am., LLC v. United States, 100 Fed. Cl. at 490 (emphasis added) (quoting Yachts Am., Inc. v. United States, 8 Cl. Ct. at 281). Although

---

[22] In Venture Industries Corp., the United States Court of Appeals for the Federal Circuit was addressing an appeal of the United States District Court for the Eastern District of Michigan's denial of a motion for relief from judgment under Rule 60(b)(2) of the Federal Rules of Civil Procedure. See Venture Indus. Corp. v. Autoliv ASP, Inc., 457 F.3d at 1323. The United States Court of Appeals for the Federal Circuit quoted a case from the United States Court of Appeals for the Sixth Circuit and stated: "'In order to prevail on a Rule 60(b)(2) motion, a movant must demonstrate . . . that the evidence is material and controlling and clearly would have produced a different result if presented before the original judgment.'" Id. at 1328 (omission in original) (quoting Good v. Ohio Edison Co., 149 F.3d at 423). In a different case, the United States Court of Appeals for the Federal Circuit stated that relief under RCFC 60(b)(2) "is a procedural issue on which we apply regional circuit law." Schreiber Foods, Inc. v. Beatrice Cheese, Inc., 402 F.3d 1198, 1204-05 (Fed. Cir. 2005) (citing Engel Indus., Inc. v. Lockformer Co., 166 F.3d 1379, 1384 (Fed. Cir. 1999)). In its motion for relief from judgment under RCFC 60(b)(2), protestor quotes Venture Industries Corp. and argues that the court should grant a RCFC 60(b)(2) motion when the alleged newly discovered evidence "clearly" would produce a different result. (internal quotation marks and citation omitted).

the difference between "clearly" and "probably" may be difficult to quantify, "probably" producing a different result appears to be a lower standard than "clearly" producing a different result.[23] In the above-captioned protest, given the unresolved questions identified in this Order, it is speculative from the record whether the protestor's argument involving FAST even would "'probably produce a different result.'" See TDM Am., LLC v. United States, 100 Fed. Cl. at 490 (quoting Yachts Am., Inc. v. United States, 8 Cl. Ct. at 281).[24]

In addition to the impaired objectivity OCI discussed above, protestor separately argues in its RCFC 60(b)(2) motion that it was arbitrary and capricious to assign Sigmatech's quotation a strength "based on its ability to support and modify the Program [FAST] because the Agency pays the Team Member [KBRWyle] to support and modify the Program [FAST]." The court finds unpersuasive protestor's argument that it was unreasonable for the Army to assign DigiFlight's quotation a strength because the reasoning the Army provided regarding its decision to award a strength to sections 2.1.1 and 2.1.3 of DigiFlight's quotation was much broader than just Team DigiFlight's ability to support FAST. See Sigmatech, Inc. v. United States, 141 Fed. Cl. at 318-19. The Army awarded a strength to sections 2.1.1 and 2.1.3 of DigiFlight's quotation based on, among other reasons, Team DigiFlight's "superior understanding of multiple SAMD databases'" and "'specialized knowledge and experience in both legacy and current data systems,'" as stated in the court's November 30, 2018 Opinion. See id. Protestor's argument that the Army should not have awarded a strength to sections 2.1.1 and 2.1.3 of DigiFlight's quotation, therefore, also would fail.

---

[23] Because protestor's RCFC 60(b)(2) motion, as discussed above, does not rely on newly discovered evidence, the court need not resolve whether the standard under RCFC 60(b)(2) should be "clearly" producing a different result or "probably" producing a different result.

[24] As stated above, protestor separately argues in its RCFC 60(b)(2) motion that KBRWyle "did not disclose any possible conflicts of interest" on its Organizational Conflict of Interest Certification submitted as part of DigiFlight's quotation in response to the TORFQ, and that DigiFlight, therefore, should have been disqualified from the procurement under the TORFQ. In its reply in support of its RCFC 60(b)(2) motion, protestor argues that, "[e]ven if there were no actual conflict of interest, the Agency and DigiFlight both ignore that KBRWyle's failure to disclose a **possible** organizational conflict of interest should have disqualified Team DigiFlight from award." (emphasis in original). Although defendant and defendant-intervenor did not address protestor's allegation of a basis to have disqualified DigiFlight, there is an absence of proof in the record of such a necessary disclosure and disqualification basis, and protestor's RCFC 60(b)(2) motion does not rely on newly discovered evidence.

**CONCLUSION**

Protestor's motion for relief from judgment under RCFC 60(b)(2) is **DENIED**. On or before **Wednesday, July 10, 2019**, the parties shall propose redactions to this Order. The parties shall provide an explanation to support each proposed redaction.

     **IT IS SO ORDERED.**

<u>s/Marian Blank Horn</u>
**MARIAN BLANK HORN**
**Judge**